Patrick J. Neligan, Jr.
Texas State Bar No. 14866000
James P. Muenker
Texas State Bar No. 24002659
**NELIGAN LLP**
325 North St. Paul Street, Suite 3600
Dallas, Texas 75201
Telephone: (214) 840-5300
Facsimile: (214) 840-5301
Email: pneligan@neliganlaw.com
Email: jmuenker@neliganlaw.com

*Attorneys for Consumer Borrowers*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| In re:<br><br>EVENTIDE CREDIT ACQUISITIONS, LLC,<br><br>                            Debtor. | Chapter 11<br><br>Case No. 20-40349-elm11 |

### CONSUMER BORROWERS' MOTION FOR AN ORDER DISMISSING THE DEBTOR'S CHAPTER 11 CASE OR, IN THE ALTERNATIVE, FOR ABSTENTION

Consumer Borrowers and Class Plaintiffs Lula Williams, John Actis II, Rose Marie Buchert, Dowin Coffy, Dominique De La Bay, Dana Duggan, Lori Fitzgerald, Renee Galloway, Derek Geter, Sonji Grandy, Lucinda Gray, Anthony Green, Keisha Hamm, George Hengle, Chris Kobin, Lamesha Kondo, Desiree Wright Lovins, Linda Madison, Lisa Martinez, Victoria Renee McKoy, Andrea Mendez, Kevin Stanley Minor, Regina Nolte, Sharon Paavo, Tasha Pettiford, Kimberly Pool, Burry Pough, Andrea Scarborough, Anastasia Sherman, Marcella Singh, Carrie Samantha Smith, Richard L. Smith Jr., Teresa Titus, and Latanya Tarleton (collectively, the "Consumer Borrowers") hereby move for an order, pursuant to Section 1112(b) of title 11 of the United States Code (the "Bankruptcy Code"), dismissing the Chapter 11 proceeding of Eventide

Credit Acquisitions LLC ("Eventide" or the "Debtor") or, in the alternative, requesting that the Court abstain from hearing the above-referenced case in accordance with Section 305 of the Bankruptcy Code (this "Motion"). In support of this Motion, the Consumer Borrowers show the following:

## I. PRELIMINARY STATEMENT

1. The Bankruptcy Code provides the proverbial "honest but unfortunate" debtor an opportunity to reorganize its business and/or financial affairs. However, the Bankruptcy Code expressly recognizes that certain types of cases (and certain types of debtors) simply do not belong in bankruptcy court. As such, the Bankruptcy Code vests this Court with broad discretion to address improper bankruptcy filings through either dismissal or abstention. Among those are cases in which a debtor attempts to utilize the Bankruptcy Code as a litigation tactic and/or to forum shop. This is a quintessential example of one of those cases.

2. Here, the Debtor has a single asset (a promissory note), no operations, no employees, and no need to reorganize. Its sole purpose is to function as a conduit for payments on the promissory note, which are then distributed to the Debtor's insiders, namely Matt and Justin Martorello. The Debtor has no vendors, no landlords, no secured lender and no customers. Instead, its legitimate creditors consist almost exclusively of consumer borrowers, like the movants, who paid usurious interest on installment loans, and the law firms representing the Debtor and/or the Martorellos. Further, the Debtor's sole asset will cease to exist as of January 26, 2023, when any remaining balance on the note is contractually forgiven, regardless of the amount of payments that the Debtor has received at that time.

3. The Debtor is here to forum shop, not to reorganize. As described below, the Debtor commenced this bankruptcy case after multiple unfavorable rulings and only after

unsuccessful attempts in other forums (including proceedings initiated by the Debtor itself) to halt a class action settlement involving a nationwide class of consumers who were victims of Martorello's illegal lending scheme. The forums in which those matters are already pending (including an arbitration proceeding commenced by the Debtor) are best positioned to resolve those disputes, and the Debtor cannot show that a reorganization under the Bankruptcy Code is either necessary or possible. Indeed, Martorello, who is the indirect majority owner and also serves as President of the Debtor, recently filed an objection in this Court characterizing the "Plaintiffs' claims" as "nothing more than a trumped-up choice of law dispute" which "this Court can determine swiftly as a matter of law, particularly in light of the recent 4th Circuit's findings." Dkt. 81 at ¶ 4. This, of course, works both ways and supports dismissing this bankruptcy case and letting the courts who have already considered the choice-of-law issues resolve the claims and other disputes between the parties.

4.       In reality, the Debtor's bankruptcy filing was for the sole purpose (and upon the assumption) that Martorello believes he will be more successful in this Court than in the Eastern District of Virginia, where Martorello's choice-of-law arguments have been rejected on five separate occasions by four different judges.[1] Other than bad faith forum shopping to benefit Martorello and his joint tortfeasors, there is simply no valid bankruptcy purpose to be served by this case. Accordingly, for the reasons set forth below, the Consumer Borrowers respectfully request that the Court dismiss this case or abstain.

---

[1] *See Hengle v. Asner*, 2020 WL 113496, at *23 (E.D. Va. Jan. 9, 2020); *Gibbs v. Haynes Invs., LLC*, 368 F. Supp. 3d 901, 929 n.49 (E.D. Va. 2019); *Gibbs v. Stinson*, 2019 WL 4752792, at *28 n.63 (E.D. Va. 2019); *Williams v. Big Picture Loans, LLC*, No. 3:17-cv-461, ECF No. 119 (March 12, 2018) (Order); Transcript of Motions Hearing at 19, *Hayes v. Delbert Servs. Corp.*, No. 3:14-cv-258-JAG (Nov. 4, 2016) (indicating that the Court was not going to dismiss the plaintiffs RICO claims based on tribal choice-of-law).

## II. RELEVANT FACTUAL BACKGROUND

### A. Events Leading to Bankruptcy

(1)     Martorello's Illegal Lending Scheme

5.      The following discussion sets forth an abbreviated recitation of a portion of the facts that support the relief requested in this Motion.  Additional detail regarding the factual and procedural background of the existing disputes between the Consumer Borrowers and the usurious and illegal lending businesses orchestrated by Matt Martorello and others is set forth in the *Class Plaintiffs' Opposition to Motion for Preliminary Injunction* [Adv. No. 20-04008, Docket No. 15], and will be presented at the evidentiary hearing on the Motion.

6.      Beginning in 2011, Martorello partnered with the Lac Vieux Desert Band of Lake Superior Chippewa Indians (the "Tribe") to make loans over the internet that typically exceed 500% interest and violate state usury laws. The lending scheme has operated in two distinct phases.

7.       From 2011 to 2016 (the "Initial Phase"), Martorello and his companies, including Bellicose Capital, LLC ("Bellicose"), partnered with Tribe-owned Red Rock Tribal Lending, LLC ("Red Rock"). Ex. 1, Oct. 25 2011 Servicing Agreement. Although characterized as a "servicing agreement," the contract provided Martorello's companies with the authority to exercise almost exclusive control over Red Rock's operations. *See generally id*. For example, the contract provided that Bellicose VI "shall have the authority and responsibility over all communication and interaction whatsoever between [Red Rock] and each service provider, lender and other agents of [Red Rock]." *Id*. at § 3.1; *see also id*. at § 4.1.1 (granting Bellicose VI "the necessary power and authority to act in order to fulfill its responsibilities" under the contract). In exchange for running the business, Martorello's company received 98% of the gross income of the lending enterprise, Red Rock received 1% of the gross revenue, and a company owned by Robert Rosette, the Tribe's lawyer, received 1% of the gross revenue. *Id*. at § 3.5.1; *id*. at 2.25; *id*. § 7.15.

8. As explained by the former Vice Chairwoman of the Tribe: "When Tribal Council initially agreed to the deal with Martorello," they "understood that all aspects of the lending business would be handled by Martorello and that the Tribe would have no risk. It was understood that Martorello's company would handle everything, including underwriting, marketing, servicing, funding, and collection of the loans." Ex. 2 at ¶¶ 2-3. As she further explained: "[a]fter the inception of the business, it was operated completely by Martorello until government regulators and litigation against competitors began. As these cases proceeded, efforts were made to create the appearance of the Tribe's involvement, but the Tribe had no substantive involvement." *Id*. at ¶ 4.

9. In 2013, the New York Department of Financial Services issued cease and desist letters to a variety of online lenders and other entities, including Red Rock.[2] Without disclosing the dominant role of Martorello in its operations, Red Rock filed a lawsuit in August 2013, seeking declaratory relief and a preliminary injunction that tribal businesses were inherently sovereign nations and not subject to New York law. *Otoe-Missouria Tribe v. N.Y. Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 356 (S.D.N.Y. 2013), *aff'd*, 769 F.3d 105 (2d Cir. 2014). The district court denied Red Rock's request for a preliminary injunction on September 30, 2013, finding that the "undisputed facts demonstrate[d]" that the illegal activity was "taking place in New York, off of the Tribes' lands," and thus, Red Rock was "subject to the State's non-discriminatory anti-usury laws." *Id*. at 361. The court reasoned, "There is simply no basis… that the Tribes are treated differently from any other individuals or entities that enter New York to lend to New York residents." *Id*.

---

[2] *See, e.g.*, The Official Website of New York State, Press Room, *Cuomo Administration Demands 35 Companies Cease and Desist Offering Illegal Online Payday Loans That Harm New York Consumers* (Aug. 6, 2013), *available at* https://www.governor.ny.gov/news/cuomo-administration-demands-35-companies-cease-and-desist-offering-illegal-online-payday-loans.

10. Two days later, Martorello wrote that the decision "presents a significant potential liability for [Bellicose] and we do not believe that we should service any new New York loans." Ex. 3 at Rosette 06304-5. Martorello further added that they were willing to see existing loans through completion, "but [they] simply cannot flaunt the clear ruling from Judge Sullivan's order, however legally incorrect it might be." *Id*. Martorello further stated a concern that the "finding that tribal enterprises are subject to New York's anti-usury laws will be regarded as sufficiently final… such that it will precipitate their potential investigation and potential prosecution of us personally and our companies if we continue" to conduct business in New York. *Id*.

11. Two weeks after the district court's decision, Martorello had come up with a solution to reduce his liability and approached Robert Rosette regarding a restructure to protect Martorello/Bellicose. *See generally* Ex. 4. In an e-mail dated October 14, 2013, with a subject matter entitled "LVD to take ownership of Bellicose VI," Martorello presented some options for a restructure so that Bellicose could attempt to share in the LVD's immunity. *Id.* (emphasis added). Martorello proposed that Bellicose would "[a]ssign today LVD 51% of Bellicose via Equity only membership interest tied to the SPVI subsidiary only." *Id*. (emphasis in original).

12. Additionally, Martorello proposed assigning 51% of the interests in his other businesses involved in the scheme. *Id*. Anticipating the business would be shut down, Martorello further proposed that BlueTech, his trust, would "own 49% equity, but 100% profits interests until month 49," *i.e.*, ensuring Martorello would retain the profits until the business was gone. *Id*. Martorello's e-mail candidly explained that the transaction must be "structured to provide all entities sovereign immunity." *Id*. (emphasis added).

13. A few weeks later, Martorello continued to voice his concerns to Karrie Wichtman. In this e-mail dated October 29, 2013, Martorello informed Wichtman that vendors and finance

providers of Red Rock were "asking what would happen to everything if the ruling in NY were upheld[?]" Ex. 5. The repercussions, according to Martorello's e-mail, would be "<u>certain death</u>" and "all vendors including [SourcePoint], banks, ACH processors, bureaus etc would all obviously shut down if it were considered off reservation activity[.]" *Id.* (emphasis added).[3]

14. On November 8, 2013, Martorello sent a similar e-mail to Wichtman, explaining that Red Rock was "down now about 55% from where it was in July," and Martorello further added that SourcePoint was "about to be discovered and will need extreme resources to defend itself against all kinds of aiding and abetting and 'true lender' claims" coming in the first quarter of 2014. Ex. 6 at Rosette_Revised_052787. And similar to his earlier emails, Martorello reiterated

---

[3] In this and the related litigation, Martorello has attempted to distort the parameters of sovereign immunity, especially after the Fourth Circuit's decision in *Williams*. According to Martorello's submissions, tribal sovereign immunity allows tribal businesses, as well as those that partner with them, provide everyone involved with a free pass to violate state laws. This is simply wrong—"[t]ribal sovereign immunity [] limits how states can enforce their laws against tribes or arms of the tribes, but… it does not transfigure debts that are otherwise unlawful under RICO into lawful ones." *United States v. Neff*, 787 F. App'x 81, 92 (3d Cir. 2019) (unpublished); *see also Kiowa Tribe of Oklahoma v. Mfg. Techs., Inc.*, 523 U.S. 751, 755 (1998) ("There is a difference between the right to demand compliance with state laws and the means available to enforce them."); *Fla. Paraplegic, Ass'n, Inc. v. Miccosukee Tribe of Indians of Fla.*, 166 F.3d 1126, 1130 (11th Cir. 1999) ("whether an Indian tribe is subject to a statute and whether the tribe may be sued for violating the statute are two entirely different questions."). In other words, "a debt can be 'unlawful' for RICO" or state usury purposes "even if tribal sovereign immunity might stymie a state civil enforcement action or consumer suit[.]" *Id.*; *see also Gingras v. Think Fin., Inc.*, 922 F.3d 112, 128 (2d Cir. 2019), *cert. denied*, 2020 WL 129562 (U.S. Jan. 13, 2020) (a tribe's "immunity is a shield, [] not a sword" and "[t]ribes and their officers are not free to operate outside of Indian lands without conforming their conduct in these areas to federal and state law.").

Although Martorello now postures that the Fourth Circuit's decision absolves him of liability, it does nothing of the sort. As the Fourth Circuit made clear: "the potential merit of the borrowers' claims against Big Picture and Ascension—and the lack of a remedy for those alleged wrongs—does not sway the tribal immunity analysis." *Williams v. Big Picture Loans, LLC*, Case No. 18-1827 (4th Cir. 2019). What really matters—as evidenced by Martorello's internal email from years ago—is whether the lending constitutes "off the reservation" activity. The answer to this question is easy, and courts have universally held that state substantive laws apply to these loans because the conduct at issue revolves around conduct occurring outside the reservation. *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 121 (2d Cir. 2019) ("The Tribal Defendants here engaged in conduct outside of Indian lands when they extended loans to the Plaintiffs in Vermont."); *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 361 (S.D.N.Y. 2013) ("The undisputed facts demonstrate that the activity the State seeks to regulate is taking place in New York, off of the Tribes' lands."); *Colorado v. W. Sky Fin., L.L.C.*, 845 F. Supp. 2d 1178, 1181 (D. Colo. 2011) ("Business conducted over the Internet that would confer jurisdiction on a state court also demonstrates that the business activity constitutes off-reservation activity."); *United States v. Hallinan*, 2016 WL 7477767, at *1 (E.D. Pa. Dec. 29, 2016) ("Because the loans at issue involve activity that takes place, at least in part, off a reservation, state law still applies."); *see also Jackson v. Payday Fin., LLC*, 764 F.3d 765, 782 (7th Cir. 2014) (finding, in the context of tribal jurisdiction, that "the Plaintiffs have not engaged in <u>any</u> activities inside the reservation. They did not enter the reservation to apply for the loans, negotiate the loans, or execute loan documents.") (emphasis in original); *Hengle v. Asner*, No. 3:19CV250 (DJN), 2020 WL 113496 (E.D. Va. Jan. 9, 2020) (same).

that there was a "very significant possibility that should we even survive long enough to get there," he would need "to defend [him]self even personally (in more than civil matters), with no ongoing business or revenue at all should the decision be made in the appeal that the activity is in fact OFF reservation (a certain end to the industry)." *Id*. (capitals in original).

15.     Over the next month, the parties did not make significant progress on the key terms or mechanics of the sale, but on October 1, 2014, it became urgent when the Second Circuit affirmed the district court's decision in *Otoe-Missouria*. In doing so, the Second Circuit made several damaging findings, including that "New York's usury laws apply to all lenders, not just tribal lenders[.]" *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 117 (2d Cir. 2014). The Second Circuit also observed that "Native Americans 'going beyond the reservation boundaries' must comply with state laws as long as those laws are 'non-discriminatory [and] … otherwise applicable to all citizens of that [State]." *Id.* (citations omitted). Against this backdrop, the Second Circuit observed that "[m]uch of the commercial activity at issue takes place in New York." *Id*. It reached all of these conclusions even though LVD/Red Rock never disclosed to the district court or Second Circuit the role of Martorello's companies in the operations. *See generally* 769 F.3d 105.

16.     After the Second Circuit issued its decision, Martorello wrote an e-mail to Wichtman on October 10, 2014, urging her to drop the case. Ex. 7 at Rosette 043659 ("I can't urge any stronger that LVD not proceed even if [O]toe does."). Martorello also indicated that "SPVI won't be willing to testify, or do anything as the result of another filing will certainly end in a slew of attacks on me, SPVI and my team." *Id*. Ultimately, Wichtman agreed, and as she explained in a subsequent e-mail to Martorello, their best option was to "***go quietly into the night and***

*restructure* based on what we know from the opinion in order to build an even stronger case for future litigation." Ex. 8 at Rosette 001130 (emphasis added).

17.     Following the Second Circuit's decision, Martorello created a new company, Eventide Credit Acquisitions, LLC, on February 9, 2015, in an effort to exploit sovereign immunity and conceal his role. Ex. 9. After months of negotiations, Martorello and the Tribe reached the basic terms of the restructure, which are embodied in an "Agreement and Plan of Merger" dated September 14, 2015. *See generally* Ex. 10.

18.     Pursuant to § 2.7 of the Agreement and Plan of Merger, Martorello "sold" Bellicose to the LVD in exchange for a $300,000,000 promissory note to Eventide, which sunsets after 7 years. *Id.* § 2.7. The transactions under the Merger Documents closed on January 26, 2016, thereby commencing the Second Phase of the lending scheme which continues to this day (the "Second Phase"). Ex. 11.

(2)     The litigation against Martorello.

19.     As feared, Martorello's lending enterprise and his violations of state and federal laws became the subject of several class action lawsuits, including litigation pending before Senior District Judge Robert Payne of the Eastern District of Virginia ("Judge Payne"), which was filed on June 22, 2017. *See generally Williams v. Big Picture Loans, LLC*, Case No. 3:17-cv-461 (filed on June 22, 2017). Notably, the Debtor was not a party to this original lawsuit and the claims asserted in that suit relate to Martorello's conduct that occurred during the Initial Phase (which largely predates the Debtor's existence), as well as the Second Phase. *Id.*

20.     Various consumer borrowers eventually initiated several ancillary suits, including a suit against the Debtor, in the same court, and additional lawsuits against Martorello, the Debtor

and other defendants are pending in Oregon and Massachusetts, as summarized in the table below (collectively, the "Pending Lawsuits"):

| Case | Date Filed | Status/Comments |
|------|-----------|-----------------|
| *Williams et al. v. Big Picture Loans, LLC et al.*, No. 3:17-cv-461 (E.D. Va.) ("*Williams*") | June 22, 2017 | Debtor is <u>not</u> a party. Discovery has been completed and the matter is pending ruling on class certification and trial setting. |
| *Galloway et al. v. Big Picture Loans, LLC et al.*, No. 3:18-cv-406 (E.D. Va.) ("*Galloway I*") | June 11, 2018 | Debtor is <u>not</u> a party. |
| *Smith et al. v. Martorello and Eventide Credit Acquisitions, LLC*, No. 3:18-cv-01651-AC (D. Oreg.) ("*Smith*") | September 11, 2018 | Debtor is a party. |
| *Duggan et al. v. Martorello and Eventide Acquisitions, LLC*, No. 1:18-cv-12277-JGD (D. Mass) ("*Duggan*") | October 31, 2018 | Debtor is a party. |
| *Williams et al. v. Microbilt et al.*, No. 3:19-cv-85 (E.D. Va.) ("*Williams II*") | February 11, 2019 | Debtor is <u>not</u> a party. |
| *Galloway et al. v. Martorello et al.*, No. 3:19-cv-00317-REP (E.D. Va.) ("*Galloway II*") | April 24, 2019 | Debtor is a party. |
| *Galloway et al. v. Williams et al.*, No. 3:19-cv-470 (E.D. Va.) ("*Galloway III*") | June 26, 2019 | Debtor is <u>not</u> a party. |

21. Notably, the Debtor is only a party in three of the Pending Lawsuits, and Martorello has been litigating these claims for almost three years. *See generally Williams v. Big Picture Loans, LLC*, Case No. 3:17-cv-461 (filed on June 22, 2017). As discussed in more detail below, during the course of the Pending Lawsuits, Martorello and the Debtor have resisted all efforts to proceed expeditiously or efficiently, including opposing efforts to consolidate the Pending Lawsuits before Judge Payne as part of multi-district litigation proceedings. *See generally In re: Big Picture Loans Litigation*, MDL No. 2906, Dkt. 44 (Martorello and Debtor's opposition to consolidation).

        (3)    <u>Martorello's Attempts to Stop the Class Settlement and Pre-Petition Litigation Against the Tribe</u>

22.     On October 21, 2019, the class plaintiffs in the Pending Lawsuits reached a nationwide settlement (the "Class Settlement") of their claims against the majority of the defendants in *Williams*, leaving Martorello the lone defendant in that action.   The Class Settlement also included certain of the defendants in the ancillary litigation also pending before Judge Payne, including, the class plaintiffs' claims against: (1) Big Picture and Ascension (collectively, the "Tribal Defendants"); (2) Brian McFadden, James Dowd, and Simon Liang;[4] and (3) Columbia Pipe & Supply Co., DMA Trinity Wealth Transfer Trust, DTA Trinity Wealth Transfer Trust, Terrance Arenberg, Timothy Arenberg, Amlaur Resources, LLC, and Brian Jedwab (collectively, the "Investor Defendants"). A copy of the Class Settlement is attached hereto as Ex. 12.

23.     Among other things, the Class Settlement provides the following relief to class members: (1) $8.7 million in cash (*id*. at § 10.1); (2) cancellation of millions of dollars in loans that are more than 210 days in default (*id*. at § 11.2); and (3) an agreement not to collect more than 2.5 times of the principal amount of any loans with consumer borrowers (*id*. at § 11.2). On November 26, 2019, the Consumer Borrowers filed their *Consent Motion to Certify Class and Approve Rule 23(b)(2) Settlement* in *Galloway III.*

24.     Although Martorello participated in the mediations that produced the Class Settlement, and subsequent mediations with then United States Magistrate Judge David J. Novak (now a federal district judge), no settlement was reached with Martorello, his family members, and other businesses controlled by him, including the Debtor. Instead, Martorello and the Debtor launched a multi-pronged attack on the Class Settlement in a variety of forums.

25.     First, on December 16, 2019, the Debtor filed with the American Arbitration Association ("AAA") a Demand for Arbitration against the Tribal Defendants (the "Tribal

---

[4] These individuals are employees of Ascension, as well as minority shareholders of the Debtor. As part of the settlement, each individual relinquished their shares in the Debtor. Collectively, they owned five percent of the Debtor.

Arbitration Proceeding"). Ex. 13.  The Tribal Arbitration Proceeding is based on various alleged defaults by the Tribal Defendants as a result of the Tribal Defendants' agreements in the Class Settlement.  *Id*.  In short, the Debtor alleges that the Tribal Defendants' agreement to pay $8.7 million and limit collections to 2.5 times the loan principal violated various provisions of the Debtor's agreements with the Tribal Defendants.  *Id*.

26.     Second, on December 17, 2019, the Debtor sued the Tribal Defendants in the United States District Court for the Western District of Michigan (the "Michigan Injunction Litigation"). *Eventide Credit Acquisitions, LLC, v. Big Picture Loans, LLC*, Case No. 2:19-cv-256 (W.D. Mich. 2019). In connection therewith, the Debtor moved for a temporary restraining order to prevent the Tribal Defendants from moving forward with the Class Settlement pending resolution of the Tribal Arbitration Proceeding. *Id.* at Dkt. 5.

27.     Third, on December 18, 2019, the Debtor filed a motion to intervene in *Galloway III* for the purposes of objecting to the Class Settlement. *Galloway v. James Williams, Jr*., Case No. 3:19-cv-470 (E.D. Va.), Dkt. 42.

28.     Despite advancing its arguments in three separate forums, the Debtor failed to stop the Class Settlement.

29.     First, on December 19, 2019, the federal judge presiding over the Michigan Injunction Litigation *sua sponte* denied the Debtor's request for the restraining order.  *Eventide Credit Acquisitions, LLC, v. Big Picture Loans, LLC*, Case No. 2:19-cv-256 (W.D. Mich. 2019), Dec. 19, 2019 Order, Dkt. 14 at 2-3. That court held, among other things, that it was far from evident that the Debtor would be likely to succeed on the merits of its claim to stop the settlement and that the "public policy favoring the equitable and expeditious settlement of mass consumer class litigation" far outweighed any harm to the Debtor.  *Id*. at 4.

30.     Then, on December 20, 2019, the *Galloway III* court held a preliminary approval hearing and entered an order preliminarily approving the Class Settlement. *Galloway v. James Williams, Jr.*, Case No. 3:19-cv-470 (E.D. Va.), Dec. 20, 2019 Order at Dkt. 65. At this hearing, Judge Payne ordered further briefing on Debtor's Motion to Intervene to Object, which was fully briefed as of February 4, 2020, and remains pending. *See* Dkt. 81.

31.     In addition to the Debtor's failed attempts to block the Class Settlement before two different United States District Court judges, Judge Payne entered an order on January 8, 2020 indicating that it was "necessary to proceed expeditiously to resolve… the plaintiffs' claims against the Non-Settling Defendants in *Williams*, *Galloway I*, and *Galloway II*[.]"  Jan. 8, 2020 Order at ¶¶ 1, 3. To that end, Judge Payne ordered the parties to appear on January 29, 2020, "for a status conference, the purpose of which" was "to set a schedule for the completion of any discovery … and a schedule for future proceedings, including the filing and briefing of class certification motions and tentative trial dates[.]" Jan. 8, 2020 Order at ¶¶ 1, 3.

32.     Having sustained adverse rulings in the Michigan Injunction Litigation and in *Galloway III*, and rather than appear at a hearing before Judge Payne on January 29, 2020 to discuss an expedited schedule for class certification and trial on the merits, the Debtor voluntarily dismissed the Michigan case and filed for bankruptcy in what is now a fourth forum for the Debtor to assert the same claims and try to obtain the same relief that it has unsuccessfully pursued in three other forums.

**B.      The Bankruptcy Case**

(1)      The Bankruptcy Filing and the Debtor's Adversary Proceedings

33.     On January 28, 2020 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Petition").

34. Because the Debtor has no employees, no customers, no business to operate, no owned or leased real property to manage, etc., the Debtor did not file the usual "first day" pleadings one would ordinarily expect to see filed at the outset of a bankruptcy case (wage motion, utility motion, bank account motion, etc.).

35. Instead, on January 29, 2020, the Debtor filed its (i) *Complaint for Declaratory and Injunctive Relief* (the "Extend Stay Complaint"), and (ii) *Motion for Preliminary Declaratory and/or Injunctive Relief* (the "Extend Stay Motion"), in *Eventide Credit Acquisitions, LLC v. Big Picture Loans, LLC*, et al., Adv. Pro. No. 20-04008-elm (Bankr. N.D. Tex.) (the "Extend Stay Adversary"). In the Extend Stay Adversary, the Debtor seeks to use its bankruptcy case to shield Martorello and other insiders from claims asserted against them by the Consumer Borrowers, and to stop the Class Settlement with the Tribal Defendants and other settling defendants, by requesting an order from this Court staying the Pending Lawsuits.

36. In other words, the Debtor seeks the same relief that it sought, and failed to obtain, in the Michigan Injunction Litigation and the still pending Motion to Intervene in *Galloway III*.

37. Shortly thereafter, Martorello, his companies, and family members filed a series of motions seeking to transfer the Pending Lawsuits to this Court. *See Williams* at Dkt. No. 674; *Galloway II* at Dkt. No. 320. These motions were fully briefed as of March 12, 2020, but have yet to be decided. *See, e.g., Williams* at Dkt. No. 693.

38. In addition, on March 6, 2020, the Debtor filed a *Complaint for Turnover, Temporary Restraining Order and Injunctive Relief, and Foreclosure* (the "Turnover Complaint") against Big Picture, Ascension and TED, Adv. Pro. No. 20—04014-elm (Bankr. N.D. Tex.) (the "Tribal Adversary Proceeding"). The Tribal Adversary Proceeding is essentially a repeat of claims asserted in the now dismissed Michigan case and the still pending Tribal Arbitration Proceedings.

39.    The Tribal Defendants have specially appeared in the Bankruptcy Case for the purpose of moving to dismiss the Turnover Complaint, as well as the claims asserted against them in the Extend Stay Complaint on the grounds that the Court lacks subject matter jurisdiction due to tribal sovereign immunity (the "Motions to Dismiss").  *See, e.g.,* Docket No 17.  The Court held a hearing on the Motions to Dismiss on April 1, 2020.

(2)    The Schedules and Statements and MOR

40.    On March 20, 2020, the Debtor filed its Schedules of Assets and Liabilities (the "Schedules") and Statement of Financial Affairs (the "Statements" and, together with the Schedules, the "Schedules and Statements").  *See* Docket Nos. 75 and 76.  The Schedules and Statements reflect the reality that the Debtor is essentially a pass-through entity with no business to operate, whose sole purpose is to collect and then distribute payments on the Note.

41.    Specifically, the Schedules show:

(a)    Assets of $60,437,205.34 (of which $60,180,386.87 is attributable to the Note and the balance is comprised of cash of $247,025.01 and an IOLTA retainer paid to a law firm in the amount of 9,793.46);

(b)    No secured debt;

(c)    Unsecured claims in the amount of $7,643,567.14;

(d)    No real property; and

(e)    No employees.

42.    The overwhelming majority of the Debtor's unsecured creditors consist of Consumer Borrowers in the Pending Lawsuits who are scheduled as contingent, unliquidated and disputed for an unknown amount.  Additionally, the Debtor lists certain insiders as holding contingent, unliquidated claims in an unknown amount for purported indemnification obligations. Significantly, the Debtor lists only six (6) creditors for which the Debtor scheduled a known claim amount:

| Name | Amount | Basis of Claim/Comments |
|---|---|---|
| Armstrong Teasdale | $1,600,000 | Attorney Fees by Law Firm representing Matt Martorello and Debtor |
| Bluetech Irrevocable Trust | $1,000,000 $250,000 | Purported loans by insider to the Debtor |
| Greenberg Traurig LLP | $102,338.12 | Legal fees by law firm representing Matt Martorello |
| Liont LLC | $115,424.46 | Legal fees allegedly paid by insider on Debtor's behalf |
| Pax ADR, LLC | $1,500 | Mediation fees |
| Tribal Economic Development Holdings | $4,574,304.56 | Advance note payments that Debtor contends have been fully offset |
| Total: | $7,643,567.14 | |

It is also noteworthy that from January 1, 2018 to present, the Debtor generated gross revenues totaling $467,285.77, but made distributions of more than $20 million to its insiders and legal counsel. *Compare* Docket No. 76 at 9; *with* Docket No. 76 at 1, 12-13. The Debtor has had more than two years with limited revenue, but it was so laden with cash that it paid well in excess of $13 million to its insiders before declaring bankruptcy. Docket No. 76 at 12-13. With any cash flow problems due solely to its multi-million-dollar distributions to insiders, the Debtor comes to this Court with a contrived bankruptcy as a basis to attempt yet again to impede the Class Settlement in Virginia.

43.    On March 20, 2020, the Debtor also filed its Monthly Operating Report for the month ending February 28, 2020 (the "February MOR"). *See* Docket No. 77. According to the February MOR, the Debtor made no disbursements whatsoever – further evidence that the Debtor has no ongoing business to operate.

(3)     The Debtor and Martorello Oppose Transparency and Seek to Limit
        Discovery

44.     On February 7, 2020, the United States Trustee formed an Official Committee of

Unsecured Creditors (the "Committee").

45.     On March 13, 2020, the Committee filed motions pursuant to Bankruptcy Rule

2004 for orders directing the production of documents from, and authorizing the examination of,

the Debtor, Matt Martorello and Bluetech Irrevocable Trust ("Bluetech").  *See* Docket Nos. 62, 63

and 64 (collectively, the "2004 Examinations").

46.     On March 20, 2020, each of the Debtor, Matt Martorello and Bluetech filed

objections to the 2004 Examinations.  *See* Docket Nos. 83-85.  The objections were largely the

same, challenging the legitimacy of the Committee due to the fact that it is currently comprised of

parties holding disputed claims (while completely ignoring the fact that the Committee acts as a

fiduciary for all unsecured creditors) and opposing discovery that is consistent with and common

to that sought by creditors' committees in virtually all commercial chapter 11 cases.  Instead, the

Debtor and the insiders asserted that the Committee should be limited to receiving copies of

discovery obtained in the Pending Litigation.  Bluetech additionally claimed that the Court does

not have jurisdiction over it due to the fact that it is a foreign entity located in the Cook Islands.

47.     Stated differently, the Debtor and its insiders want the benefit of bankruptcy

without the attendant burdens, one of which is transparency.

48.     On March 23, 2020, the Committee withdrew its request for a 2004 examination of

Bluetech, without prejudice to refiling same.  *See* Docket No. 90.

49.     On March 30, 2020, the Court entered orders granting in part and denying in part

the 2004 Examinations regarding the Debtor and Matt Martorello.  *See* Docket Nos. 102-103.

(4)     The Debtor's sole asset will cease to exist as of January 26, 2023.

50. As stated previously, the Debtor is a single purpose entity whose sole purpose—to collect on the promissory note—will expire in less than three years. Ex. 15 at § 1.3 ("The term of this Note is seven (7) years from execution. At the expiration of the term, the balance is forgiven."). The Debtor has no other businesses or revenue streams and nothing that it needs to reorganize pursuant to Chapter 11 of the Bankruptcy Code.

### 3. <u>LEGAL ARGUMENT</u>

**A. This Case Should be Dismissed Under Section 1112(b) as a Bad Faith Filing**

51. This case was filed in bad faith for the primary purpose of impeding litigation against Matt Martorello and other non-debtor insiders and to prevent a Class Settlement of third-party claims entered into between non-debtor third parties. The Debtor has no operations, no employees, and this case does not serve any valid bankruptcy or reorganizational purpose. Instead, the Debtor's sole focus is shopping for a more favorable forum and a second bite at relief that the Debtor and/or Martorello has already sought, and failed to obtain, before other federal courts.

52. The Debtor's filing is driven by Martorello's desire to stay pending rulings and upcoming deadlines in the *Williams* litigation before Judge Payne in the Eastern District of Virginia—litigation in which the Debtor is not even a defendant. As such, the Debtor has not invoked the protections of the Bankruptcy Code in good faith, and this case should therefore be dismissed.

53. Pursuant to Section 1112(b)(1) of the Bankruptcy Code, absent unusual circumstances, a court shall dismiss a bankruptcy case "for cause." Section 1112(b)(1) states, in pertinent part:

> on request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court shall convert a

case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause.

11 U.S.C. § 1112(b)(1).

54.     Section 1112 of the Bankruptcy Code, thus, limits the Court's discretion to refuse to dismiss or convert a Chapter 11 case upon a finding of cause. *In re 3 Ram, Inc.*, 343 B.R. 113, 119 (Bankr. E.D. Pa. 2006) ("Under new § 1112 when cause is found, the court shall dismiss or convert unless special circumstances exist that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate."); *see also In re Broad Creek Edgewater, LP*, 371 B.R. 752, 759 (Bankr. D.S.C. 2007). "Cause" may be established by a showing that a debtor lacked good faith in commencing its Chapter 11 case. *In re Humble Place Joint Venture*, 936 F.2d 814, 816-17 (5th Cir. 1991) ("The Bankruptcy Code provision that a Chapter 11 case may be dismissed 'for cause' has been interpreted to include the lack of good faith in its filing."); *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986); *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393 (11th Cir. 1988) (Chapter 11 petition may be dismissed for "cause" under § 1112(b) if not filed in good faith). It is well established that good faith is an implied jurisdictional requirement for filing a bankruptcy petition. *Little Creek Dev. Co.*, 779 F.2d at 1071 (noting that bankruptcy reorganization provisions since 1898 have incorporated expressly, or by judicial interpretation, a good faith standard for the commencement of bankruptcy cases); see also *In re C-TC 9th Ave. P'ship*, 113 F.3d 1304, 1310 (2d Cir. 1997).

55.     The Fifth Circuit has determined that "[f]indings of lack of good faith … have been predicated on certain recurring but non-exclusive patterns, and they are based on a conglomerate of factors rather than on any single datum." *Little Creek Dev. Co.*, 779 F.2d at 1072; see also *Integrated Telecom Express, Inc.*, 384 F.3d 108, 118 (3d Cir. 2004) ("[w]hether the good faith requirement has been satisfied is a 'fact intensive inquiry' in which the court must examine the

'totality of facts and circumstances' and determine where a 'petition falls along the spectrum ranging from the clearly acceptable to the patently abusive.'") (quoting *In re SGL Carbon Corp.*, 200 F.3d 154, 162 (3d Cir. 1999)).

56. In determining whether a debtor has instituted a bad faith filing, courts have considered the following non-exclusive factors including, without limitation:

(a) Whether the debtor has only one asset;

(b) Whether the debtor has few creditors;

(c) Whether the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default;

(d) Whether the debtor's financial condition reflects in essence, a two party dispute between the debtor and creditor which can be resolved in the pending action;

(e) Whether the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's creditors to enforce their rights in a pending proceeding;

(f) Whether the debtor has little or no cash flow;

(g) Whether the debtor lacks the possibility of reorganization; and

(h) Whether the debtor has any employees.

*See Little Creek Dev. Co.*, 779 F.2d at 1072-1073; *In re Carbaugh*, 299 B.R. 395, 398 (Bankr. N.D. Tex. 2003). These factors or indicia of bad faith should not, however, be rigidly applied, but viewed broadly in the light of the circumstances of a particular case. *See Little Creek Dev. Co.*, 779 F.2d at 1072. As a result, "[a]ll the facts and circumstances leading up to the filing of the case, and the conduct of the Debtor during the case, can properly be considered by the Court in determining whether" dismissal is warranted. *In re Silberkraus*, 253 B.R. 890, 902 (Bankr. C.D. Cal. 2000).

57. *Little Creek* and many other decisions involving bad faith filings arose in the context of single-asset real estate cases, and the factors articulated in those cases reflect the often-

unique fact patterns applicable to such cases. Other courts have articulated slightly different hallmarks of bad faith outside the context of single asset real estate cases, but the substance is generally the same. For example, the court in *In re Serfass*, 325 B.R. 901 (Bankr. M.D. Fla. 2005) held that the "hallmarks of bad faith" include the following:

(a) pre-petition litigation already pending in the state court between the parties;

(b) basically a two party dispute;

(c) the debtor is either solvent or it has very few unsecured debts which the debtor is able to meet;

(d) the petition is filed for an improper purpose;

(e) there is no need for reorganization and the filing was for the sole purpose to use the judicial resources of the bankruptcy court, most likely under the assumption that the debtor will receive a more favorable treatment in the bankruptcy court then it had received so far in the state court, and

(f) there is no ability or sincere desire to reorganize the financial affairs of the debtor.

*Id*. at 905-06.

58. Almost all of the factors applied by courts addressing the question of a bad faith bankruptcy filing are either present or are inapplicable in this case.

(1) <u>The Debtor filed this case to evade unfavorable rulings in the *Williams* case and prevent that litigation from proceeding to trial before Judge Payne.</u>

59. Courts have routinely held that forum shopping is not a valid basis for the filing of a bankruptcy case. As set forth above, the filing of this case is largely premised upon the Debtor's desire to evade a series of unfavorable rulings by Judge Payne in the *Williams* litigation, to interfere in the Class Settlement, and to prevent litigation against Martorello from proceeding to trial before Judge Payne. Indeed, the Debtor and Martorello themselves have admitted their desire to avoid a trial before Judge Payne.

60.     For example, when attempting to sell some of his equity interest in the Debtor, Martorello provided the potential buyer with an internal memorandum from Martorello's law firm advising him that an unfavorable outcome was likely before Judge Payne. Ex. 14 ("we do not believe success at trial is likely… In fact, we believe an unfavorable verdict at the trial court level is more likely than not.").

61.     Similarly, Martorello's filings in opposition to consolidation of various proceedings before Judge Payne have characterized the judge as "favorably disposed toward" the Consumer Borrowers and "bias[ed] against the Defendants." *In re: Big Picture Loans Litigation*, MDL No. 2906, Dkt. 44 at 1-2 (emphasis in original); *see also id*. at 18 ("Judge Payne has displayed bias against Defendants from the outset of the various Virginia actions. . . ."); *see also id*. at 18 ("the Motion to Transfer is a transparent effort to place the varied claims raised across the country before a court that will look most favorably upon them. Judge Payne has displayed bias against Defendants from the outset of the various Virginia actions. . . ."); *id*. at 19 ("Judge Payne— no ally to Defendants—has determined. . . ."); *id*. at 20 ("The Motion to Transfer is simply an effort to capitalize on the favoritism Plaintiffs have discovered in one court in Virginia. . . .").

62.     Courts have dismissed bankruptcy cases as bad faith filings upon finding that the case was filed as a litigation tactic or as the result of forum shopping. *See, e.g., In re Argus Group 1700, Inc*., 206 B.R. 737, 753 (Bankr. E.D. Pa. 1996) (compiling cases). These authorities make clear that "Congress did not create the bankruptcy courts to provide an alternative forum for unfavorable litigation." *Id*. at 756. As a result, dismissal is appropriate where the evidence reflects that the debtor's primary motivation in seeking bankruptcy relief is to shop for a more favorable forum for litigation. *See id*. at 753 (dismissing case upon finding that "Debtors filed this case for an improper purpose, namely as a means to forum shop. [They] were dissatisfied with the treatment

they were receiving in the State Court and desired another forum in which to litigate their dispute. Debtors commenced their bankruptcy cases to remove their dispute from the State Court to this Court."); *see also In re Heritage Wood 'N Lakes Estates, Inc.*, 73 B.R. 511, 514 (Bankr. M.D. Fla. 1987) (bankruptcy case dismissed where debtor "determined that it was not going to get the best side of the coin in the state court and looked to go elsewhere to have a new bite at the apple.").

63.     As in *Argus*, the Debtor's motivation in filing this case can be "inferred from the timing of [its] bankruptcy vis-à-vis the status and progress of" the litigation against Martorello and the settling defendants, "the fact that, immediately after the filing, the Debtor [requested transfer] of the litigation [solely between non-debtors] to this Court and sought to proceed with it here," and the fact that the only substantive action the Debtor has taken to date in this case is to seek to impede a pending settlement in litigation to which it is not a party. 206 B.R. at 753-54. As set forth above, the Debtor has already tried and failed to persuade two different district court judges to enjoin or deny preliminary approval of the settlement, the same relief the Debtor seeks here. The Debtor's conduct reflects "blatant forum shopping" and a bad faith effort to "revers[e] setbacks . . . suffered in another forum." *In re Monsour Med. Center, Inc.*, 154 B.R. 201, 209 (Bankr. W.D.Pa. 1993). "Such conduct is inappropriate and must not be permitted." *Id*. Accordingly, this factor alone warrants dismissal.

64.     Additionally, this Court lacks constitutional authority to adjudicate the Consumer Borrowers' claims against non-debtor third parties under *Stern v. Marshall*, 564 U.S. 462 (2011). The Debtor's attempt to consolidate third-party litigation in this Court therefore necessarily means the Debtor is seeking consolidation of those claims before a district judge, the precise relief Martorello opposed with respect to Judge Payne. Having contested the basis for consolidation of the litigation into a single forum before Judge Payne, the Debtor should be estopped from arguing

that the need for a central forum for claims against it serves as a good faith basis for the filing of this case. *See In re Grand Traverse Dev. Co. Ltd. P'ship*, 150 B.R. 176, 194 (Bankr. W.D. Mich. 1993) (holding that a debtor's "inconsistency of position may constitute a bellwether of bad faith"). It is evident that the Debtors' true purpose in filing this bankruptcy is to remove actions from Judge Payne's court to another federal district court with the hope of achieving a better result from a different judge. This fact also supports dismissal.

       (2)   <u>Eventide has a single asset that will soon cease to exist, no employees, no operations, and no need to reorganize.</u>

65. Dismissal is also appropriate because the Debtor has a single asset that sunsets in less than three years, no business operations, no employees, and therefore no need to reorganize. The fact that the "debtor has one asset" is a factor courts frequently consider in determining whether to dismiss under Section 1112(b). *Little Creek Dev. Co.*, 779 F.2d at 1072-1073; *see also In re Sterling Bluff Inv'rs, LLC*, 515 B.R. 902, 916 (Bankr. S.D. Ga. 2014) (finding this factor weighed against where the "Debtor's assets comprise a single investment"); *In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 299 (Bankr. D. Del. 2011) (finding this factor weighed against a debtor where it had "only one asset," *i.e.*, a "membership interest" in another company); *In re State St. Houses, Inc.*, 305 B.R. 726, 728 (Bankr. S.D. Fla. 2002), aff'd, 305 B.R. 738 (S.D. Fla. 2003) (finding this factor weighed against a debtor where its only asset was a high-rise residential apartment building), *aff'd*, 356 F.3d 1345 (11th Cir. 2004); *In re PM Cross, LLC*, 494 B.R. 607, 611 (Bankr. D.N.H. 2013) (same).

66. Here, the Debtor has a single asset, *i.e.*, the Note between it and TED related to the sham reorganization of Martorello's tribal lending business. Other than receipt of payments on the Note – which are then distributed to the Debtor's owners (primarily Matt Martorello's companies and his brother Justin Martorello) – Eventide does not have any other material assets.

What's more, the sole asset will cease to exist as of January 31, 2023, as a result of a sunset provision. Ex. 15 ("The term of this Note is seven (7) years from execution. At the expiration of the term, the balance is forgiven.")

67.     The Debtor's lack of business operations and employees also supports dismissal. *See Little Creek Dev. Co.*, 779 F.2d at 1072-1073; *see also In re Orange Park S. P'ship*, 79 B.R. 79, 81 (Bankr. M.D. Fla. 1987) (finding bad faith where the debtor "ha[d] no employees; conduct[ed] no business, and it [was] a mere shell entity" for its principal); *Matter of Indian Rocks Landscaping of Indian Rocks Beach, Inc.*, 77 B.R. 909, 911 (Bankr. M.D. Fla. 1987) (finding bad faith where the debtor "was no longer operating any business, had no employees, no unsecured debts, and no assets, filed its Chapter 11 Petition merely to gain the protection of the automatic stay imposed by 11 U.S.C. § 362 and to litigate a money damage claim in the bankruptcy court."); *In re Canbec Inv. Corp.*, 349 B.R. 915, 918 (Bankr. M.D. Fla. 2006) (finding bad faith, in part, because the debtor had "no employees").

68.     Like the cases cited above, the Debtor has no employees; it is simply "one of the many shell entities of which Martorello is president." *See Williams v. Big Picture Loans, LLC*, 303 F. Supp. 3d 434, 445 (E.D. Va. 2018).  Given the Debtor's principal function – to hold the Note and make distributions to Martorello and other insiders – the Debtor does not need any employees.

69.     Because the Debtor has one asset, no operations, and no employees, it also has no need to reorganize.  This factor therefore also supports dismissal.  *See, e.g.*, *Serfass*, 325 B.R. at 905-06 (finding bad faith where "there is no need for reorganization and the filing was for the sole purpose to use the judicial resources of the bankruptcy court, most likely under the assumption that the debtor will receive a more favorable treatment in the bankruptcy court then it had received so far in the state court").

(3)     This case is essentially a two-party dispute, which can be more efficiently resolved in the ongoing litigation.

70.     The Debtor's Schedules make clear that this case is essentially a dispute between the Debtor and a group of consumer borrowers that assert class action claims against the Debtor as a joint tortfeasor in an illegal lending scheme.  Other than those consumer borrowers and contingent, unliquidated claims of insiders holding alleged indemnification claims related to the Pending Litigation, the Debtor lists only six other creditors: (i) TED for a disputed claim related to prepayments on the Note; (ii) two law firms (Armstrong Teasdale and Greenberg Traurig) (Martorello's litigation defense firms); (iii) Pax ADR, LLC (a mediation firm who oversaw months of mediation between the parties); and (iv) certain insiders that allegedly provided unsecured loans to the Debtor.

71.     With respect to TED, the Debtor has scheduled its claim as disputed, and TED has asserted that it has sovereign immunity and will most assuredly not be filing a proof of claim and submitting to the jurisdiction of this Court.  More fundamentally, the Debtor claims that TED owes it money, not the other way around, and the Debtor's claims are the subject of the Tribal Arbitration Proceeding that the Debtor initiated.  Thus, TED should not be considered a creditor of the Debtor for purposes of determining whether this case should be dismissed.

72.     Additionally, Pax ADR is not a creditor of the Debtor for multiple reasons.  First, Class Plaintiffs have paid the $1,500 mediation fee and Pax ADR is not owed any money.  Second, the Debtor was never a party to any of the mediation agreements, including the retainer agreement between Class Plaintiffs, Big Picture, Ascension, and Matt Martorello and therefore never had any liability for the payment of the mediation fee. Ex. 16. This nominal mediation fee was Martorello's responsibility, not the Debtor's, and, regardless, has been paid by the Consumer Borrowers.

73. This leaves certain insiders of the Debtors that allegedly loaned the Debtor money, and the law firms that represent the Debtor and its insiders in litigation as the only remaining potential creditors of the Debtor. However, there is no evidence of "any pressure from" these law firms or insiders, necessitating the filing of the petition. *See In re Brazos Emergency Physicians Ass'n, P.A.*, 471 F. App'x 393, 394 (5th Cir. 2012) (affirming the dismissal of a Chapter 11 petition where the debtor's "creditors were mainly insiders and affiliates, and as the bankruptcy petition was filed without any pressure from those creditors" and, thus, concluding that the "filing was to gain control of the state-court claims"). To the contrary, the law firms continue to represent the Debtor, which attempts to use its non-payment of legal fees as a justification for this filing. This is a quintessential example of bad faith, especially when the fees in question were likely incurred for non-Debtor related services such as: (1) non-indemnified defense costs for Matt Martorello relating to his liability for Red Rock loans; and (2) the defense costs of Justin and Rebecca Martorello, whose liability stems from misconduct predating the existence of the Debtor.

74. Once placed in its proper context, this case is "essentially a two-party dispute" between the Consumer Borrowers and the Debtor. *In re Sydnor*, 431 B.R. 584, 592 (Bankr. D. Md. 2010). Aside from the Debtor's self-serving and suspicious non-payment of litigation fees, there "are virtually no other significant creditors" beyond the Consumer Borrowers, who can resolve their claims with the debtors in the ongoing class litigation. *Id.*; *see also In re State St. Houses*, 305 B.R. at 736 ("the fact that Debtor faces no imminent threat from any of its other purported creditors, is compelling evidence that this Chapter 11 filing is a mere two-party dispute[.] "), *aff'd*, 356 F.3d 1345 (11th Cir. 2004); *In re Midway Investments, Ltd.*, 187 B.R. 382, 389 (Bankr. S.D. Fla. 1995) (describing the case as "plainly a two party dispute" where the debtor "faced no imminent threats from other creditors" and its "only pending disputes involve claims" brought

against it by "two tenants"). This factor also supports a finding of bad faith and dismissal under Section 1112(b).

(4)   <u>The Debtor lacks the ability to reorganize.</u>

75.    In determining whether to dismiss a bad faith filing under Section 1112(b), courts also consider whether the debtor has the ability to reorganize. *Serfass*, 325 B.R. at 905-06. Here, it is far from clear how the Debtor intends to confirm a plan in this case—or even what a plan might look like. As set forth above, the Debtor has no operations around which it can reorganize and its sole source of revenue is a promissory note with a sunset provision expiring in January 2023 regardless of the balance of the note. Further, it appears that the only non-insider creditors are the Consumer Borrowers and the law firms representing the Debtor and its insiders in litigation. Thus, it appears that the Debtors do not have an impaired accepting class necessary to confirm a plan. 11 U.S.C. § 1129(a)(10). Dismissal is appropriate where a debtor cannot prove an ability to reorganize based on the lack of an impaired accepting class. *In re Babayoff*, 445 B.R. 64, 76–77 (Bankr. E.D.N.Y. 2011).

76.    Furthermore, it is less than clear whether the Debtor has the funds necessary to pay its chapter 11 administrative expenses as they come due (which consist primarily, if not exclusively of professional fees and expenses and US Trustee fees). The Debtor's MOR shows it has less than $270,000 in cash. Prior to the Petition Date, the Debtor received $5 million in prepayments on the note from TED and it is unclear when payments on the note will resume and/or how much they will be. While the Debtor has sought relief from the Court relating to TED and the other Tribal Defendants, those parties have raised various objections to that relief (including that they are entitled to immunity) and moved to dismiss for lack of subject matter jurisdiction. On April 6, 2020, the Court granted one of those motions to dismiss and continued the hearing as to the other motion to dismiss to April 13, 2020. Additionally, as discussed in more detail below, the Debtor's

stated plans to reorganize are doomed to fail due to the Court's inability to adjudicate third party claims or grant third party releases. Because the Debtor lacks the ability to reorganize, this factor warrants dismissal.

(5) <u>The Court lacks jurisdiction to determine the Consumer Borrowers' claims against third parties.</u>

77.     Finally, this case should be dismissed because the Debtor's stated purpose for the filing is to consolidate litigation against it and its joint tortfeasors before this Court.  According to the Debtors, this will allow the parties to more efficiently liquidate the various claims asserted by the Consumer Borrowers in a single forum.  However, this justification erroneously assumes that the Court has "related to" jurisdiction over the Consumer Borrowers' claims against non-debtors. 28 U.S.C. § 1334(b).  To the contrary, this Court cannot exercise jurisdiction over claims by the Consumer Borrowers against non-debtors that have no connection or relation to the Debtor's estate. *See, e.g., In re Zale Corp*., 62 F.3d 746, 757 (5th Cir. 1995).

78.     The sole connection between the Consumer Borrowers' claims against non-debtor third parties and the Debtor's estate are purported indemnification obligations owed to various parties by the Debtor, but those obligations alone, even if they are valid, are insufficient to confer jurisdiction over otherwise unrelated tort claims by the Consumer Borrowers against non-debtors. *Id*.  As in *Zale*, the Consumer Borrowers' claims do not derive from, or relate to, the Debtor's conduct and are instead based on the independent malfeasance of the individual defendants in those actions, many of which occurred before the Debtor was even created.  *Id*. at 755.  Under these circumstances, the Debtor's purported indemnification obligation to those parties is insufficient to confer "related to" jurisdiction over those claims.  *Id*. at 756-57.[5]

---

[5] The Debtor's reference to promotion of judicial economy also does not serve as a justification for this Court's exercise of jurisdiction over the Consumer Borrower's third-party claims.  *Id*. at 753-54.

79.     Absent the consolidation of third-party litigation in this Court, which also depends on discretionary transfers of those cases under 28 U.S.C. § 1404, the stated purpose of this bankruptcy will be frustrated, and the Debtor's litigation strategy will have failed.  Because the Court cannot properly exercise jurisdiction over the cases the Debtor is attempting to consolidate in this Court, this bankruptcy will only serve to further increase litigation costs and further delay the prosecution of the Consumer Borrowers' claims against Martorello and his joint tortfeasors. This too counsels in favor of dismissal of the Debtor's bankruptcy case.

80.     As the foregoing factors demonstrate, this case is nothing more than a litigation tactic by the Debtor in an effort to interfere with and impede litigation against Martorello and his joint tortfeasors.  Because this case results from forum shopping and servers no valid bankruptcy or reorganizational purpose, it was not filed in good faith and dismissal is mandatory under Section 1112(b).

### C.     Alternatively, the Court Should Dismiss or Abstain Under Section 3005(a)

81.     If the Court declines to dismiss the Debtor's bankruptcy case for cause under Section 1112(b), it should exercise its discretion to suspend proceedings under Section 305(a)(1) pending the liquidation of the Consumer Borrowers' claims in one or more of the pending lawsuits. Suspending proceedings would permit the parties to liquidate claims against the Debtor's estate and third parties by trying one or more "bellwether" cases in the Eastern District of Virginia, which is prepared to proceed to trial in the *Williams* matter.  Indeed, the consumer borrowers and Martorello have largely completed depositions and discovery in *Williams,* and Judge Payne has indicated a desire to get *Williams* resolved without delay. *See, e.g.*, *Williams* at Jan. 8, 2020 Order. Once those claims are liquidated, the parties can return to this Court for further proceedings.

82.     Under Section 305(a)(1), the Court may dismiss a case or suspend proceedings if it finds that the interest of creditors and the debtor would be "better served" by a dismissal or

suspension. *In re Acis Cap. Mgmt., L.P.*, 584 B.R. 115, 145 (Bankr. N.D. Tex. 2018). Courts have identified a variety of factors to be considered when determining a request for abstention under Section 305(a)(1), including:

(1)     the economy and efficiency of administration;

(2)     whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court;

(3)     whether federal proceedings are necessary to reach a just and equitable solution;

(4)     whether there is an alternative means of achieving an equitable distribution of assets;

(5)     whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case;

(6)     whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and

(7)     the purpose for which bankruptcy jurisdiction has been sought.

*Id*. at 145 and n.118 (collecting cases). However, the Court has substantial discretion in deciding whether to abstain under Section 305(a)(1) and is not required to give each factor equal weight or conduct a strict balancing. *Id*. at 146; *In re Northshore Mainland Servs., Inc*., 537 B.R. 192, 203 (Bankr. D. Del. 2015).

83.     Considering the totality of the circumstances, *Northshore* 537 B.R. at 203, multiple factors support abstention in this case. The overarching justification for abstention is the Debtor's the lack of good faith and the absence of a proper bankruptcy purpose in filing this case. As discussed above, the Debtor initiated this case for the sole purpose of gaining a tactical advantage in pending litigation. Under these circumstances, courts have exercised their discretion to abstain. *In re Schur Mgmt. Co., Ltd*., 323 B.R. 123, 129 (Bankr. S.D.N.Y. 2005); *In re ABQ-MCB Joint*

*Venture*, 153 B.R. 338, 341 (Bankr. D. N.M. 1993). Accordingly, factor 7 strongly favors abstention in this case.

84. For similar reasons, factors 2 through 5 also favor abstention. These factors all turn upon the availability of an alternative forum to achieve an equitable distribution to creditors. *Acis*, 584 B.R. at 146. Here, there is pending class action litigation against various parties aimed at liquidating consumer claims against the Debtor and equitably distributing recoveries from the Debtor to class members under the supervision of a federal district court. As a result, there is an alternative forum—in which proceedings are already under way—that is capable of achieving an equitable result for creditors. Under these circumstances, abstention is appropriate. *Id*.

85. Finally, considerations of economy and efficiency of administration favor abstention under Section 305(a)(1). Where there is no valid bankruptcy purpose being served in a case, especially where a case was filed as an improper litigation tactic, courts have concluded that creditors and debtors should not bear the expense of a bankruptcy. *Acis*, 584 B.R. at 146 (abstention appropriate where bankruptcy "would simply add an additional layer of expense to the resolution of a two-party dispute and another forum already provides a suitable place to resolve the dispute"); *Argus*, 206 B.R. at 756 (noting debtors "would incur needless additional expenses if their bankruptcy case proceed[ed]," including fees of "specialized bankruptcy counsel," US trustee fees, and the costs of a plan and disclosure statement); *In re Realty Trust Corp.*, 143 B.R. 920, 929 (N. Mariana Islands 1992) (extreme expense of administering case in bankruptcy because of additional legal fees that would be involved in hiring specialized bankruptcy counsel is a factor counseling dismissal of the case pursuant to § 305(a)); *In re Walter*, 108 B.R. 244, 251 (Bankr. C.D. Cal. 1989) (reasoning that debtor did not need a "staff of bankruptcy lawyers (and the high cost associated with retaining specialty counsel)"); *In re Bus. Info. Co., Inc.*, 81 B.R. 382, 387

(Bankr. W.D.Pa. 1988) (noting that bankruptcy petition already cost the Debtor $10,000 in legal fees and that substantially larger fees would be requested if the bankruptcy remained).  Neither creditors nor the Debtor should bear the expense of a chapter 11 bankruptcy in this case at least until the claims against the Debtors are liquidated.  Factor 1 therefore supports abstention as well.

## IV.  CONCLUSION & PRAYER

86.    For the reasons set forth above, the Consumer Borrowers request entry of an order (i) dismissing this case for cause under 11 U.S.C. § 1112(b), (ii) alternatively suspending all proceedings in this matter under 11 U.S.C. § 305(a)(1), and (iii) awarding the Consumer Borrowers any additional relief the Court deems appropriate.

Dated:  April 9, 2020

Respectfully submitted,

*/s/ Patrick J. Neligan, Jr.*
Patrick J. Neligan, Jr.
Texas State Bar No. 14866000
James P. Muenker
Texas State Bar No. 24002659
**NELIGAN LLP**
325 North St. Paul Street, Suite 3600
Dallas, Texas 75201
Telephone: (214) 840-5300
Facsimile: (214) 840-5301
Email: pneligan@neliganlaw.com
Email: jmuenker@neliganlaw.com

*Attorneys for Consumer Borrowers*

## CERTIFIATE OF SERVICE

I hereby certify that on April 9, 2020 a true and correct copy of the foregoing document was filed with the Court and served (i) electronically upon all parties receiving notice via the ECF system and (ii) by first class mail on the parties listed on the attached service list.

*/s/ Patrick J. Neligan, Jr.*
Patrick J. Neligan, Jr.