Robin Phelan
Texas Bar No. 15903000
PHELANLAW
4214 Woodfin Drive
Dallas, Texas 75220
Tel: 214-704-0222
Email: robin@phelanlaw.org

*Counsel to Matt Martorello*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| EVENTIDE CREDIT ACQUISITIONS, LLC, | § | Case No. 20-40349-elm11 |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |

### OBJECTION OF MATT MARTORELLO TO THE CONSUMER BORROWERS' PROOF OF CLAIM NO 8-2 FILED BY ANASTASIA SHERMAN

Matt Martorello ("**Martotello**") files this objection (the "**Objection**") to the Consumer Borrowers' (the "**Plaintiffs**") proof of claim number 8-2 filed by Anastasia Sherman (the "**Claim**"). In support of this Objection, Martorello states as follows:

### PRELIMINARY STATEMENT

1.     The Plaintiffs do not have allowable claims. The alleged claims arise from suits against the Debtor and a number of other defendants, including Martorello (the "**Defendants**"). These suits allege violations of state usury laws and have cost the Debtor more than ten million dollars in litigation costs with no resolution in sight. The theories of the Plaintiffs ignore two fundamental premises. First state usury laws apply to lenders. The Debtor and the other Defendants aren't lenders. Second, to the extent that state law governs a transaction, state usury

1

laws only apply to lenders loaning money in the relevant state. The loans made by the tribal lenders were made on the reservation. The time has come to resolve these disputes and determine that the alleged claims of the Plaintiffs are without merit and not allowable.

2.     The theories of the Plaintiffs have never been applied by courts to arm-of-the-tribe lending operations like those in this Chapter 11 case and have never been applied to a legitimate vendor to, or creditor of, an Indian tribe. An adverse ruling by this Court in this case likely will negatively impact the ability of Indian tribes to use the internet, to interact with non-Indian businesses and financial activities and potentially prevent the Indian tribes from engaging in industries where non-Indian expertise and services are required.[1]  Even if everything alleged by the Plaintiffs is correct, the result is exactly what Federal law dictates. The efforts by the Plaintiffs to manufacture RICO claims under a pejorative "rent-a-tribe" theory have no legal basis, are an affront to routine tribal nation building efforts in numerous industries, impermissibly conflict with federal law and federal interests and are precisely the type of efforts federal law obligates the United States government to guard against.

3.     The loan agreements between the Debtor and the Plaintiffs are not alleged to have violated any federal or tribal law, contain all appropriate disclosures of rates and terms, and acknowledge and consent to the tribal lender's sovereignty and the applicability of tribal and federal law to the contracts. The lending activity occurs exclusively on the reservation where state usury laws are inapplicable. The legal incidence and impact of the state usury law falls on the tribal government lender, not the borrower, and is therefore not applicable to the tribal lending

---

[1] For example, under Plaintiff's theories, an Indian tribe cannot to issue insurance policies online from a remote reservation and require resources not available on its reservation: i.e. non-Indian agents, actuaries, cloud service providers and other parties to assist in the running of the insurance business unless they submit to state regulations.

business of the LVD tribe.[2] The location of the borrower, or even the loan transaction, isn't relevant.

4.      Martorello hereby adopts the Debtor's objection to the claims of the Plaintiffs (the "**Debtor Objection**")

## THE ACTIONS OF THE DEBTOR AND THE DEFENDANTS PROMOTE AND COMPLY WITH FEDERAL LAW AND POLICY

5.      The Supreme Court has recognized that a key goal of the Federal Government is to render Tribes more self-sufficient, and better positioned to fund their own sovereign functions, rather than relying on federal funding, and that tribal business operations are critical to the goals of tribal self-sufficiency.[3]

6.      Non-Indians are encouraged by Federal law and policy to approach tribes with ideas. Tribes are encouraged to attract outside investment and use outside experts to run their businesses and provide the capital to establish their tribal operations. The tribes are encouraged to self-determine the economics of these arrangements.

7.      Statutes designed for the benefit of the tribes are subject to the longstanding canon of construction that they must be liberally construed in favor of Indian tribes. Conversely, statutes which abrogate tribal rights are to be construed narrowly and most favorably toward tribal interests.[4] Federal law says tribes and non-Indians should develop Indian nation building ventures

---

[2] *Oklahoma Tax Commission v Chickasaw Nation*, 515 U.S. 450 (1995) After rejecting the State's request to perform a balancing test pertaining to taxation of fuel sales made on the reservation to non-Indians, opting instead for a more categorical and dispositive approach absent clear congressional authorization (legal incidence test), the state next argued that the legal incidence would ultimately fall upon the wholesaler or the consumer. The court rejected and decided in favor of the tribe. A similar incidence test is appropriate here, given the more recent Native American Business Development Act of 2000 and further developed modern federal policy since *Chickasaw*. Particularly considering the federal government's longstanding approach to preemption of state usury laws in banking, even when third party payday lending originators seek to party with banks with the express intent to use their licenses to export interest rates."

[3] *Michigan v. Bay Mills Indian Community*, 134 S. Ct. 2024 (2014)

[4] *Rincon Band Of Luiseno Mission v. Schwarzenegger*, 602 F.3d 1019 (9th Cir. 2010)

to alleviate issues of remoteness, poverty, the costs and burdens of self-government, and extreme lack of resources.

8.      Indian tribes predate the Constitution, and have treaties with the United States of America, not the state of Virginia, or any other state. Federal Indian law dictates that tribes are sovereign nations, with sovereignty that can only be restricted by Congress. Tribes are subject to federal law and authorities so tribal lending entities are subject to certain regulations of federal agencies such as the federal lending laws enforced by the Consumer Financial Protection Bureau (CFPB"), the Federal Trade Commission and the Department of Justice. States may not limit, restrict or otherwise impose on tribal sovereignty. In implementing Federal law, a Federal agency should defer to tribal law and decisions. With respect to Federal statutes and regulations administered by Indian tribal governments, the Federal Government shall grant Indian tribal governments the maximum administrative discretion possible, defer to Indian tribes to establish standards and preserve the prerogatives and authority of Indian tribes. In this case the tribal lending regulatory authority has determined (by licensing, monitoring and auditing) that the tribal lenders, Red Rock Tribal Lending LLC ("Red Rock"), Duck Creek, LLC ('Duck Creek") and Big Picture Loans, LLC ("Big Picture") are arms of the tribe and the true lenders to the Plaintiffs while the non-tribal entities are licensed, monitored and audited as vendors and creditors.

9.      Given its trust obligations, it has long been the obligation of the United States government to "guard" and "protect" tribes, like a guardian protects its ward. State laws, including usury laws, generally do not apply to tribes, and tribal economic ventures.

10.      Congress has not restricted sovereignty as it pertains to a tribe's use of the internet or engaging in consumer lending. If the state law interferes with the purpose or operation of a federal policy regarding tribal interests, it is **pre-empted**. (*Hoopa Valley Tribe*, 881 F.2d at 659).

Therefore, state usury laws are pre-empted. States cannot apply their usury laws to a sovereign tribe, particularly if the business activity is governed by tribal law.

11. In this case, the tribe is the Lac Vieux Desert Band of the Lake Superior Chippewa Indians ("LVD"). It's an important obligation of the United States government to guard, promote, and protect tribal self-sufficiency, through self-determination and economic development and to encourage the Indians to obtain outside capital and expertise and enter into arrangements with non-Indians to take advantage of Indian sovereignty

12. To formalize these policies, Congress enacted The Native American Business Development, Trade Promotion and Tourism Act of 2000 ("NABDA") which specifically codifies these policies. The NABDA is required to be liberally construed in favor of the Indians and ambiguities resolved in favor of the Indians. [5]

13. Consequently, tribes should make their jurisdictions friendly to outsider investment, and engage non-tribal resources of the private markets, including management, capital, and technical expertise. NABDA encourages tribes to go beyond the reservation, to trade freely and seek trade rights. It also encourages help with these efforts through investment and mentorship from outside sources that do not originate with the tribes and economic ventures with outside entities that are not tribal entities. A key tenant of federal law and policy is the promotion of commercial dealings with non-Indians. These dictates include ecommerce arrangements with non-Indians.[6] The law makes clear that tribes do not lose their sovereignty just by contracting for the special expertise of non-Indian operators and are encouraged to do so. Consequently, the NABDA

---

[5] *See, Cheyenne River Sioux Tribe v. Jewell*, 205 F. Supp. 3d 1052, 1062 (D.S.D. 2016) (citing *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 767 (1985); *Bryan v. Itasca County, Minn.*, 426 U.S. 373, 392 (1976); *Alaska Pacific Fisheries v. United States*, 248 U.S. 78, 89 (1918))).

[6] *Colorado v. Cash Advance,* Case No. 05CV143, 2012 WL 3113527, at 23 (Colo. Dist. Ct. 2012); *Cabazon Band of Mission Indians v. Riverside Cty,* 783 F.2d at 901; *Native Am. Dist. v. Seneca-Cayuga Tobacco Co.*, supra, 546 F.3d at 1294.

encourages and recognizes the legality of the tribal lending operation and structures of the LVD

tribe and the activities of this Debtor and its members and a state usury law that stands as an

obstacle to the accomplishment and execution of the full purposes and objectives of Congress, as

detailed in the NABDA, is preempted.

14.     These principles continue today.[7] The Fourth Circuit applied these principles to the

parties in this Chapter 11 case:

> "We reach this conclusion with due consideration of the underlying
> policies of tribal sovereign immunity, which include tribal self-
> governance and tribal economic development as well as the
> protection of 'the tribe's monies' and the 'promotion of commercial
> dealings between Indians and non-Indians.' *Breakthrough*, 629 F.3d
> at 1187-88.   The evidence here shows that the Entities have
> increased the Tribe's general fund, expanded the Tribe's
> commercial dealings, and subsidized a host of services for the
> Tribe's members.   Accordingly, the Entities have promoted 'the
> Tribe's self-determination through revenue generation and the
> funding of diversified economic development.' *Breakthrough*, 629
> F.3d at 1195".

## TRIBAL LENDING IS LIKE TRIBAL GAMING

15.     Since 1988, all tribal gaming enterprises are subject to the 1988 Indian Gaming

Regulatory Act ("IGRA").   25 U.S.C. §§ 2701-21.   IGRA placed limited restrictions on

sovereignty by governing the relationship between tribes engaged in gaming and the states.   IGRA

furthers federal policy by expressly recognizing activities that were already lawful.   No such

federal restrictions exist regarding tribal internet lending.   Prior to the enactment of IGRA in 1988,

such restrictions on tribal gaming did not exist yet the Supreme Court concluded that Federal pre-

---

[7] In support of several tribes recently filing suits against the SBA and Treasury for the CARES act's preclusion of tribal online lenders and casinos from accessing government assistance due to a nearly 70-year-old rule, several members of Congress issued a letter on April 16, 2020 urging Treasury and the Department of Interior to exercise their federal trust obligations in relation thereto.   One might consider it uncommon for criminal RICO enterprises to file suit against the federal government for economic support.

emption applied, and state gambling laws did not apply to Indian tribes, even though the games were open to the public and were played predominantly by non-Indians[8]

16.     However, a tribe that wanted to have a casino often didn't have the expertise, or the capital, or the requisite manpower to build and run a casino. Consequently, tribes would contract with non-Indians to build and run the casinos, and employ some of the members of the tribe, and the tribe would receive some dollars from the casino venture to support the tribal government. At first the non-Indians would do pretty much everything, including taking the risk, funding the "house bank" and working capital, conducting day to day operations, and get most of the dollars. The United States government recognizes that type of dollar allocation as a necessary path to self-sufficiency consistent with the NABDA.

17.     A cursory review of management contracts published by the National Indian Gaming Commission (NIGC), a federal agency, reveals that non-Indians are federally sanctioned to: approach the tribe, buy the land for development, fund the "house bank", provide their proprietary information and systems, design the facility, set the gaming odds, control the build out, and *exclusively* manage all staffing, training, accounting, budgeting, banking, operation, reporting, investing, and marketing.[9]

18.     IGRA restricts the percentage of the **NET** profits of the non-Indian to 40% of the bottom line for a maximum of 7 years, but typically the non-Indian *cannot* be voluntarily terminated by the Tribe. However, no restrictions prevent the outsiders from additionally receiving

---

[8] *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987). The court found that the federal and tribal interests of tribal sovereignty outweighed the concerns of the state of California regarding criminal activities surrounding the tribes' "high stakes" gambling even though the games were open to the public and primarily played by non-Indians.

[9] *See e.g.*: https://www.nigc.gov/images/uploads/approved-management-contracts/unitedauburnstation.pdf and other contracts published by the NIGC at: https://www.nigc.gov/finance/approved-management-contracts.

payment for returns on its financing, equipment leases, consulting contracts, and even its own management expenses, all directly from the casino *before* the 60/40 split. Consequently, the actual return to the non-Indian can be much higher, particularly in a casino of marginal profitability. IGRA also obligates a minimum monthly distribution to the tribal government, often subject to reimbursement to the non-Indian casino developer. In the case of the lending operation of the LVD tribe, in less than four years from the inception of its arrangement with Bellicose the LVD tribe received millions of dollars in distributions, tens of millions in equity appreciation, and owned 100% of the consumer lending operation. Today, it also owns its supporting financial technology business, together they are worth over $100 million.

19.    Under IGRA, the Non-Indian manager is granted authority and responsibility over all business affairs in connection with the day-to-day operation and management of the casino, can establish enterprise bank accounts and facilitate payments for operating expenses and capital expenses. The non-Indian is responsible for reporting to the gaming commission, development and construction debt service, payment of management fees and minimum monthly disbursements to the tribe. The non-Indian manager also typically provides: operating budgets, marketing services, investment of reserve funds, employee management, setting business hours, negotiating and entering into contracts on behalf of the business, proprietary information techniques and methods of designing, selecting, maintaining, operating, marketing, developing and customizing games, proprietary information techniques and methods of training employees in gaming, proprietary business plans, projections and marketing, advertising and promotion plans, strategies, and systems. The non-Indian manager may provide these services from off the reservation using off site employees. Indeed, IGRA even allows for the licensure of non-Indian *owned* casinos on tribal land.

20. The LVD contract with Bellicose VI, LLC ("Bellicose"), discussed below, was modeled on government recognized NIGC casino agreements but provided for a much greater level of participation by members of the LVD tribe. LVD council members on the reservation were LLC managers of the tribal lender and operated as its CEO and Operations Manager. Members of the LVD tribe setup the on-reservation headquarters, posted job ads, interviewed prospective employees, set the compensation, bought the computers, reviewed and approve all operations and policies, and originated and collected the loans from the reservation. They trained, managed and hired, independently authored their company handbook and engaged in a three-phase detailed plan to grow to as many as 70 jobs on the reservation.[10]

21. Unlike many gaming contracts between a tribe and non-Indians, the distributions to the LVD tribe were not subject to recoupment by the non-Indian, and Bellicose could be fired at any time if its pricing was not market competitive, or its services were unsatisfactory. Notably, the expenses of Bellicose were *not* paid by the tribal lender and Bellicose initially incurred substantial losses on the Red Rock contract with the LVD tribe.

22. If the Plaintiffs' "rent-a-tribe" interpretation and RICO theories were applied to tribal gaming, the tens of billions of dollars a year flooding into Indian country and hundreds of thousands of jobs created would not exist. Consequently, Congress is expressly aware of tribal online lending and has taken no action to restrict it. [11]

---

[10] Approximately 10% of the members of the tribe.

[11] For example: https://tomgraves.house.gov/news/documentsingle.aspx?DocumentID=398869 (Tribes are not only recognized by Congress as co-regulators in Dodd-Frank, but the House Financial Services Committee acknowledged "[t]hese short-term, small-dollar loans are already regulated by all 50 states, the District of Columbia **and Native American tribes**."); United States Senators Steve Daines and Jon Tester wrote to the Director of the CFPB in support of tribal sovereignty specifically in the context of online lending. The Senators reminded Director Cordray that, as it relates to the CFPB's rulemaking process for payday loans, "**[m]eaningful tribal consultation is essential to upholding the federal trust responsibility, honoring the government-to-government relationship, and ensuring federal regulations take into account the sovereign status of tribal governments.**" Id. The Senators also reinforced that meaningful tribal consultation is necessary to "**ensure the preservation of tribal sovereign**

23. The LVD tribe has a casino which followed the typical pattern. The LVD Indians learned the business and eventually took over full operation of the casino. Unfortunately, profits from the LVD casino have declined and now meet less than 10% of the governmental needs of the LVD tribe, making its diversification into online lending all the more important today. In January of 2020 the LVD tribe entered into a 20-year agreement with an Australian sports betting company for the Australian non-Indian company to provide a tribal sports betting operation with the non-Indian company to offer online sports betting through the LVD tribe.

24. Unlike tribal gaming, there is no federal statute expressly governing or limiting online lending by tribes. The Supreme Court has admonished lower courts not to give "short shrift" to the important federal policies favoring tribal self-sufficiency, even in the absence of federal regulation.[12] Tribes are statutorily encouraged by the NABDA to engage in forms of commerce like tribal lending. Moreover, there is comprehensive tribal regulation of consumer lending by the Tribal Financial Services Regulatory Agency ("TFSRA") in accordance with the 2010 Federal Consumer Financial Protection Act ("CFPA"). The CFPA formed the CFPB and gave tribes the same status as states, respecting them as regulators of their online lending

---

rights and guard against harmful impacts on Indian tribes in the rulemaking process." Id. (emphasis supplied)"; In 2016, tribes even testified about online lending to the US House of Representatives Committee on Financial Services.; and despite its use of the politically charged phrase "Renting Sovereign Immunity," the Democratic Staff Report plainly states that tribal **"sovereign immunity generally precludes tribally run business from the obligation to comply with state regulations."** SKIRTING THE LAW: FIVE TACTICS PAYDAY LENDERS USE TO EVADE STATE CONSUMER PROTECTION LAWS, Democratic Staff Report, Prepared for Democratic Members of the H. Comm. on Fin. Servs, 114th Cong. (June 16, 2016), p. 16 (emphasis supplied and internal citation omitted).

[12] *Ramah Navajo School Board Inc. v. Bureau of Revenue* 458 U.S. 832, 846-47 (1982) "We have consistently admonished that federal statutes and regulations relating to tribes and tribal activities must be "construed generously in order to comport with . . . traditional notions of [Indian] sovereignty and with the federal policy of encouraging tribal independence." *White Mountain, supra*, at 448 U. S. 144; *see also McClanahan v. Arizona State Tax Comm'n*, 411 U.S. at 411 U. S. 174-175, and n. 13; *Warren Trading Post Co. v. Arizona Tax Comm'n*, 380 U.S. at 380 U. S. 690-691. This guiding principle helps relieve the tension between emphasizing the pervasiveness of federal regulation and the federal policy of encouraging Indian self-determination.

operations.[13] Today the CFPB works diligently with online tribal lenders, including the LVD tribe, on a government to government basis, to discuss its rulemaking ideas and consider the impact its rules will have on tribal economies.[14] The Plaintiffs are private parties, not a governmental agency. If internet tribal lending by the LVD tribe wasn't appropriate, and was in violation of state usury laws, and was a RICO criminal enterprise, Congress, the CFPB and other federal agencies would have shut it down long ago.

## ROUTINE TRIBAL NATION BUILDING

25.     Development arrangements with far less Indian participation, or tribal benefit, than the LVD lending operation have been approved by the courts and the United States Government. An example is *Shivwits Band of Paiute Indians v. Utah*, 428 F.3d 966, 968 (10th Cir. 2005).  In Shivwits a non-Indian specializing in outdoor advertising approached the Shivwits Band of Paiute Indians (the Band) and proposed that the Band purchase land, with money provided by Kunz, a non-Indian, south of St. George, Utah (the City) along the Interstate 15 corridor, transfer that land to the federal government to be held in trust for the Band, and lease the land to Kunz on a long-term basis so that Kunz could erect and maintain advertising billboards thereon.  Thus, the idea for

---

[13] In the very same act that recognized Tribes as regulators, Congress rejected an amendment to cap interest rates based on geography of the borrower: "In addition, one proposed amendment would have capped the interest rate at which loans could be offered at the maximum rate permitted by the State in which the consumer resided.  S. Amdt. 3746 to S.3217, 111th Cong. (introduced May 13, 2010) ("Whitehouse Amendment").  That proposal was rejected.  Id. (rejected May 19, 2010)."

[14] The relationship between the CFPB and tribal governments is expressly set forth on the CFPB web site in "**working with tribal governments**" at: https://www.consumerfinance.gov/tribal/ stating "**CFPB ostensibly recognizes that it must respect the unique relationship between the federal government and tribes**".  See also: https://files.consumerfinance.gov/f/documents/cfpb_strategic-plan_fy2018-fy2022.pdf at 2 (Acting Director recognized the same abuse LVD uncovered during the era of illegal Operation Chokepoint which Plaintiffs so frequently cite, Mr Mulvaney commented that prior leadership of **the CFPB risked "trampling upon the liberties of our citizens or interfering with the sovereignty or autonomy of the states or Indian Tribes. I have resolved that this will not happen at the Bureau.**"; https://files.consumerfinance.gov/f/documents/cfpb_payday_nprm-2019-reconsideration.pdf at 30 (CFPB since "**has engaged in consultation with Indian tribes about this proposal. The Bureau held a consultation on December 19, 2018, at the Bureau's headquarters. All Federally recognized Indian tribes were invited to this consultation, which generated frank and valuable input from Tribal leaders to Bureau senior leadership and staff about the effects such a proposal could have on Tribal nations and lenders.**") (emphasis added).

placing the billboards came from a non-Indian business, as did the capital for the purchase of land and the entire construction and operation of the billboards – with Kunz receiving $2 million and the tribe simply receiving $60,000 lease payments over the 20-year term, an undiscounted return to the tribe of 3%. The percentage revenue split was not relevant.

26.     The State of Utah and City of Saint George issued a stop order and threatened criminal action against Kunz, claiming that the billboards were in violation of state law and city zoning, but the Tenth Circuit held that the state and municipal laws had no effect on tribal land and that the state could not forbid or regulate the billboards.  In reaching this holding, the court rejected precisely the argument made by Plaintiffs here, that the Band will derive little economic benefit from the parcels and the leases, and that Kunz had improperly benefited from the Tribe merely marketing an exemption to state law.   Instead the court observed that the balancing of tribal interest is to be taken on a relative basis, "the Band's income from the leases of the parcels at issue now constitutes its greatest source of revenue."   "Not only are the billboard leases providing the Band with a significant portion of its current revenue, the record on appeal establishes that the land is an important asset for the Band in terms of future economic development."  Just as California had no authority to forbid "high-stakes" casino gaming on the Cabazon Reservation and Utah had no authority to forbid billboards on the Shivwits Reservation, no state has the authority to forbid consumer lending by the LVD tribe on the Lac Vieux Desert Reservation.[15]

27.     The 10th Circuit in *Shivwits* completely rejected the arguments the Plaintiffs make in this Chapter 11 case.  It doesn't matter if the non-Indian approaches the tribe.  It doesn't matter that the non-Indian wanted to use the Indian exemption from state law.  It doesn't matter that the

---

[15] *State of California v. Cabazon Band of Mission Indians,* 480 U.S. at 216 (citing *Mescalero*, 462 U.S. at 333-35).

parties were concerned about regulatory action. It doesn't matter that the non-Indian funded all the money. It doesn't matter that the non-Indian did all the work. It doesn't matter that the non-Indian made more money. The policy of self-determination disfavors courts second guessing the business judgment of the tribe. If you check the boxes of the Indian Commerce Clause and the appropriate Federal law, then the operation is legal. [16]

## THE DEBTOR AND THE OTHER DEFENDANTS COMPLIED WITH THE APPLICABLE LAW

28.    Prior to the involvement of Martorello, the LVD Indians had determined to establish an internet lending operation and had contracted with non-Indians to assist with the development of their business operations.[17]  Martorello is a finance and accounting professional who has started, and successfully run, financial internet tech ("fintech") companies, and has experience in consumer lending.  In 2011 Martorello learned from a "developer" for the LVD tribe that the LVD tribe wanted to expand its small consumer lending operation and was looking for outside capital and expertise.[18]  Martorello had a business, Bellicose, that had developed systems and intellectual property to streamline and optimize a consumer lending operation.  So, it made sense for the LVD tribe to hire Bellicose.[19]

29.    LVD already had the regulatory agency, the lending code, the consumer loan agreements, the on-reservation server, the consulting contracts, and creditor agreements. Martorello reviewed LVD's proposed expanded lending operation and evaluated the proposal by

---

[16] U.S. Const., Art. I, § 8, cl. 3.

[17] As early as 2008 the LVD tribe had considered establishing a tribal lending operation.

[18] Martorello was first introduced by a "developer", hired and paid for by LVD, to LVD's general counsel. Martorello would later learn that the developer had direct or indirect financial connections with the LVD tribe and its general counsel, which is not uncommon in tribal economic development.

[19] The Plaintiffs contended that Martorello devised the tribal lending operation for the LVD tribe and then pushed it to the tribe.  However at a hearing in Virginia on 5-8-2020 the Plaintiffs now admit that it was the lawyers for the LVD tribe, the Rosette firm, who found Martorello and "pushed" the tribal lending enterprise to the tribe.

the LVD tribe. Bellicose was to provide the IP and the analytics and the tribal lender would make the final lending decision and originate the loans from the reservation according to lending criteria established by the tribe.

30.     Bellicose would suggest strategies, methods and ideas and the LVD tribe would decide how to operate and underwrite. Bellicose would also assist with vendors and creditors, several of which were understandably concerned about dealing with tribes with sovereignty.

31.     Bellicose provided the LVD tribe with growth strategies to increase Indian jobs on the reservation and enhance the management capabilities of LVD executives, did data analytics, developed marketing lead strategies, provided credit analysis, arranged financing (because many lenders, like the vendors, are hesitant to loan to borrowers with sovereign immunity), and performed ministerial operational tasks.

32.     Both Martorello and the LVD tribe wanted to be certain that the lending operation would comply with all applicable laws. The LVD Indian lending business was not like other online lending operations that are frequently cited by the Plaintiffs. Those other operations involved non-existent dispute resolution forums, in many cases didn't even involve tribes, had revoked federal law or were blatant frauds engaged in egregious federal lending law violations.[20]

33.     Because there is no federal statute comparable to IGRA to regulate tribal lending, Martorello engaged one of the leading experts in the country on tribal lending, Jennifer Weddle at Greenberg Traurig. Weddle has been involved in virtually every Supreme Court case involving Indian law since 2001. She had over two dozen esteemed lawyers extensively involved in the creation of the arrangement between Bellicose and the LVD tribe. The lawyers examined every

---

[20] In this case, The LVD tribe did not revoke federal law. Rather, the loan agreements specifically invoke applicable federal laws and LVD's Tribal law even embeds the federal consumer lending laws, by title, in the LVD lending code.

contract and issue, the consumer loan agreements, the tribe's laws and regulations, the tribal jurisdiction and dispute resolution procedures, third party debt facilities, and attorney general inquires. These lawyers included: the former United States Attorney for Colorado (co-head of GT Indian Law group); former Assistant Attorney General of the State of New York; former Assistant United States Attorneys; the former appellate chief for the Southern District of New York; and a former top Federal Trade Commission official. Experienced lawyers for the LVD tribe were also intimately involved in the construction of the relationship and in the day-to-day on-reservation activities. Those tribal lawyers consistently reported to the LVD tribal council and the co-managers of the LVD lending operation who sought legal advice for federal compliance on nearly every Bellicose recommendation prior to its implementation. Martorello received a dozen legal opinions, in various forms, concluding that the lending structure is legal and state law inapplicable.[21]

34. Together, these experts developed the structure of the relationship between the LVD tribe and Bellicose, modeled on the Congressionally approved NIGC tribal gaming management contract. The experts all agreed, and still agree today, that the LVD tribal lending business was entirely lawful then and is lawful today. The lawyers for the LVD tribe constructed similar structures for numerous other tribes engaged in tribal lending.[22] Today, the online tribal

---

[21] Inception (GT and Rosette); 11/21/12 (GT law); 8/22/13 (GT Law directly addressing NY DFS); 9/9/13; 10/13/13 (NCAI); 4/1/14 (GT Law publication); 5/9/14; 10/1/14 (result of Otoe-Missouria conclusion); 11/3/15; 12/8/15; 1/26/16; 2/6/16; and 11/27/17 (NCAI amicus by GT Law). Ms Weddle and the former General Counsel of Bellicose, Dan Gravel, have testified that the lending structure is, and always was, lawful.

[22] These are not the only lawyers recognizing the legality of tribal lending. Pepper Hamilton's Richard P. Eckman, *et al.*, Update on Tribal Loans to State Residents, 68 The Business Lawyer, ABA Business Law Section, 2 (February, 2013) ("**Most agree that federally recognized, sovereign tribes have the authority to engage in internet lending to state residents without those tribes being subjected to state authority.**"); Victor D. Lopez, When Lenders can Legally Provide Loans with Effective Annual Interest Rates Above 1,000 Percent, is it Time for Congress to Consider a Federal Interest Cap on Consumer Loans?, 42 J. Legis 36 (2016) (same); Blake Sims & Justin Hosie, Tribal Loans to State Residents—The Next Test of Sovereign Immunity, Consumer Fin. Servs. Newsl. (Am. Bar Ass'n), Winter 2011 (**"[T]ribes may continue to make loans to non-tribal residents, following only tribal law, until Congress passes federal legislation clarifying the respective rights of the sovereigns involved."**); Jennifer

lending industry is growing. Sources estimate dozens of tribes now depend on tribal government to consumer online lending for critical tribal funding.

35.     Consistent with tribal economic development, it was contemplated that the operation would ultimately employ a significant percentage of the LVD tribe.[23] A member of the tribal council, Craig Mansfield, was selected as Operations Manager. Mansfield was responsible for all call center operations including the initial implementation and build out of the call center, all front-line personnel management, including hiring and training, daily origination of loans and ACH files and general office management. Bellicose provided detailed job descriptions and postings for the Operations Manager and other employee positions demonstrating the material involvement the reservation played in the lending operation. Michelle Hazen, one of the tribal co-managers and now CEO of the tribal lender, was also involved with the interview process.[24]

---

H. Weddle, Nothing Nefarious: The Federal Legal and Historical Predicate for Tribal Sovereign Lending, 5 The Federal Lawyer (April 2014) **(just like interstate bank loans, "loans by sovereign Indian tribes represent another category of loans under U.S. law that may be made to residents of states without regard to state usury law.")**; Nathalie Martin & Joshua Schwartz, The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk, 69 Wash. & Lee L. Rev. 751 (Spring 2012) **("We do not question the right of tribes to utilize sovereign immunity to engage in payday lending. Rather, we gently question the wisdom.")**; Bree R. Black Horse, The Risks and Benefits of Tribal Payday Lending to Tribal Sovereign Immunity, 1 Am. Indian L. J. 388 (2013) **("With regard to tribal sovereign immunity, Congress has elected to not obstruct the doctrine in an effort to encourage tribal economic development and self-sufficiency…[Thus,] tribal payday lending operations do function as arms of the tribe under the law, and are therefore entitled to the protections of tribal sovereign immunity.")**; Heather L. Petrovich, Circumventing State Consumer Protection Laws: Tribal Immunity and Internet Payday Lending, 91 N.C. L. Rev. 326 (December 2012) **(advocating for congressional action to address perceived problems with tribal online lending)**; Adam Mayle, Usury on the Reservation: Regulation of Tribal-Affiliated Payday Lenders, 31 Rev. Banking & Fin. L. 1053, 1076 (2012) **(advocating for Congress to address tribal online lending by limiting sovereign immunity to tribal lenders "created under tribal law and owned by the tribal government.")**; Jeff M. Kosseff, Sovereignty for Profits: Courts' Expansion of Sovereign Immunity to Tribe-Owned Businesses, 5 Fla. A&M U.L. Rev. (2009) **(advocating for congressional action to address perceived problems with sovereign immunity being asserted by tribally owned businesses)**.

[23] *See* the declaration of Justin Martorello.

[24] See Michelle Hazen's declaration detailing the tribe's conception of Red Rock, the role of Red Rock and Bellicose, LVD's "considerable experience and knowledge" gained, the purpose for Big Picture Loans and the sale transaction, complete lack of post transaction involvement by Eventide or Martorello, the operations of Big Picture and Ascension today, the substantial interest of the business on the tribal membership, and a detailed description of a consumer loan transaction process.

36. Mansfield setup the call center, purchased cubicles, purchased computers, setup the internet, setup billing, hired an assistant manager, hired call center operators, setup payroll, purchased items for the tribal lending business and controlled the bank accounts.

37. Mansfield unilaterally set the initial wages in his sole discretion, independently placed employment adds, and was the ultimate decision maker for hiring and created the employee handbook. Mansfield also communicated with the bank and payment processor. He coordinated with Bellicose. He reviewed and approved everything including website content, loan applications, underwriting strategies, funding, approval process, direct mail strategy, lead buying, collections, contracts, call center scripts, customer acquisition, etc.

38. He acknowledged that the authority to extend the funds rested solely and absolutely in the discretion of Red Rock and Duck Creek, that the decisions to make the loans were made by the people who worked on the reservation, and that it was the on-reservation personnel who received the payments and applied them to the consumer accounts. The team he built also sent communications to past due accounts, handled customer complaints, continued to learn about the business and supported and answered questions for the Philippines call center employees.

39. To obtain a loan, customers must visit LVD's on-reservation tribal server, which hosts the website and controls the application process. As the 4th Circuit found, the last act necessary to consummate the loan agreements – along with the most the key initial steps took place **on the Reservation**. The application is electronically reviewed, applying procedures that have been adopted and approved by the tribal management located on tribal land who had the ultimate say in what procedures would be adopted. Employees located on Reservation undertake the final review of the loan, enter the date for the dispersal of funds, and approve the agreement. Thus, the last act necessary to form the contract takes place on the Reservation.

## TRIBAL CONTROL

40.     Plaintiffs attempt to manufacture a fiction that the Tribe was not in control and therefore not the true lender.  In addition to being factually inaccurate it is legally irrelevant.  No legal basis exists for anyone but Congress to dictate an ecommerce law comparable to IGRA in gaming.  It is not the ministerial details of who did what, or if the LVD tribe accepted consulting advice too much, or if the LVD tribe had yet learned enough to reject recommendations, or if/how the LVD tribe documented their approvals.  The binding legal contract between the LVD tribe and Bellicose unequivocally gives ultimate control to the Tribe, in its sole and absolute discretion, to approve or reject (or revoke) every single aspect by which their business operated.  The LVD lending operation was implemented and operated in accordance with the agreements between the LVD tribe and Bellicose.  At all times, the lending businesses were controlled by LVD.

41.     If Bellicose was not operating at market rates, or was performing at a substandard level of service, LVD always had the right to terminate Bellicose at will.  The LVD tribal lenders also had the right to reject daily originations, to cease applying payments to loans, to turn off the on-reservation server, to revoke all prior authorizations pertaining to operations procedures, to fire key vendors, and to close accounts.

42.     If terminated, Bellicose would be left, potentially overnight if the tribal council so chose, to turn over to the LVD tribe its intellectual property and walk away.  Martorello was aware of this risk, and the potential improper copying of Bellicose's intellectual property.[25]

43.     The Fourth Circuit has already concluded, after its review of the evidence pertaining to the LVD tribal lending operation, that Big Picture Loans is the lender and all decisions and control resided decisively with the tribal lender and ultimately the tribal council.

---

[25] *See* Declaration of Matt Martorello.

18

## NON-TRIBAL SMALL DOLLAR LENDERS ARE ALSO NOT SUBJECT TO STATE USURY LAWS AND THEIR RATE EXPORTATION MODELS ARE THE EXPRESS POLICY OF THE FEDERAL GOVERNEMENT

44.    Tribes aren't the only ones who structure their operations to minimize exposure to state usury laws.  For example, bank lenders, and others, engage in high interest consumer loans utilizing banks in Utah, South Dakota, Delaware and other favorable states as the initial lender to avoid less favorable state usury laws.  The banks often enter into arrangements with non-banks to perform significant functions.  That lending structure has been supported by the CFPB, the Federal Reserve, the US Treasury, the GAO, the FDIC and the OCC, even though the non-bank financial technology partner makes more than 90% of the profits, uses its brand as the face for the lender, performs nearly all of the front-end and loan performance functions, originates the loans carrying triple digit interest rates, and immediately sells the loans to non-bank third parties.[26]  Although these loans are made nationwide, the banks utilize federal preemption concepts (just like the LVD lending operation) to export the favorable Utah or South Dakota rates to the rest of the country even though the nominal bank lender is minimally involved and makes a small percent of the revenue.[27]  Even though these arrangements have been criticized as rent-a-bank structures, they

---

[26] See, FDIC Examination Guidance for Third-Party Lending As of July 29, 2016 at www.fdic.gov. (Third-party lending **arrangements may include the following:  "Insured institutions originating loans for third parties** – In these situations, an insured institution typically serves as the originator for an entity that lacks the necessary licenses or charter to lend on its own behalf **or seeks to take advantage of the institution's ability to export interest rates. Often, the insured institution does not retain significant amounts of loan volume generated, but rather holds the loan for only a short period of time before selling it to the third party, which typically secures the ultimate funding source)**;  See also: https://www.fdic.gov/news/news/financial/2005/fil1405a.html#foot1 updated in November 2015, citing the "**typical charge is… an APR of nearly 400%**", and "Insured depository institutions may have payday lending programs that they administer directly, using their own employees, or they may enter into arrangements with third parties. In the latter arrangements, the institution typically enters into an agreement in which the institution funds payday loans originated through the third party. These arrangements also may involve the sale to the third party of the loans or servicing rights to the loans. Institutions also may rely on the third party to provide additional services that the bank would normally provide, including collections, advertising and soliciting applications."

[27]  S*ee, Sawyer v. Bill Me Later, Inc.*, 23 F. Supp. 3d 1359 (D. Utah 2014): The servicer was the face of the transaction, facilitated origination, performed a credit check, determined whether to extend the credit and purchased the loans from the lender after 2 days.  The Court held that the Federal Deposit Insurance Act preempted the plaintiff's claims under California law [similar to tribal preemption of state law under the Indian Commerce Clause].

are specifically authorized by the FDIC.  This is consistent with the current federal policy of expansion of consumer access to credit, consumer choice and innovations in banking operations and structure. [28]

---

The court analogized the partnership between the bank and Bill Me Later to a credit card program and stated that such program was subject to supervision by federal banking authorities.  See 23 F. Supp. 3d at 1366–68.  **Even if the partnership was simply a sham to avoid state usury law, the court explained, it would be the task of federal banking regulators, not courts, to address problems that resulted from that partnership and similar arrangements**.  See id. at 1367–68; *Hudson v. ACE Cash Express, Inc*., 2002 WL 1205060 (S.D. Ind.): "The plaintiff alleged that the purpose of the partnership agreement between ACE and the bank was to circumvent Indiana's usury laws, but the court held that **even if circumvention of state usury laws was the purpose of the agreement, § 85 of the National Bank Act [similar to tribal preemption of state law] made such an agreement lawful**.  See id. at *4.  The fact that the agreement required ACE to purchase a **95% interest** in any loan made under the agreement was **irrelevant** to the court, as was the fact that ACE was responsible for collecting payments under the loans.  See id. at *3.  **The court saw "no basis for drawing jurisdictional boundaries" between federal and state banking regulation based on the purpose of an arrangement between a bank and a non-bank entity**.  Id. at *6."*; Beechum v. Navient Solutions, Inc.*, 2016 WL 5340454 (C.D. Cal. Sept. 20, 2016): The court held that when assessing whether a transaction falls under a constitutional or statutory exemption from the state's usury laws, the court may only look to the face of the transaction.  **The non-bank lender originated, underwrote, marketed, and funded private student loans for which the bank would be identified as the lender The non-bank lender would subsequently purchase 100% of the loans** from the bank within 90 days of disbursement for principal, plus accrued interest, and less the amount paid for indemnification of loan loss.); *Meade v. Avant of Colorado, LLC*, 2018 WL 1101672 (D.Colo.) **consumer applied for and obtained loans from servicer website; servicer buys loans within 2-days, paid all lender legal fees and fees to initiate the program, bore all expenses incurred, determined which loan applicants received loans and bore all costs of making such recommendations, was responsible for compliance with federal and state laws, indemnified the Lender, bore all risk of default, and conducted underwriting, servicing, and collection; Servicer retained 99% of profits** on the loans); *Ubaldi v. SLM Corp.,* 852 F.Supp.2d 1190 (N.D. Cal. 2012) where the court stated that a 5% retained interest would have "some persuasive force" as a significant stake: "In Hudson, the bank 'made the loan to Hudson and then sold a participation interest to ACE,' retaining a 5% stake in the loan. 2002 WL 1205060 at *7. The Hudson court noted: 'The record shows that Goleta actually made the loan **and retained an even greater financial interest in its loan to Hudson than the national bank in Krispin, which the Eighth Circuit held sufficient to invoke the National Bank Act in that case**." Id. at *5-6 (citing Krispin, 218 F.3d at 924). Hudson concluded as a matter of law that the usury claims were expressly preempted because '§ 85 of the National Bank Act governs the fees and interest rate that Goleta charged Hudson in this case.' Id.".  The court agreed with Hudson that public policy concerns arising from the "rental" of charters as potentially suitable for regulatory redress, but reasoned that the federal banking regulatory scheme (much like tribal development) required uniform application rather than fact-intensive difficult line drawing by the courts predicated on "the subjective purpose of those engaged in the transaction and/or the precise extent of financial risk accepted by the national bank". (emphasis added).

[28] See May 20, 2020 joint press release by Federal Reserve Board, FDIC, NCUA and OCC at https://www.fdic.gov/news/news/press/2020/pr20061.html?source=govdelivery&  to "recognize the important role that responsibly offered small-dollar loans can play in helping customers meet their ongoing needs for credit from temporary cash-flow imbalances, unexpected expenses, or income shortfalls, including during periods of economic stress, natural disasters, or other extraordinary circumstances such as the public health emergency created by COVID-19" and "encourage supervised banks, savings associations, and credit unions to offer responsible small-dollar loans to customers for consumer and small business purposes" including a fact sheet summarizing studies proving that small dollar loan products meet the credit needs of families.  See also; CFPB "statutory mandate to promote competition, innovation, and consumer access within financial services. To achieve this goal, the new office will focus on creating policies to facilitate innovation, engaging with entrepreneurs and regulators, and reviewing outdated or unnecessary regulations" https://www.consumerfinance.gov/about-us/newsroom/bureau-consumer-financial-protection-announces-director-office-innovation/ and "building a bridge to credit visibility"

45.     The concept of federal preemption of state interest rates is rooted in the power of Congress, and has always been implicit in financial transactions since citizens of one state were free to visit a neighboring state to receive credit at foreign interest rates.[29] In the early years after the founding of the United States, national banks often faced regulatory challenges waged by hostile state regulators against national banks who made loans to out-of-state borrowers under terms that state regulators alleged were usurious. But nearly 200 years ago, in *McCulloch v. Maryland*, the Supreme Court held that federal law is supreme over state law with respect to national banking. [30] Congress ended state interference in national banking by passing the National Bank Act ("NBA") in 1864 to facilitate a national banking system. Since the passage of the NBA, the Supreme Court has repeatedly made clear that the States can exercise no control over national banks unless permitted by Congress.  As a result of this federal preemption, a national bank may export a favorable interest rate from its home state in transactions with borrowers from other states. There is no such thing as a state-law claim of usury against a national bank.

46.     The National Bank Act, Rev. Stat. § 5197, as amended, 12 U.S.C. § 85, provides that a national bank may charge interest 'on any loan' at the rate allowed by the laws of the State in which the bank is "located." *Marquette Nat. Bank v. First of Omaha Corp.*, 439 U.S. 299, 308 (1978). [31]   "[A] national bank is 'located' for purposes of § 85 in the State named in its organization

---

https://www.consumerfinance.gov/about-us/events/archive-past-events/building-bridge-credit-visibility/; Treasury "A Financial System that Creates Economic Opportunities – Nonbank Financials, Fintech, and Innovation report: https://home.treasury.gov/sites/default/files/2018-08/A-Financial-System-that-Creates-Economic-Opportunities---Nonbank-Financials-Fintech-and-Innovation_0.pdf; OCC office of innovation promoting a non-bank rate exportation lending license, https://www.occ.treas.gov/topics/responsible-innovation/index-innovation.html; and GAO recommending "expansion of credit" urging more certainty "for fintech lenders interested in pursuing partnerships with banks" https://www.noonanandlieberman.com/updates/gaos-report-to-congress-on-fintech-recommends-agencies-provide-clarification-on-lenders-use-of-alternative-data/

[29] *Marquette Nat'l Bank*, 439 U.S. at 318.

[30] *McCulloch*, 4 L. Ed. 579 (1819.

[31] In that case the Supreme Court specifically addressed the risk that its decision would undermine state usury laws and found that it was implicit in the provision of the National Bank Act that applied the interest rate of the bank's

certificate or in a state in which it has its main or branch offices." *Pacific Capital Bank v. Connecticut*, 542 F.3d 341, 352 (2d Cir. 2008)(quotations omitted). In addition, "[a]t a minimum, the bank must demonstrate, through proof in admissible form, that at least one significant non-ministerial action associated with the account took place in the bank's 'home state.'" *Citibank v. Hansen*, 28 Misc. 3d 195, 196 (N.Y. Misc. 2010). The three non-ministerial functions are the "approval, disbursal and the extension of the credit." Comptroller of Currency Interpretive Letter No. 822 at 12. With regard to approval, "[i]f . . . a loan is subject to non-discretionary criteria [such as a credit-scoring model] that will be applied mechanically, … the loan is approved where the decision to apply those criteria to that loan is made." Id. at 12. All approval criteria of the LVD tribal lending operation were approved by the tribal Co-managers, all operating on the Reservation, and all personnel with the authority to override these criteria were located on the Reservation. Consequently, this non-ministerial function took place on the Reservation. The instruction to disburse funds was also issued from the Reservation.

47. The *final* non-ministerial function is "the site from which the first communication of final approval comes.".[32] This took place on the Reservation. Indeed, the lenders are incorporated under tribal law, headquartered on the Reservation, and undertake substantially **all** of the non-ministerial functions on the Reservation. [33] If the National Banking Act and its benefits

---

home state, not the customers'. *Marquette Nat. Bank v. First of Omaha Corp.*, 439 U.S. 299, 318-19 (1978) ("Petitioners' final argument is that the 'exportation' of interest rates, such as occurred in this case, will significantly impair the ability of States to enact effective usury laws. This impairment, however, has always been implicit in the structure of the National Bank Act, since citizens of one State were free to visit a neighboring State to receive credit at foreign interest rates. Cf. 38 Cong. Globe, 38th Cong., 1st Sess., 2123 (1864). **This impairment may in fact be accentuated by the ease with which interstate credit is available by mail through the use of modern credit cards. But the protection of state usury laws is an issue of legislative policy, and any plea to alter § 85 to further that end is better addressed to the wisdom of Congress than to the judgment of this Court.**") (emphasis added)

[32] https://www.occ.gov/topics/charters-and-licensing/interpretations-and-actions/1998/int822.pdf

[33] *See* expert opinion Richard Ross, detailing: the LVD non-ministerial functions occurring on reservation; the origin of rent-a-tribe from banking; Red Rock bore the risk of the loans as "true lender"; and similar models existing in lending attached to the Debtor Objection.

of preemption of state law are any barometer as to what is appropriate for tribal preemption, and the ability for a tribal lender to engage non-tribal fintech support, the legality of the LVD tribal lending is unquestionable.

48. It is perfectly permissible for an entity to deliberately structure its affairs with this test in mind. "[T]he court does not question [the banks'] right, consistent with federal law, to structure its credit line and credit card affairs in a manner that enables it to avoid and circumvent the usury limits of th[e] state," provided that it "has, indeed, so structured its affairs." *Citibank v. Hansen*, 28 Misc. 3d 195, 201 (N.Y. Misc. 2010). The same is true for tribal internet lending.

49. If Plaintiff's theories of a "predominate economic interest test" are somehow relevant to restricting sovereignty, (unlike non-tribal cases Plaintiffs frequently cite) Red Rock, Duck Creek and later, Big Picture, were the *only* entities which bore the entire risk of defaults and owned the entire economic interest in the loans from inception through termination.[34]

50. Under Restatement (Second) of Contracts 188, the 4th Circuit has effectively determined that the reservation also is the place of contracting, the place of negotiation and the place of performance (since this is where payments were mailed, or electronically received, and uploaded to the bank and loan accounts to apply against the consumer accounts). In addition, the risk of a default on the loan agreement is borne by the tribe. Were a balancing necessary, the tribal interest in revenues to provide vital services to an impoverished community, much like the interest of the federal government in tax collections, far outweighs and constitutes a "materially greater interest" in the loans than any state.[35]

---

[34] Big Picture Loans, LLC is the tribal successor to Red Rock and Duck Creek.

[35] As demonstrated in *Shivwits Band of Paiute Indians v. Utah*, 428 F.3d 966, 968 (10th Cir. 2005), tribal interests are measured on a relative basis and long-term basis, not a nominal basis. See declaration of Chairman Williams detailing the substantial interests the tribe has in the loans, as the Fourth Circuit also found. In balancing interests, tribal interests additionally benefit from the federal interests inextricable link to tribal economic development. Here, LVD's interest are on par with the importance of federal income taxes to the US government.

51.     In Texas, Credit Access Businesses ("CABs") have charges for small dollar consumer lending similar to those of the LVD tribe.  In the CAB model the CAB is the face of the lender, and performs all of the front-end and loan performance functions, but the lender provides the dollars to be loaned, and it receives the non-usurious "interest" rate (usury cap is 10% APR) while the CAB gets all of the remainder as fees for a combined triple digit average percentage rate to the borrower.  This economic split, on a net basis, is not unlike the fintech/bank partnerships above, approximately 90% to the CAB and 10% to the lender. [36]

52.     An even more striking example involves Low Income Housing Tax Credits ("LIHTC").  Because tribes are federally tax-exempt entities, non-Indian investors may own up to 99 percent of a tribal project for the 10-year period of the tax credits.[37]   The same is true for New Market Tax Credits where the non-Indian investor may own up to 99 percent of the tribal project for seven years.  In both cases, it is common for the investors to transfer ownership of the project to the Indians after the tax credit period has expired. [38]   In this case, the entire operation was transferred to the LVD tribe in four years, resulting in several millions of dollars for the tribe. [39]

53.     In what could be described as a perfectly legal rent-a-municipality structure, an industrial organization will team up with a municipal organization to issue tax free industrial

[36] The Texas Office of Consumer Credit Commissioner details the statutory fintech-lender relationship here: https://occc.texas.gov/sites/default/files/uploads/what-is-a-cab-6-26-14.pdf; see also the economic breakdown within the "Components of the Finance Charge" at 90% net vs 10% net: https://www.checkngo.com/wp-content/uploads/2018/02/TX_PDL_CNG_ONLINE_2018V1.pdf).  Dozens of comparative examples exist across Texas are publicly available, and similar statutory arrangements to the CAB model have existed in FL, OH and MD. CABs are prevalent across the state of Texas and was upheld by the 5th Circuit in *Lovick v. Ritemoney, Ltd.,* 378 F.3d 433 (2004).

[37] *Low Income Housing Tax Credits 101,* Travois, Inc. (2013).

[38] 26 U.S.C. 45d.

[39] While Plaintiffs prefer to measure only distribution to owner, 2% of **revenue** increasing to 6% over time (alone a substantial interest to LVD as the Fourth Circuit found), one benefit they ignore is the **value of the equity** which has been estimated to be $25 million in additional value to the Tribe at the date of sale, and well in excess of $100 million upon maturity of the note.

24

revenue bonds at low rates. The industrial organization gets a new facility by using the tax attributes of a municipality and the municipality gets a new business resident. Similarly, private activity bonds are nominally issued by the governmental entity for the benefit of the private party.

### THE ARRANGEMENT WITH BELLICOSE

54. Having been assured that the arrangement and the economics would be legal, and not subject to state usury laws, the LVD tribe and Bellicose entered into a contract where the tribe's consumer lenders, Red Rock and Duck Creek, which were arms of the tribal government, would make internet loans on the reservation. The documents between the tribal lenders, Red Rock and Duck Creek, and the borrower apply tribal and federal laws, not state law. The tribe would own the lending business and conduct all of the activities of the lending business on the reservation.[40] The tribe would determine the marketing strategy. The tribe would get the online credit applications from the customers, which were submitted to a server on the reservation. The tribe would determine the underwriting and decide which loans to make or deny. The tribe would send the money to the customer from the reservation. The payments would be made to the tribe and debited to the accounts and applied to the loans all on the reservation.

55. The tribe would determine the collection strategy. The tribe would bear the entire risk of defaults and owned the entire economic interest in the loans. The tribe made the strategic decisions and could revoke those decisions at any time in its sole discretion. The tribe employed Indians on the reservation to handle the lending business.[41] Dozens of Philippine customer service representatives reported directly to on reservation employees of the tribe. The tribe's compliance board, and the tribal regulatory agency ensured that applicable federal and tribal laws were

---

[40] See Declaration of Matt Martorello.

[41] See declaration of Justin Martorello regarding on reservation operations.

followed. Tribal officials, and the tribal council were regularly involved in decisions, and approved the annual budgets. A member of the LVD tribal council acted as executive officer and approved operational decisions for the tribal lender.

56.     Bellicose would develop the tribe's intellectual property and provide support services off the reservation. The tribe could fire Bellicose and retain increasingly valuable intellectual property that Bellicose had developed. Bellicose would provide expertise not available on the reservation, and operational services, off the reservation, and was paid for that expertise and services based on levels of success at economic rates similar to comparable arrangements between bank and non-bank lenders. While the tribe would receive a guaranteed minimum of 2% of the revenues, it also built an equity value approximating $25,000,000 by date of sale in January 2016 and is estimated to increase to well over $100 million by 2023.

57.     The LVD tribe has also loaned over $7,000,000 to the current tribal lender, Big Picture, also an arm of the tribe, and has received significant interest payments in addition to the millions of dollars received by the LVD tribe from the lending operation.

58.     All of this was subject to federal lending laws, as well as Indian law, which has comprehensive regulations for consumer lending to protect consumers and was blessed by both lawyers for Bellicase and the LVD tribe. In many cases these Indian laws incorporate relevant federal laws. This structure is absolutely consistent with the federal policy of long range Indian economic development and worked as contemplated by the government policies which the United States government is obligated to promote.

59.     LVD's distributions funded schools, college scholarships, health care, housing, elder care programs, utility assistance programs, safety and legal systems, and provided other significant benefits to the tribe. The distributions alone averaged 30% to 40% of the governmental

operating budget of the LVD tribe. As originally contemplated by the LVD tribe, it was then ready to purchase Bellicose and take over the entire operation.

## THE SALE

60.     In the Fall of 2012, less than a year after the inception of the Bellicose agreement with Red Rock, Michelle Hazen, one of the tribal co-managers of Red Rock, first suggested the possibility of a potential acquisition by the LVD tribe of the Bellicose operation citing the substantial importance its continuity meant to the tribal people. Martorello responded offering to sell a copy of the Bellicose IP, but the parties did not come to terms.

61.     Subsequently, the parties discussed a long-term joint venture option, and in December of 2013 Martorello again rejected LVD's proposal tribe for economic reasons.

62.     In June of 2014 the LVD tribe again approached Martorello regarding a proposed sale. Once again Martorello rejected the offer based on the economics.

63.     On August 14, 2014 the general counsel for the LVD tribe sent Martorello three options to consider, including one with a structure similar to the final sale terms contemplating a sale price as a multiple of portfolio revenue, payments from a waterfall and a sunset provision.[42] The economics appeared to meet the economic and tax benefits required by Martorello. If a final agreement could not be reached, Martorello had other tribes eager to acquire Bellicose. For the remainder of 2014, Martorello studied the tax impact and structure of the contemplated transaction.

64.     In late 2014 Martorello's wife became pregnant and Martorello realized that he would relocate from his then residence in Puerto Rico and his Puerto Rican tax benefits might

---

[42] Plaintiffs used to contend that "the sale transaction was devised by Martorello to shield him and his closely-held corporations…" The Fourth Circuit disagreed. In fact, Plaintiffs knew that Martorello did not devise the sale deal at all. In other litigation, Plaintiff's complaint admits, "This sale model-**designed by the Rosette law firm** (counsel for the Tribe and Tribal Lending Entities)-has been used by several other tribal lending enterprises involved in this illegal conduct. **See Williams v Big Picture Loans, LLC**, 329 F. Supp. 3d 248, 272 (E.D. Va. 2018)… (Solomon v. Am. Web Loan, No. 4:17CV145, 2019 WL 1324490, at *7 (E.D. Va. Mar 22, 2019))" (emphasis added).

expire.[43]  After concluding that the structure of the proposed sale would not jeopardize Puerto Rican tax benefits contemplated by Martorello the sale contracts were further negotiated and finally executed in October of 2015.

65.    Consequently, after considerable negotiations over many months, this Debtor, Eventide, was formed to implement the sale of Bellicose to the LVD tribe in exchange for a seller financed 7-year secured earn out note with a face amount of $300 million **(the "Note")**.  The tribe would pay no more than $300 million, and possibly much less, for Bellicose.  In December 2018, LVD Chairman Williams testified that "LVD is projected to pay only $139 million for the business, which is likely worth about two times as much."  The sale closed in January 26, 2016, over three years after the initial of discussions of a sale began.  The parties publicly announced the deal as a landmark success story in Indian country. [44]  Today, the LVD tribal lending operations have over $57 million in retained earnings.

66.    As part of the restructure, the tribe formed Big Picture, a successor to Red Rock and Duck Creek, as the lender on the reservation, and Ascension Technologies, Inc. ("Ascension") as the tech provider for the business and successor to Bellicose.  Ascension is owned by the tribe and is headquartered on the reservation.  Most of Ascension's employees are off the reservation, where technical expertise, not available on the reservation, is available for the Ascension operations. [45]  The utilization of non-Indian expertise is specifically provided for and sanctioned in Section 2(a) (12) of the NABDA to fulfill federal policy.

---

[43] Significant tax and economic benefits were available to Martorello in Puerto Rico.

[44] https://www.prnewswire.com/news-releases/lac-vieux-desert-band-of-lake-superior-chippewa-indians-bolsters-tribal-economic-development-portfolio-with-purchase-of-bellicose-capital-llc-300210679.html

[45] Experienced data analysts and software experts are few and far between on a rural reservation of 700 members.

67.     Both Big Picture and Ascension are wholly owned by Tribal Economic Development Holdings, LLC ("TED"), which is owned by the tribe. Each of these, and each of their predecessors, is a governmental arm of the tribe and not subject to state law. The tribe runs everything. Lending by Big Picture continues to be done on the reservation, with primarily Indian employees. The tech services, CPAs and data scientists are provided by Ascension in Atlanta, the American Virgin Islands and Puerto Rico, with many of the Ascension employees, including its CEO, Brian McFadden, being the non-Indian personnel formerly employed by Bellicose. Neither Eventide nor Martorello is involved in the lending by Big Picture or the operations of Ascension. Eventide is just a secured creditor with marketplace rights consistent with holders of earn out secured notes with termination provisions.[46]

68.     The economics of the earn out Note work like this. As is typical for Indian operations, the tribe now takes 6% of the gross revenues off the top to support the governmental activities of the tribe. This is comparable to the off the top amount that tribes take from casino operations regulated by IGRA. Next comes the costs of the operation, including the operational costs of Ascension. That includes not only wages and rent, and the day to day expenses, but also very large marketing costs, as well as interest payments and financing costs to other lenders to Big Picture.

69.     Only then, after all costs are paid, if there are any dollars left over, those dollars go to pay down the Eventide Note. To ensure that only fair value is paid by the tribe, the Note, unless extended by a court, sunsets the remaining principal and interest after 7 years, in 2023. In fact, the

---

[46] *See,* expert report of John Norman 1-11-2019.

LVD tribe has not made payments to Eventide in accordance with the provisions of the Note for several months and the LVD tribe appears to be in default.[47]

70.     Since this is an earn out note, it has some tight reporting and other covenants, typical of that type of a note, including provisions regarding change of management and budgetary constraints.[48] The tribe hasn't provided required information, has improperly incurred debt, has breached several covenants, and changed its business operation to the detriment of the Debtor, which are additional defaults.[49]    These defaults, the lack of payments on the Note, and the oppressive cost of litigating in multiple forums, has resulted in this Chapter 11 case.

## THE OTOE-MISSOURIA REQUEST FOR PRELIMINARY INJUNCTION

71.     Plaintiffs cite to the *Otoe-Missouria* injunction decisions for the proposition that the loans are subject to state law and as the factual catalyst for Martorello's alleged effort to avoid liability. In *Otoe-Missouria* certain tribes, including the LVD tribe, sued the New York Attorney General seeking to enjoin the New York Attorney General from interfering with the tribal lending businesses of the tribes, much like the activities taken in Operation Chokepoint (detailed below). In October of 2014, the 2nd Circuit concluded that enough evidence had not been presented to meet the difficult standards for an injunction but neither the district court nor the 2d Circuit found LVD's lending activities were "illegal," In fact, the Fourth Circuit's decision in *Williams* effectively determined that the lending activities of the LVD tribe weren't subject to Virginia usury laws. The Fourth Circuit noted *Otoe-Missouria* in rejecting the theory advanced by the *Williams* plaintiffs in Virginia and by the Plaintiffs in this Chapter 11 case. See *Williams*, 929 F.3d at 175.

---

[47] Reconciliation of the Note payments is currently part of the arbitration proceeding.

[48] Expert report of John H. Norman January 11, 2019.

[49] The business model was changed to minimize profits and payments to the Debtor on the Note in favor of potential increases in equity appreciation.

72.     While the preliminary injunction record presented to the 2d Circuit was insufficient to justify an injunction, the court did not disagree with LVD's ultimate legal position regarding the application of tribal law to the LVD tribal lending operations through the principles established in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987) and *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 143 (1980), finding that "[a] court might well find that the tribes' sovereign interest in raising revenue militate in favor of prohibiting a separate sovereign from interfering in their affairs" and that with the benefit of a complete record the tribes "may ultimately prevail" in the litigation. *Otoe-Missouria*, 769 F.3d at 112 n.4, 118, n.6.

73.     The much more complete record before the Fourth Circuit in *Williams* confirmed the 2nd Circuit's legal conclusions necessary to prevail in *Otoe-Missouria*, that: "one side of the transaction" (i.e. the lending) is "firmly rooted on the reservation"; or that the "transactions occurred" on the reservation and the tribe has a substantial interest in the lending business. [50] *Williams*, 929 F. 3d at 174-75, 182, 184-85. The Fourth Circuit further concluded that the LVD tribal lending entities serve the important federal interests of "tribal self-governance and tribal economic development" and "'the promotion of commercial dealings between Indians and non-Indians.'" Id. at 185 (quoting *Breakthrough Management Group, Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1187-88 (10th Cir. 2010)).

74.     Martorello and the LVD tribe viewed the 2d Circuit decision in Otoe-Missouria as a validation of the tribal law positions determined by the experts and relied upon by Martorello, but LVD concluded that further litigation at that time wasn't warranted. The LVD tribe noted it

---

[50] Big Picture's operation provide[d] more than 40% of LVD's general fund, and those profits [we]re projected to be capable to fully fund LVD's government budget in the coming years. The loan is consummated (and collected) by Big Picture Loans on reservation where Big Picture is managed, headquartered and all its employees are based, and the tribal and federal interests in Big Picture's revenues are vital to LVD's self-government.

was on the best footing it had ever been, and agreed to "go quietly into the night" and build an "even stronger case" in the event of future litigation.

75.     By September 24, 2013 Martorello reported "I know the FDIC issues are over.  The banking issues are dealt with and over.  CFPB/FTC is non-issue, and DOJ is likely not an issue either (though some say it is and I don't know why).  So… all federal issues are mitigated outside of this litigation."  Martorello was uninterested in being the center of what he called a political and improper attack by governmental authorities and refused to provide services to the LVD tribe related to New York consumers, notwithstanding the legality of the loans and his belief that the ruling of the New York court was incorrect.

76.     Contrary to the allegations of the Plaintiffs, the 2d Circuit decision in *Otoe-Missouria,* which occurred in October of 2014, long after negotiations for the sale of Bellicose to the LVD tribe began, and well before the sale actually occurred, was not the reason for the sale of Bellicose in 2016.

## <u>OPERATION CHOKE POINT</u>

77.     Operation Chokepoint was an improper and unsanctioned effort by a small constituency of agents at the Department of Justice, the CFPB and the FDIC, who desired to use their position to destroy several politically disfavored industries, including the small dollar lending industry.  It almost worked.  The Operation Chokepoint participants recognized that they could not directly challenge the perfectly legal tribal lending industry, so they attempted, in many cases successfully, to intimidate the banks and processors that were critical to the lending businesses and force them to discontinue relationships under threat of investigation.  As a significant vendor to the LVD tribal lending business Bellicose, and Martorello, were justifiably concerned about the actions of the participants in Operation Chokepoint.

78.     Operation Chokepoint was essentially disbanded by agency leadership after, among other things, admonishment by Congress, first by letter in August 2013, and then by formal investigative reports published in May of 2014 and December 2014.[51] New management at the DOJ, the FDIC and the CFPB expressly renounced the tactics of Operation Chokepoint as having been improper.[52] The banks and credit bureaus threatened by Operation Chokepoint ultimately concluded that tribal lending at high rates was perfectly legal and not subject to state usury laws and continue to do business with the LVD tribe and other tribal lenders now, six years later, unhindered by their regulators. Throughout this period Martorello, the LVD tribe and experts on tribal lending (including Weddle) continued to believe that the lending operation of the LVD tribe and the provision of services by Bellicose was legal and they agreed with Congress that these agents involved had no legal justification for these actions and were engaging in an improper abuse of governmental power.

---

[51] House Oversight Committee Report on Operation Chokepoint summary of key findings published May 29, 2014: https://republicans-oversight.house.gov/report/report-dojs-operation-choke-point-secretly-pressured-banks-cut-ties-legal-business/ "Operation Choke Point was created by the Justice Department to "choke out" companies the Administration considers a "high risk" or otherwise objectionable, **despite the fact that they are legal businesses**"; "Operation Choke Point has forced banks to terminate relationships with a wide variety of entirely lawful and legitimate merchants. The initiative is predicated on the claim that providing normal banking services to certain merchants creates a "reputational risk" sufficient to trigger a federal investigation"; " Acting in coordination with Operation Choke Point, bank regulators labeled a wide range of lawful merchants as "high-risk" – including coin dealers, firearms and ammunition sales, and short-term lending. **Operation Choke Point effectively transformed this guidance into an implicit threat of a federal investigation"; "Operation Choke Point was focused on short-term lending, and online lending in particular**. Senior officials expressed their belief that its elimination would be a "significant accomplishment" for consumers." Also, December 8, 2014, Congress issued a seething report about the FDIC's involvement in OCP: https://republicans-oversight.house.gov/wp-content/uploads/2014/12/Staff-Report-FDIC-and-Operation-Choke-Point-12-8-2014.pdf

[52] See, e.g., https://www.fdic.gov/transparency/legal-misc/statement-and-letter-on-bank-customer-relationships.pdf, page 4 resolving the litigation brought against the FDIC for its OCP actions and a letter to Congressman Luetkemeyer acknowledging their responsibilities must be borne out of our laws and regulations. "They must never be based on personal beliefs or political motivations. Regulatory threats, undue pressure, coercion, and intimidation designed to restrict access to financial services for lawful businesses have no place at this agency." See also http://alliedprogress.org/wp-content/uploads/2017/08/2017-8-16-Operation-Chokepoint-Goodlatte.pdf "the initiative is no longer in effect, and **it will not be undertaken again**" and that "the Department will not discourage the provision of financial services to lawful industries, including businesses engaged in short-term lending and firearms-related activities."

79.     Although Operation Chokepoint had been effectively discontinued in 2014, the CPFB had also proposed rules that would have indiscriminately annihilated small dollar lending nationwide.  The bureau's own analysis predicted the rules could eliminate at least 60% to 80% of the small dollar loan market.[53]  By April 2015, after considerable criticism of the proposed rule by numerous parties, the proposed rule was reconsidered by the CFPB and numerous tribes, including the LVD chairman, joined a panel, the SBREFA panel, which interacted with the CFPB about the proposed rule and its impropriety. By mid-2015 the small dollar rule was addressable with technology to ensure the longevity of the LVD Tribe's business and the tribal lending industry. Throughout this entire period Martorello checked with the legal experts and was repeatedly assured of the legality of the LVD tribe lending business.  As Jennifer Weddle stated in her deposition, LVD and Martorello's businesses were legal in 2011, in 2013, in 2014, in 2016 and all remain legal still today.[54]

80.     The sale of Bellicose to the LVD tribe was negotiated from late 2012 until an agreement was reached in 2015.  The negotiations were driven by the economics of the proposed transaction, not by the inappropriate and ultimately unsuccessful actions of the participants in Operation Chokepoint.

81.     The LVD lending operation was carefully designed and operated to comply with applicable law.  What combination of motivations caused Martorello to agree to a sale of Bellicose

---

[53] The CFPB rule was reported as **reducing revenue of small payday lenders by 82%**, forcing many payday lenders to close locations, particularly in rural areas. *See* http://www.crai.com/sites/default/files/publications/Economic-Impact-on-Small-Lenders-of-the-Payday-Lending-Rules-under-Consideration-by-the-CFPB.pdf And **the CFPB's own recent testimony to Congress** by about the rule reference it as "one of the most detrimental regulations ever issued by the CFPB," Press said: https://www.heartland.org/news-opinion/news/consumerfinancial-protection-bureau-considers-repealing-payday-loan-rule.

[54] *See*, e.g. excerpts from the deposition of Jennifer Weddle.

to the LVD Indians has absolutely nothing to do with whether the structure and the operations were legal.

## THE CURRENT CONTROVERSY

82. Eventide and Martorello, and several others, including the LVD tribe, have been sued by the Plaintiffs in several states since 2017. It's no secret that this tribal lending structure, in fact the entire tribal lending industry consisting of over a dozen tribes, was designed to enable internet lending to consumers, in small dollar amounts, with annualized interest rates much higher than permitted by state usury laws. This is much like the casinos which are structured to enable Indians to provide gambling notwithstanding state gambling laws and the internet bank lending operations which also rely on federal preemption to ignore state usury laws. The sovereignty rights of Indian tribes do not depend on the choice of business by the tribes.

83. High cost small dollar lending is permitted in at least 30 states. For example, in Virginia, where the Debtor is accused of illegally violating the Virginia usury laws, consumer loans over $2500 are exempt from the usury laws entirely. Also, in Virginia, licensed payday lenders with a physical presence in Virginia can charge triple digit effective annualized rates (e.g. 625%).[55] As late as 2018, the Virginia State Corporation Commission Bureau of Financial Institutions issued a letter stating that "an arm of the [tribe]" was "not required to be licensed under the laws that are enforced by the Bureau". The Plaintiffs and others contend this type of business constitutes predatory lending, is unfair to borrowers and should be eliminated.

84. But that's up to Congress. And the fact is that Congress has rejected a federal interest rate cap as recently as 2010, in the very same law that designated tribes as regulators of

---

[55] 10VAC5-200-80. Payday Lending Pamphlet Text and 10VAC5-200-30.

their consumer lending operation.[56]  Congress went so far as to prohibit the CFPB from issuing

regulations establishing a usury limit.[57]  Tribal online lending structures are legal until Congress,

not the states, decides to restrict Indian sovereignty. Congress has not limited the ability of tribes

to enter into relationships with non-Indian service providers. *Williams v. Big Picture Loans, LLC*,

929 F.3d 170, 180 (4th Cir. 2019) (noting that "the district court cited to no authority suggesting

that a tribe must receive a certain percentage of revenue from a given entity for the entity to

constitute an arm of the tribe" and that tribal revenue creation "both now and in the future" was

likely dependent upon the Tribe's relationship with a non-tribal entity).

85.     As repeatedly stated by the Supreme Court, the judiciary may not independently

decide when and how to abrogate tribal immunity for commercial conduct but must defer to

Congress. *Williams*, 929 at 185 ("It is Congress – not the courts – that has the power to abrogate

tribal immunity") (citing *Bay Mills*, 572 U.S. at 800); see also *Kiowa*, 523 U.S. at 758; Oklahoma

Tax Comm'n, 498 U.S. at 509.  A severely consequential restriction to tribal ecommerce is equally

as deferential.

86.     Martorello and the LVD tribe's experts did their homework and structured the LVD

tribe operation to comply with the law.  Complying with the law doesn't make someone liable.

Unlike the operations of some other operators, customers of Red Rock, Duck Creek and later Big

Picture, weren't defrauded and comprehensive consumer protection regulations covering these

loans actually existed on the reservation.   The LVD tribe owned the customer loans, from

origination to collection, unlike in other situations where the loans were immediately sold to non-

Indians.

---

[56] "In addition, one proposed amendment would have capped the interest rate at which loans could be offered at the maximum rate permitted by the State in which the consumer resided.  S. Amdt. 3746 to S.3217, 111th Cong. (introduced May 13, 2010) ("Whitehouse Amendment").  That proposal was rejected.  Id. (rejected May 19, 2010)."

[57] 12 U.S.C. 5517(o).

87.     The Plaintiffs say that the structure was a sinister scheme to avoid the usury laws and hide behind sovereign immunity.  They say it was a sham, and that Martorello was actually the lender.  They say that Eventide and Martorello made too much and the LVD tribe didn't perform enough functions and didn't receive enough of the proceeds.  Therefore, Eventide and Martorello and the tribe were illegally violating the usury laws.  And because they were knowingly violating the usury laws Eventide and Martorello and the LVD tribe, and others, are corrupt racketeers and subject to RICO and were unjustly enriched.  Effectively, the Plaintiffs say that Eventide, and the other defendants, should be liable for doing exactly what the federal government and the NABDA encourage. [58]

88.     But they can't get past the fact that the LVD tribe consumer lending operation was specifically designed to be legal, and not subject to state usury laws, much like bank small dollar lending and credit card operations are often based in South Dakota or Utah.  These bank structures have been upheld by the courts, even when the loan is purchased immediately by the non-bank and the nominal bank lender is minimally involved.[59]

89.     Because of federal preemption, if the federal government doesn't like tribal lending, or the relationship between tribes and outside vendors and service providers, it can pass laws, or enact regulations, to achieve that objective.  But so far, the federal government has adopted a policy that economic empowerment of Indian tribes outweighs state concerns about interest rates.

---

[58] Despite their original contention that Martorello lacked good faith, **Plaintiffs have recently admitted** in another Court, "**in [Martorello's] view, this structure was legitimate** because the 'cornerstone of the sovereign model,'… was the delegation of 'loan originations' to the tribal lending entity.  Delegating originations to the tribal lender… **purportedly exempted the loans from state interest rates**" and "**Martorello believed that his company could control operations so long as the final act of loan origination occurred on the reservation**".

[59] *Beechum v. Navient Solutions, Inc*., 2016 WL 5340454 (C.D. Cal. Sept. 20, 2016): *Hudson v. ACE Cash Express, Inc*., 2002 WL 1205060 (S.D. Ind.) *Sawyer v. Bill Me Later, Inc.*, 23 F. Supp. 3d 1359 (D. Utah 2014) *Meade v. Avant of Colorado, LLC*, 2018 WL 1101672 (D.Colo.).

If the Plaintiffs and the states, and others, disagree they can take it up with Congress and have laws passed regarding these loans, similar to federal laws governing casinos and bank lenders.

## THE PLAINTIFFS ATTEMPT TO MANUFACTURE A CLAIM WHERE NONE EXISTS

90.     Because restrictive laws or regulations regarding tribal lending don't exist, the Plaintiffs throw around a bunch of pejorative statements like sham, and *defacto* lender, and scheme, and rent a tribe, which, to the Plaintiffs, is apparently defined as complying with the law and implementing Federal policy.[60]    They discount the intelligence and judgment of the tribal leaders and point to other lending arrangements that DID defraud people, or didn't actually involve tribes at all, and weren't structured to comply with federal lending laws.[61] They say that the benefit to the LVD tribe was too little.   And they point to failed improper attempts by government authorities like the CFPB and the New York Attorney General and Operation Chokepoint to destroy the tribal lending industry.

91.     There is no court ruling or order that permits any state, much less a private party, to declare an Indian tribe's consumer lending and its consensual contracts unlicensed or illegal, let alone permitting a state, to interfere with those contracts. Instead, federal law permits national banks, FDIC-insured state-chartered banks and certain other classes of lenders (e.g., preferred ship-mortgage lenders), to make loans to residents of states without being subject to that resident state's usury laws.  Loans by Indian tribes as sovereigns represent another category of loans under the laws of the United States that may be made to residents of states without regard to state usury law.

---

[60] A successful British reorganization results in a Scheme of Arrangement.

[61] Not only is Plaintiff's interpretation of: "rent-a-casino", "rent-a-billboard" and "rent-a-tribal-tax-credit" lawful, so are "rent-a-bank"; "rent-a-municipality"; "rent-a-Delaware-liability-protection-company", "rent-a-startup", "rent-a-franchise"  Plaintiff's conveniently ignore that the arrangement between the Plaintiffs and their counsel could be described as "rent-a-plaintiff".

92.     The Indian Commerce Clause broadly preempts state laws that interfere with tribal activities and business enterprises. "[T]he Indian Commerce Clause accomplishes a greater transfer of power from the States to the Federal Government than does the Interstate Commerce Clause" because although the "States still exercise some authority over interstate trade," they "have been divested of virtually all authority over Indian commerce and Indian tribes." *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 62, (1996).

93.     The Plaintiffs point out that the borrowers aren't physically located on the reservation. That isn't relevant. [62] The Supreme Court has made it clear that Indian tribes even retain some forms of civil jurisdiction over the conduct of non-Indians on non-Indian fee lands, including "the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Montana v. U. S.*, 450 U.S. 544, 565–66 (1981) (emphasis added).[63] The contract clause, found in Article I, section 10 of the Constitution, prohibits the states from impairing the obligations of contracts. States have no power to generally restrict their citizens' freedom of contract or ability to shop for credit across jurisdictional boundaries. Governments cannot generally substitute their judgments for those of their citizens.[64] Usury laws regulate and license the conduct of the lender, not the

---

[62] Under The Restatement (Second) of Contracts Section 187, the physical location of parties has no bearing on fundamental policy or a balancing test on "materially greater interest" in the loan, and only a minor influence on a balancing test under Section 188.

[63] *Kiowa Tribe,* 523 U.S. at 755 ("To date, our cases have sustained tribal immunity from suit without drawing a distinction based on where the tribal activities occurred. . . . [or] between governmental and commercial activities of a tribe"); *Federal Trade Commission v Payday Financial, LLC*, 935 F.Supp. 2d 926 (Dist. S.D. 2013). A contract dispute with a non-Indian may be subject to tribal jurisdiction, *Williams v. Lee*, 358 U.S. 217, 223, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959), and a tribe has the authority to tax a non-Indian regarding business on a reservation, *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 141, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982).

[64] *See, e.g., Frisbie v. U.S.*, 157 U.S. 160 (1895) ("generally speaking, among the inalienable rights of the citizen is that of the liberty of contract"); *Allgeyer v. Louisiana*, 165 U.S. 578 (1897); *Lochner v. New York*, 198 U.S. 45 (1905); *Adair v. U.S.*, 208 U.S. 161(1908); *Coppage v. Kansas*, 236 U.S. 1 (1915); *Buchanan v. Warley*, 245 U.S. 60 (1917); *Ogden v. Saunders*, 25 U.S. 213 (1827); *Craigmiles v. Giles*, 312 F.3d 220 (6th Cir. 2002).

borrower, and it is undisputed in this case that there is a consensual contractual relationship between the LVD lenders and the borrowers.

94.     This concept has been applied to tribal lending. "When a nonmember enters into a commercial transaction with a tribal member or reservation-based tribal business, receives a benefit coming from the reservation as a result, and consents in a written contract to tribal jurisdiction, that nonmember has engaged in the sort of consensual relationship with the tribe or its members, through commercial dealing that would subject the nonmember to tribal jurisdiction". *FTC v. Payday Fin., LLC,* 935 F. Supp. 2d 926, 936 (D.S.D. 2013).  The inquiry pertains to the non-Indian's consensual *conduct*, not their geography.  Tribal authority is not defeated even if it exerts some regulatory force on off-reservation activities and tribal regulation can extend to non-Indian activities occurring off-reservation.[65]

95.     Even the Virginia Bureau of Financial Institutions recognizes that Virginia state laws do not apply to tribes. As recently as late 2018, the Virginia Bureau of Financial Institutions issued a letter acknowledging that a tribal business entity, Mountain Summit, was "an arm of the Habematolel Pomo of Upper Lake" tribe and therefore, was "not required to be licensed under the laws that are enforced by the Bureau." See ECF No. 589-17.

96.     The Plaintiffs hoped to find a court and a jury where they could present facts to convert a typical lender and servicer relationship into a fraudulent enterprise, the facts would be ignored and distaste for high interest lending would prevail.  So they sued practically everybody involved with the LVD tribal lending business, in various combinations, in multiple courts from coast to coast, effectively for structuring the business to comply with the law and federal policy.

---

[65] *See Wisconsin v. E.P.A.*, 266 F.3d 741, 749 (7th Cir. 2001)

They found a favorable United States District Judge in Virginia who ruled that sovereign immunity didn't apply when the issue of sovereign immunity was raised by the tribe.[66]

97.     The Virginia judge came to that conclusion even though under Virginia law other non-tribal exemptions from usury can carry similar triple digit annual percentage rates and the leading Virginia Supreme Court case, *Settlement Funding*, had already decided that the usury law agreed to between the parties, in the contract, applies.[67]   In this case, the contracts between the LVD tribe and the borrowers clearly specified that tribal law would apply.

98.     In *Settlement Funding*, the defendant borrower refused to repay a consumer loan made by the plaintiff lender—an out of state, unlicensed lender operating as a Utah industrial loan corporation subject solely to regulation by the state of Utah. The plaintiff brought claims against the borrower for, inter alia, breach of contract and unjust enrichment. The defendant raised the affirmative defense that the loan was usurious under Virginia law. The Supreme Court of Virginia rejected the usury defense, finding that the loan agreement's choice of Utah law must be enforced, even in the face of an assertion that the loan was usurious under Virginia law.  The Virginia Supreme Court stated "[i]f a contract specifies that the substantive law of another jurisdiction governs its interpretation or application, the parties' choice of substantive law should be applied." *Id.* at 80. "Virginia law looks favorably upon choice of law clauses in a contract, giving them full effect except in unusual circumstances ...." *Colgan Air, Inc. v. Raytheon Aircraft Co.,* 507 F.3d 270, 275 (4th Cir. 2007). Therefore, even though "there is no usury in Utah," id., Utah law applied, and the affirmative defense under Virginia's usury law was not available.  This result

---

[66] That judge is Judge Payne in the Eastern District of Virginia.  The Plaintiffs went so far as to attempt to bring three subsequent online tribal lending suits against other tribes in Judge Payne's court by stating on the case cover sheet that the case they were filing was related to a case in that court against the LVD tribe.

[67] *Settlement Funding, LLC v. Von Neumann-Lillie,* 645 S.E.2d 436, 438 (Va. 2007); FTC v. Payday Fin., LLC, 935 F. Supp. 2d 926, 936 (D.S.D. 2013).

accords with black letter law that a loan agreement between parties in different jurisdictions will be sustained against a charge of usury if it is permissible under the law of one jurisdiction, provided that the jurisdiction has a substantial relationship to the loan transaction. See Restatement (Second) of Conflict of Laws § 203 (1971). In this case, there is no question that the Tribe has a substantial relationship to the loan transaction, as the 4th Circuit recently decided.

99.     The adverse ruling in favor of the Plaintiffs against the LVD tribe by the Virginia District Court was appealed to the 4th Circuit. The 4th Circuit properly considered Federal policy and reversed the Virginia District Court judge. After considering thousands of pages of the trial court record, the 4th Circuit rejected the theories of the Plaintiffs and ruled that the tribal lender, Big Picture, was the lender, not Eventide, not Ascension, not Martorello, and that sovereign immunity did apply to the tribes and the LVD tribal lending operation. The 4th Circuit ruled that the lender, Big Picture, was controlled by members of the LVD tribe, "answerable to the Tribe at every level" and the evidence showed they "exercised that power with frequency". The 4th Circuit ruled that Big Picture and Ascension were created under tribal law and that Big Picture is an "independent tribal lending entity" managed by the tribe. The 4th Circuit ruled that the stated purposes of Big Picture and Ascension were to help accomplish the economic development, self-government and self-sufficiency of the tribe and that the desire of the tribe to reduce exposure to unwarranted enforcement and potential liability was appropriate. The 4th Circuit ruled that the payments and benefits to the LVD tribe were substantial and appropriate and that the decisions of the tribe should not be second guessed. The 4th Circuit ruled that the number of Indians employed was appropriate and that the actual lender, Big Picture, conducted its operations on the reservation, and controlled its operations. The 4th Circuit ruled that the loans originated, and were managed and collected, from the reservation, that the tribe intended that Big Picture and Ascension have

tribal immunity and that the arrangements between the tribe and Ascension, and its predecessor

Bellicose, served important federal policy. The 4th Circuit ruled that an entity's entitlement to

tribal immunity cannot, and does not, depend on a court's evaluation of the respectability of the

business in which a tribe has chosen to engage. That's for Congress to determine.

100. The Fourth Circuit ruled with respect to the tribal lending activities of the LVD

tribe:

> "We reach this conclusion with due consideration of the underlying
> policies of tribal sovereign immunity, which include tribal self-
> governance and tribal economic development as well as the
> protection of 'the tribe's monies' and the 'promotion of commercial
> dealings between Indians and non-Indians.' *Breakthrough*, 629 F.3d
> at 1187-88. The evidence here shows that the Entities have
> increased the Tribe's general fund, expanded the Tribe's
> commercial dealings, and subsidized a host of services for the
> Tribe's members. Accordingly, the Entities have promoted 'the
> Tribe's self-determination through revenue generation and the
> funding of diversified economic development.' *Breakthrough*, 629
> F.3d at 1195".

101. The Fourth Circuit considered LVD's Intratribal Servicing Agreement (the "ISA")

between Ascension and Big Picture Loans and concluded that Ascension provided material

"support", but that all decisions and control resided decisively with the lender, Big Picture, which

was controlled entirely by the LVD tribal council. Plaintiffs have repeatedly noted the ISA as

virtually identical to the prior servicing agreement between SourcePoint (which was a subsidiary

of Bellicose) and Red Rock. Of course, the two agreements are similar; they provide that the same

services which were previously provided by Source Point/Bellicose would now be provided by

Ascension.

102. The 4th Circuit also ruled that the activities of the LVD tribe and Bellicose were a

"far cry" from the illegal operations of other high interest consumer lenders and that Big Picture

and Ascension were arms of the tribe, covered by sovereign immunity. That should have ended it.

## THE PROPOSED SETTLEMENT

103. But the Plaintiffs continued their lawsuits to force the LVD tribe and the other defendants, including Eventide, to spend so much on legal fees that they would surrender. In fact, the LVD tribe has contended that the cost of litigating with the Plaintiffs has threatened the viability of its consumer lending business and the support that business gives to LVD government operations. Consequently, the Plaintiffs have forced an unwarranted proposed settlement on the LVD tribe, and certain other defendants, not including Eventide and the non-settling defendants, notwithstanding that the Fourth Circuit has already ruled that the LVD tribe is entitled to the protection of sovereign immunity.[68] Ironically, this proposed settlement takes dollars from the allegedly illegal LVD tribe consumer lending business, which would otherwise go to payments to Eventide on the 7-year secured earn out Note, and gives those dollars to the Plaintiffs. Effectively, the Plaintiffs profess to want to shut down what they say is an illegal operation under Virginia choice of law, but in the settlement, they continue the supposedly criminal enterprise in order to get a big piece of the proceeds of that very activity for the next two years.

104. The positions of the Plaintiffs cannot be reconciled. They claim that the LVD consumer lending business is a criminal enterprise for which its benefactors are liable, but at the same time received approval from the Virginia court of a proposed settlement that continues that very business, for the benefit of the Plaintiffs. Incredibly, the Virginia court ignored this blatant inconsistent position of the Plaintiff and granted preliminary approval of the settlement.

---

[68] The proposed settlement is attached to the Debtor Objection.

105.     Continuation of the online lending by the LVD tribe in order to pay the Plaintiffs, supposedly in violation of Virginia usury law, requires instead application of tribal law and a sovereign preemption from Virginia usury laws.  Even more curious, some of the settling parties are equity owners in Eventide and those equity interests would be transferred to the Plaintiffs under the settlement.  In effect, the Plaintiffs would be minor equity owners of Eventide, the very party that they allege is the illegal true lender whose members they sued under RICO.

106.     The position of the Plaintiffs regarding the proposed settlement effectively constitutes a judicial admission by the Plaintiffs that the LVD tribal lending operations are legal.

## THE EVIDENCE

107.     The overwhelming evidence supports the conclusion that the entirety of the LVD tribal lending operation is legal and that its arrangements with Eventide, Bellicose and Martorello are not subject to state usury laws. That was the effective conclusion of the 4th Circuit.[69] Notwithstanding the findings by the 4th Circuit after reviewing thousands of pages of documents and emails the Plaintiffs continue to promote nonexistent theories based upon continued distortion of documents and email correspondence.[70]

108.     The Plaintiffs also rely on the declaration of Joette Pete, a former member of the LVD tribal council, whose testimony is contradicted by every other witness and documentary evidence, including stolen tribal government property, and who was removed from her office after

---

[69] In another recent favorably decided tribal online lending case, the Seventh Circuit ruled that a third party cannot be held liable for not ascertaining illegality of transactions involving tribal choice of law provisions in the absence of a formal adjudication in the underlying dispute.  Speculation of possible illegality is not enough to create liability. *Denan et. Al. v Trans Union, LLC*, No. 19-1519, (7th Cir., May,11,2020)

[70] A sampling of these distortions is attached as an exhibit to the Debtor Objection.

being involved in a violent altercation involving the family of another member of the LVD tribal council.[71]

109.    Plaintiffs contend that the LVD tribal managers didn't learn enough, the council members didn't know enough, they didn't hire members quickly or pay them enough, the TFSRA suffers from nepotism and the LVD court is biased.  They contend that Martorello told his accountants the valuation was minimal due to Operation Chokepoint and the proposed CFPB rule, and that LVD got a bad deal, that that Martorello sold to evade Operation Chokepoint, and that Bellicose did too much, notwithstanding that Congress has dictated in the NABDA exactly that type of arrangement.  These allegations are obviously illogical.  The tribal managers apparently learned enough to purchase Bellicose, generate tens of millions in equity value, and they now operate a very valuable tribal lending business and sophisticated data business.[72]  If Martorello believed that the value of Bellicose was minimal Eventide wouldn't have accepted an expiring cash flow note.  Operation Chokepoint was decidedly illegitimate, and ended well before the sale took place.  And there is no standard for the relative split of responsibilities between a tribal lender and an outside service provider.  As detailed above, members of the LVD tribal council controlled and actively participated in the tribal lending business.  The loans were made from the reservation

---

[71] *See Memorandum In Support Of Motion To Strike (1) Declaration Of Joette Pete (detailing Plaintiffs cancelation of her deposition hours before, instead unilaterally producing a declaration that the LVD Tribe asserts contains several statements she could never have had knowledge of, "ghost-written" by the Plaintiffs; (2) Documents Produced*

*By Joette Pete, And (3) Joette Pete From Plaintiffs' Witness List,* attached as an exhibit to the Debtor Objection.

[72] Ascension's resource will be useful for the tribe in numerous other current and future investments and opportunities of LVD, across any industry.  And were Congress to one day restrict tribes from online lending, Ascension could provide similar services to bank lenders, form a CAB and service non-bank lenders, convert to mortgage servicing, provide generally: data analytics services, compliance consulting, or resell call center support services, etc.

by the tribal lenders' on reservation activity and are not subject to state usury laws.  There is no credible evidence to the contrary.

110.    The Plaintiffs contend that Martorello sold Bellicose to the tribe because he was afraid of investigations by Operation Chokepoint and other regulators who were unsuccessfully trying to put all consumer lenders out of business by threatening banks and other financial parties necessary for consumer lending operations.  Apparently, the Plaintiffs extrapolate that allegation into some kind of admission by Martorello that the LVD tribal lending operation was illegal.  That isn't either relevant or accurate.  The sale of Bellicose was principally motivated by the economics and tax benefits and had been discussed long before Operation Chokepoint surfaced.  By the time the sale was agreed to, Operation Chokepoint was exposed and admonished and the CFPB rule was no longer a threat to the consumer lending industry. [73]

111.    The Plaintiffs claim that Martorello sold Bellicose to reap the benefits of the arrangement yet continue to control the business and hide behind immunity.  There are no facts that support that theory and all testimony is to the contrary.  The evidence shows that any involvement by Eventide or Martorello with the tribal lending business of the LVD tribe was consistent with that of a secured creditor, not a control party.[74]  Also, Martorello clearly opted to not assert personal immunity defenses and not have control by rejecting the chance to stay on as President post-transaction.  Instead, he demanded that the transaction documents not contain a non-compete to prevent him working for other tribal lenders.

---

[73] See the attached non-privileged legal memo of former Assistant Director of the CFPB, then Hudson Cook attorney Rick Hackett detailing for Martorello's valuation experts the fall of OCP and the CFPB rule in late 2014 and the corresponding rise in online tribal lending activity once again.

[74] *See*, the expert report of John Norman of January 11, 2019.  Prior to the sale of Bellicose, the activities of Bellicose and Martorello were those of a vendor.

112.     But more important, Martorello's motivation to sell Bellicose isn't relevant.[75]  The structure of the relationship between the LVD tribe and Bellicose was either legal or it wasn't.  What Martorello believed doesn't change that fact.

113.     The Plaintiffs claim that Martorello exercises control over Ascension (not the lender, Big Picture) through Brian McFadden, its President.  They point out that McFadden, and all subsequent Presidents of Ascension are somewhat insulated from the political whims of the LVD tribal council because the President of Ascension directly reports to its co-managers, not the LVD tribal council. The federal government encourages separation of tribal politics from tribal enterprises and recognizes non-recourse financing for tribal enterprises.[76] These separations make tribal businesses **four times more likely** to succeed.  The fact is that there is no evidence that Martorello was ever involved with the operations of Ascension, through McFadden or otherwise.

114.     The Note and related documents contain limited change of management and budgetary provisions to prevent, for example, the LVD tribe from firing a President of Ascension who had demonstrated competence and then hiring an incompetent individual and to prevent the LVD tribe from engaging in unwarranted spending (*e.g.* corporate jets) during the duration of the Note.  It is common for holders of cash flow notes with a termination provision to have change of management and budgetary provisions.

115.     The 4th Circuit reviewed the agreements, including, the Operating Agreements, the Transaction Documents and the Intratribal Servicing Agreement and did not conclude that the

---

[75] The Plaintiffs contend that Martorello lied in a declaration when he said that his decision to sell Bellicose was "not motivated by impending threats of litigation or enforcement actions by government agencies", but by economics. They somehow extrapolate their erroneous conclusion into a theory that Martorello knew that the LVD/Bellicose structure was illegal.  Their dots don't connect, and that theory is wrong.  There is no support for that theory and it isn't relevant to the legality of the LVD tribal lending operation.

[76] https://www.irs.gov/pub/irs-tege/tribal_business_structure_handbook.pdf also detailing notes like the Debtor's, non-recourse development loans at 80 to 100% leverage against solely the future revenues of the business, as the suggested path towards tribal nation building efforts with outsiders.

Debtor or Martorello controlled the lending business. The contention by the Plaintiffs that Martorello is exercising any measure of so-called "control" over any facet of Big Picture's or Ascension's businesses is flatly contradicted by every piece of record evidence, including the depositions of Ascension employees. [77]

116.    Plaintiffs contend that Martorello improperly ordered Greenberg Traurig to destroy documents after the sale when, in fact, to the extent that any documents were destroyed they were destroyed at the request of the LVD tribe in connection with the sale of Bellicose to the tribe. This allegation is completely without merit.

## OBJECTION

117.    The Plaintiffs have effectively cut off payments to Eventide on the 7-year secured earn out Note to benefit themselves, and Eventide can't finance protracted litigation in multiple forums. The Plaintiffs have sued Martorello and others, who have indemnification claims against the Debtor which continue to escalate, to the detriment of the Debtor. These Plaintiffs have been harassing the Debtor and others for three years with no end in sight. The 4th Circuit has effectively held that the LVD tribe consumer lending operation was a government entity, protected by sovereign immunity, and not subject to the usury laws of the state of Virginia, or any other state. The NABDA encourages and sanctions tribal ecommerce under LVD law and the LVD tribal lending structure. The Plaintiffs have no facts or law to the contrary and the time has come for this court to put an end to this harassment and allow the Debtor to successfully reorganize. As a

---

[77] McFadden, Hazen, Williams, and multiple other Ascension personnel have already testified that Eventide and Martorello had no role in LVD's business operations post-sale. In their opposition to Eventide's motion to intervene to object to their settlement agreement, Plaintiff's stated they "disagree with Eventide's interpretation of the contract, i.e., **that the Tribal Defendants lack the authority to modify the terms of their contracts with borrowers**" (emphasis added). Further, in objection to Debtor's 4008 motion filed in this Court, Plaintiffs additionally admit (in contrast with allegations that Martorello is the "de facto owner") the "**Tribe-owned Red Rock Tribal Lending, LLC**" and moreover that it indeed was "**the tribal entities that <u>originated</u> those loans**". Properly under tribal control, Plaintiffs even admit "TED is the parent company for Big Picture Loans, LLC and Ascension Technologies, LLC, i.e., **the subsidiaries that <u>operate</u> the lending business.**"

result, the Plaintiffs have no allowable claims against this Debtor, or anyone else. Their claims should not be allowed.

## CONCLUSION

WHEREFORE, Martorello requests that the Court sustain this Objection, deny the allowance of the Claim and grant such other and further relief as is just and appropriate.


Dated: May 27, 2020                          **PHELANLAW**

                                             */s/ Robin Phelan*
                                             Robin Phelan
                                             Texas Bar No. 15903000
                                             4214 Woodfin Drive
                                             Dallas, Texas 75220
                                             Tel: 214-704-0222
                                             Email: robin@phelanlaw.org

                                             *Counsel to Matt Martorello*



## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 27, 2020, a true and correct copy of the foregoing Objection was served upon all parties that are registered to receive electronic service through the court's CM/ECF notice system in the above case.

*/s/ Robin Phelan*
Robin Phelan