**LOEB & LOEB LLP**
Bernard R. Given II
State Bar No. 07990180
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA  90067-4120
Tel: 310-282-2000
Fax: 310-282-2200
Email:   bgiven@loeb.com

*Counsel to the Debtor*
*and Debtor-in-Possession*

**FORSHEY & PROSTOK, LLP**
Jeff Prostok
State Bar No. 16352500
Lynda Lankford
State Bar No. 11935020
777 Main Street, Suite 1290
Fort Worth, TX 76012
Tel:  817-877-8855
Fax: 817-877-4151
Email: jprostok@forsheyprostok.com
          llankford@forsheyprostok.com

*Counsel to the Debtor*
*and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| EVENTIDE CREDIT ACQUISITIONS, LLC, | § | Case No. 20-40349-elm11 |
| Debtor. | § | |
| | § | |
| | § | |
| | § | |
| | § | |

### NOTICE OF FILING OF PROPOSED AMENDED AND RESTATED
### DEBTOR-IN-POSSESSION FINANCING AND SECURITY AGREEMENT

PLEASE TAKE NOTICE that on May 15, 2020, the Debtor filed the *Debtor's Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 362, 363, 364, and 507, Bankruptcy Rules 2002, 4001, 6004, and 9014, (I) Authorizing the Debtor-In-Possession to Obtain Postpetition Financing, (II) Granting Liens and Providing Administrative Expense Status, and (III) Granting Related Relief* [Docket No. 153]  (the "**DIP Motion**"), seeking approval of the Debtor-in-Possession Financing and Security Agreement attached to the DIP Motion as Exhibit A (the "**DIP Loan Agreement'**).

PLEASE TAKE FURTHER NOTICE that the Debtor has negotiated revised terms for the DIP Loan Agreement, which are set forth in that certain Amended and Restated Debtor-in-

Possession Loan and Security Agreement attached hereto as <u>Exhibit 1</u> (the "**Amended DIP Loan Agreement**").

PLEASE TAKE FURTHER NOTICE that a redline comparing the DIP Loan Agreement to the Amended DIP Loan Agreement is attached hereto as <u>Exhibit 2</u>.

PLEASE TAKE FURTHER NOTICE that the Debtor will seek approval of the terms of the Amended DIP Loan Agreement at the interim hearing on the DIP Motion, which is scheduled to occur before the Honorable Edward L. Morris at 501 W. Tenth Street, Room 204, Fort Worth, TX 76102 on May 29, 2020 at 9:30 a.m (CT).

Dated: May 27, 2020

**LOEB & LOEB LLP**

*/s/ Bernard R. Given II*
Bernard R. Given II
State Bar No. 07990180
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA  90067-4120
Tel.: 310-282-2000
Fax: 310-282-2200
Email:  bgiven@loeb.com

-and-

**FORSHEY & PROSTOK, LLP**
Jeff P. Prostok
State Bar No. 16352500
Lynda Lankford
State Bar No. 11935020
777 Main Street, Suite 1290
Fort Worth, TX 76012
Tel:  817-877-8855
Fax: 817-877-4151
Email: jprostok@forsheyprostok.com
          llankford@forsheyprostok.com

*Counsel to the Debtor and Debtor in Possession*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served upon all parties receiving electronic notice via the Court's CM/ECF system and via email to the parties listed below on May 27, 2020.


**U.S. TRUSTEE:**

**Erin Marie Schmidt**
United States Trustee
1100 Commerce St., Room 976
Dallas, TX 75242-1496
(214) 767-1075
Fax : (214) 767-8971
Email: ustpregion06.da.ecf@usdoj.gov

**Elizabeth Ziegler Young**
U.S. Trustee Office
1100 Commerce Street, Room 976
Dallas, TX 75242
(214) 767-8967
Fax : (214) 767-8971
Email: elizabeth.a.young@usdoj.gov


**COMMITTEE**:

**Gary Howard Leibowitz**
Cole Schotz P.C.
300 E. Lomard Street, Suite 1450
Baltimore, MD 21202
(410) 528-2971
Fax : (410) 528-9401
Email: gleibowitz@coleschotz.com

**Irving E. Walker**
Cole Schotz P.C.
300 East Lombard St., Ste. 1450
Baltimore, MD 21202
410-230-0660
Fax : 410-230-0667
Email: iwalker@coleschotz.com

**Michael D. Warner**
Cole Schotz P.C.

1

1700 City Center Tower II
301 Commerce St.
Fort Worth, TX 76102
(817)810-5250
Fax : (817)810-5255
Email: mwarner@coleschotz.com


**REQUEST FOR SPECIAL NOTICE**:

**Robin Phelan**
PhelanLaw
4214 Woodfin Dr.
Dallas, TX 75220
Email: robin@phelanlaw.org

**Kristi C. Kelly**
Kelly Guzzo, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Fax: (703) 591-0167
Email: kkelly@kellyguzzo.com

**Steve A. Pierce**
Norton Rose Fullbright US LLP
111 West Houston Street, Suite 1800
San Antonio, TX 78205
Fax: (210) 270-7205
Email: steve.pierce@nortonrosefullbright.com

**Toby L. Gerber**
Norton Rose Fullbright US LLP
2200 Ross Avenue, Suite 3600
Dallas, TX 75201
Fax: (214) 855-8000
Email: toby.gerber@nortonrosefullbright.com

**Justin Gray**
**Anna M. Bruty**
Rosette, LLP
44 Grandville Ave. SW
Grand Rapids, MI 49503
Email: jgray@rosettelaw.com
        abruty@rosettelaw.com

**Marcus Alan Helt, Esq**.
FOLEY & LARDNER LLP
2021 McKinney Avenue
Suite 1600 Dallas, TX 75201
Fax: 214-999-4667
Email: mhelt@foley.com

**Michael A. Caddell**
**Amy E. Tabor**
Caddell & Chapman
628 East 9th Street
Houston TX 77007-1722
Fax: 713-751-0906
Email: mac@caddellchapman.com
       aet@caddellchapman.com

**J. Brian Vanderwoude**
Dorsey & Whitney LLP
300 Crescent Court, Suite 400
Dallas, Texas 75201
Fax: (214) 981-9901
Email: vanderwoude.brian@dorsey.com

By:    */s/* Bernard R. Given _____
             Bernard R. Given II

# **Exhibit 1**

## **(Amended DIP Loan Agreement)**

## AMENDED AND RESTATED DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT

This **DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT** is entered into as of May 26, 2020 (this "**Agreement**"), by and between GUARDIAN TRUST CORPORATION AS TRUSTEE OF THE BLUETECH IRREVOCABLE TRUST ("**Lender**") and EVENTIDE CREDIT ACQUISITIONS, LLC, a Delaware limited liability company ("**Borrower**" or "**Debtor**"), debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code.

### Recitals

WHEREAS, on January 28, 2020 (the "**Petition Date**"), the Debtor filed a voluntary petition with the Bankruptcy Court initiating a case pending under Chapter 11 of the Bankruptcy Code (the "**Case**") and has continued in the possession of its assets and in the management of its businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, Borrower has requested that the Lender make available to the Borrower a debtor-in-possession term loan in an aggregate principal amount of two million dollars ($2,000,000);

WHEREAS, Borrower and Lender entered into a prior loan agreement, dated as of May 15, 2020 (the "**Prior Agreement**"), which the parties have agreed to terminate and supersede with this Agreement; and

WHEREAS, Lender is willing to make the Loan described herein on the terms and conditions set forth in this Agreement.

NOW THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, Lender and Borrower agree as follows:

1.      **DEFINITIONS AND CONSTRUCTION**.

    **1.1**      **Definitions**.  As used in this Agreement, the following terms shall have the following definitions:

"Advance" or "Advances" means a cash advance or cash advances under the DIP Loan Facility.

"Advance Request" has the meaning assigned in Section 2.1(c).

"Affiliate" means, with respect to any Person, any Person that owns or controls directly or indirectly such Person, any Person that controls or is controlled by or is under common control with such Person, and each of such Person's senior executive officers, directors, and partners.

"Arbitration" means that certain arbitration commenced by the Borrower on December 18, 2019 before the American Arbitration Association against Tribal Economic

Development Holdings, LLC, Big Picture Loans, LLC, Ascension Technologies, LLC, and The Lac Vieux Desert Band of Lake Superior Chippewa Indians.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"Bankruptcy Court" means the United States Bankruptcy Court for Northern District of Texas or any court having jurisdiction over the Case from time to time.

"Bankruptcy Sale" means a sale pursuant to Section 363 of the Bankruptcy Code of all or a portion of the assets of Borrower.

"Borrower's Books" means all of Borrower's books and records including: ledgers; records concerning Borrower's assets, liabilities business operations or financial condition; and all computer programs, or tape files, and the equipment, containing such information.

"Budget" means a 13-week cash flow projection and debtor-in-possession budget in form and substance acceptable to the Lender; provided that, with the consent of the Lender, the budget may be updated in accordance with Section 6.13.

"Budget Variance Report" means a weekly report provided by the Borrower to the Lender showing by line item and in the aggregate the actual cash disbursements of the Borrower for the applicable trailing two (2)-week period set forth in Section 6.13(b), comparing the actual cash receipts and disbursements (on a line item by line item basis) with the weekly and cumulative budgeted amounts for each such line item set forth in the Budget for such period, noting therein all variances on a line-item and cumulative basis from the amounts set forth for such period in the Budget, together with explanations for all material variances, and certified as being true and correct by the Borrower's controller.

"Business Day" means any day that is not a Saturday, Sunday, or other day on which banks in the State of Delaware are authorized or required to close.

"Case" has the meaning set forth in the recitals.

"Closing Date" means the date on which the conditions specified in Section 3.1 are satisfied.

"Code" means the Delaware Uniform Commercial Code.

"Collateral" means the property described on **Exhibit A** attached hereto.

"Committee" means the official committee of unsecured creditors appointed in the Case by the U.S. Trustee on February 7, 2020 as set forth at Docket No. 14.

"Contingent Obligation" means, as applied to any Person, any direct or indirect liability, contingent or otherwise, of that Person with respect to (i) any indebtedness, lease, dividend, letter of credit or other obligation of another; (ii) any obligations with respect to undrawn letters of credit, corporate credit cards, or merchant services issued or provided for the account of

that Person; and (iii) all obligations arising under any agreement or arrangement designed to protect such Person against fluctuation in interest rates, currency exchange rates or commodity prices; provided, however, that the term "Contingent Obligation" shall not include endorsements for collection or deposit in the ordinary course of business.  The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determined amount of the primary obligation in respect of which such Contingent Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by Lender in good faith; provided, however, that such amount shall not in any event exceed the maximum amount of the obligations under the guarantee or other support arrangement.

"Credit Extension" means each Advance or any other extension of credit by Lender for the benefit of Borrower hereunder.

"Daily Balance" means the amount of the Obligations owed at the end of a given day.

"Debtor" has the meaning set forth in the recitals.

"Default" means any circumstance that, with the passage of time or giving of notice, would constitute an Event of Default.

"DIP Loan" has the meaning given to such term in Section 2.1(a) hereof.

"DIP Loan Commitments" means an aggregate amount not to exceed Two Million Dollars ($2,000,000).

"DIP Loan Facility" means the facility under which Borrower may request Lender to issue Advances, as specified in Section 2.1 hereof.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations thereunder.

"Event of Default" has the meaning assigned in Section 8.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to Lender or required to be withheld or deducted from a payment to Lender, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case (i) imposed as a result of Lender being organized under the laws of, or having its principal office or its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) any U.S. federal withholding Taxes imposed on amounts payable to or for the account of Lender with respect to any obligations under this Agreement pursuant to a law in effect on the date Lender acquired its interest in such obligations or on the date that Lender changes its lending office, except, in each case, to the extent that amounts with respect to such Taxes were payable to Lender immediately before the date it acquired such interest or changed its lending office, (c) Taxes that are attributable to Lender's failure to comply with Section 2.5, and (d) any U.S. federal withholding Taxes imposed under FATCA.  For purposes of this definition, any reference to Lender shall be deemed to include a Foreign Lender.

"FATCA" means Sections 1471 through 1474 of the IRC, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the IRC, any intergovernmental agreement entered into in connection with the implementation of such sections of the IRC and any fiscal or regulatory legislation, rules or practices adopted pursuant to, or official interpretations implementing such, intergovernmental agreements.

"Final Order" means a final order of the Bankruptcy Court in substantially the form of the Interim Order (or such other form acceptable to the Lender) authorizing the Loans.

"Final Order Entry Date" means the date on which the Final Order is entered by the Bankruptcy Court.

"GAAP" means generally accepted accounting principles as in effect from time to time.

"Governmental Authority" is any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization.

"Guarantee" means, as to any Person, any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly.

"Highest Lawful Rate" means the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the laws applicable to Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum non-usurious interest rate than applicable laws now allow.

"Indebtedness" means (a) all indebtedness for borrowed money or the deferred purchase price of property or services, including without limitation reimbursement and other obligations with respect to surety bonds and letters of credit, (b) all obligations evidenced by notes, bonds, debentures or similar instruments, (c) all capital lease obligations and (d) all Contingent Obligations.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Lender under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Interim Order" means an interim order of the Bankruptcy Court (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms thereof) in the form and substance satisfactory to the Lender, approving the Loan Documents and authorizing the initial DIP Loans in accordance with the Budget.

"Interim Order Entry Date" means the date on which the Interim Order is entered by the Bankruptcy Court.

"Investment" means any beneficial ownership of (including stock, partnership interest or other securities) any Person, or any loan, advance or capital contribution to any Person.

"IRC" means the Internal Revenue Code of 1986, as amended.

"IRS" means the United States Internal Revenue Service.

"Lender Expenses" means all reasonable and documented out-of-pocket costs and expenses (including reasonable and documented fees and expenses of one external counsel) of counsel to Lender incurred in connection with the preparation, negotiation, administration, and enforcement of the Loan Documents; reasonable Collateral audit fees; and Lender's reasonable and documented fees and expenses of external counsel incurred in amending, enforcing or defending the Loan Documents (including fees and expenses of appeal).

"Lien" means any mortgage, lien, deed of trust, charge, pledge, security interest or other encumbrance.

"Loan" means the DIP Loans.

"Loan Documents" means, collectively, this Agreement, any note or notes executed by Borrower, the Orders and any other agreement entered into in connection with this Agreement, all as amended or extended from time to time.

"Material Adverse Effect" means a material adverse effect on (i) the business, operations, condition (financial or otherwise), or prospects of Borrower taken as a whole or (ii) the ability of Borrower to repay the Obligations or otherwise perform its obligations under the Loan Documents or (iii) the value of the Collateral taken as a whole or priority of Lender's security interests in the Collateral; provided that the term "Material Adverse Effect" will not be deemed to exist as a result of the Case.

"Maturity Date" means the earlier of (i) the date which is one-hundred eighty (180) days from the date of the first Advance, (ii) the consummation of a sale of all of the assets or a portion of the assets of the Borrower pursuant to Section 363 of the Bankruptcy Code or otherwise (including a Bankruptcy Sale); (iii) the effective date of a plan of reorganization or liquidation in the Case; (iv) entry of a final order by the Bankruptcy Court dismissing the Case; or (v) the date of termination of the DIP Loan Commitments and the acceleration of any outstanding extensions of credit under the Loans in accordance with the terms of this Agreement.

"Obligations" means all debt, principal, interest, Lender Expenses and other amounts owed to Lender by Borrower pursuant to this Agreement or any other agreement, whether absolute or contingent, due or to become due, now existing or hereafter arising.

"Orders" means collectively, the Interim Order and the Final Order.

"Other Connection Taxes" means, with respect to Lender, Taxes imposed as a result of a present or former connection between Lender and the jurisdiction imposing such Tax (other than connections arising from Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any loan hereunder or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"Permitted Budget Variance" has the meaning given to it in <u>Section 6.13</u>.

"Permitted Discretion" means a determination made in good faith in the exercise of its commercially reasonable (from the perspective of a first priority perfected secured asset based lender) business judgment based on how an asset based lender with similar rights providing a credit facility of the type provided under this Agreement would act in similar circumstances at the time with the information then available to it.

"Permitted Indebtedness" means:

(a)     Indebtedness of Borrower in favor of Lender arising under this Agreement or any other Loan Document;

(b)     Indebtedness to trade creditors incurred in the ordinary course of business;

(c)     Indebtedness existing on the Closing Date;

(d)     Indebtedness incurred as a result of endorsing negotiable instruments received in the ordinary course of business; and

(e)     Guarantees of Borrower in respect of Indebtedness otherwise permitted hereunder.

"Permitted Liens" means the following:

(a)     Any Liens existing on the Closing Date;

(b)     Any Liens arising under this Agreement or the other Loan Documents;

(c)     Liens for taxes, fees, assessments or other governmental charges or levies, either not delinquent or being contested in good faith by appropriate proceedings, provided the same have no priority over any of Lender's security interests;

(d)     carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business which are not overdue for a period of

more than 30 days or which are being contested in good faith and by appropriate proceedings if adequate reserves with respect thereto are maintained on the books of the applicable Person;

(e)     Liens arising from judgments, decrees or attachments in circumstances not constituting an Event of Default under Sections 8.4 (attachment) or 8.7 (judgments/settlements);

(f)     Subject to Section 6.7, Liens in favor of other financial institutions arising in connection with Borrower's deposit accounts held at such institutions to secure standard fees for deposit services charged by, but not financing made available by such institutions, provided that Lender has a perfected security interest in the amounts held in such deposit accounts; and

(g)     Liens incurred in connection with the extension, renewal or refinancing of the indebtedness secured by Liens of the type described in clauses (a) through (g) above, provided that any extension, renewal or replacement Lien shall be limited to the property encumbered by the existing Lien and the principal amount of the indebtedness being extended, renewed or refinanced does not increase.

"Person" means any individual, sole proprietorship, partnership, limited liability company, joint venture, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, entity or governmental agency.

"Petition Date" has the meaning set forth in the recitals.

"Responsible Officer" means Drew McManigle, the Chief Restructuring Officer of the Borrower.

"Tax" or "Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"U.S. Trustee" means the United States Trustee for the Northern District of Texas.

"US Withholding Tax Form" means whichever of the following that is relevant (including, in each case, any successor form):

(a)     IRS Form W-8BEN or W-8BEN-E,

(b)     IRS Form W-8IMY (with appropriate attachments),

(c)     IRS Form W-8ECI,

(d)     IRS Form W-8EXP,

(e)     In the case of a Foreign Lender relying on the "portfolio interest exemption," IRS Form W-8BEN or W-8BEN-E and a certificate to the effect that such Foreign Lender is not (1) a "bank" within the meaning of IRC section 881(c)(3)(A), (2) a "10-percent

shareholder" of Borrower within the meaning of IRC section 881(c)(3)(B), or (3) a "controlled foreign corporation" described in IRC section 881(c)(3)(C), or

(f)      any other IRS form by which a person may claim complete exemption from, or reduction in the rate of, withholding (including backup withholding) of US federal income tax on interest and other payments to that person.

**1.2      Accounting Terms**.  All accounting terms not specifically defined herein shall be construed in accordance with GAAP and all calculations made hereunder shall be made in accordance with GAAP.  When used herein, the terms "financial statements" shall include the notes and schedules thereto.

**2.      LOAN AND TERMS OF PAYMENT**.

**2.1      Credit Extensions.**  Borrower promises to pay to the order of Lender, in lawful money of the United States of America, the aggregate unpaid principal amount of all Credit Extensions made by Lender to Borrower hereunder.  Borrower shall also pay interest on the unpaid principal amount of such Credit Extensions at rates in accordance with the terms hereof.

(a)      **Term Loan**.  Subject to and upon the terms and conditions of this Agreement (including the satisfaction (or waiver) of the conditions precedent set forth in Sections 3.1 and 3.2), Lender agrees that it will make from time-to-time Advances in an amount not to exceed its DIP Loan Commitment (each, a "**DIP Loan**").  Amounts borrowed under this Section 2.1(a) may not be reborrowed once repaid.

(b)      Whenever Borrower desires an Advance of a DIP Loan, Borrower will notify Lender by e-mail transmission or telephone no later than 12:00 p.m. Central time (each an "**Advance Request**"), two (2) Business Days prior to the date the Advance may be made.  Lender is authorized to make Advances under this Agreement, based upon instructions received from the Responsible Officer or a designee of the Responsible Officer, or without instructions if in Lender's discretion such Advances are necessary to meet Obligations which have become due and remain unpaid.  Lender shall be entitled to rely on any telephonic notice given by a person who Lender reasonably believes to be the Responsible Officer or a designee thereof, and Borrower shall indemnify and hold Lender harmless for any damages or loss suffered by Lender as a result of such reliance.  Lender will wire Advances in immediately available federal funds to a deposit account identified by the Borrower in writing from time to time.

(c)      All Advances under this Section 2.1 and all accrued and unpaid interest thereon shall be repaid in full by Borrower on the Maturity Date.

**2.2      [Reserved.]**

**2.3      Interest Rates, Payments, and Calculations**.

(a)      **Interest Rate.**  Except as set forth in Section 2.3(b), the Advances shall bear interest, on the outstanding Daily Balance thereof, at a rate equal to twelve percent (12%) per annum.

(b)     **Default Rate**.  All Obligations shall bear interest, from and after the occurrence and during the continuance of an Event of Default, automatically and without notice to Borrower, at a rate equal to five percent (5%) above the interest rate applicable immediately prior to the occurrence of an Event of Default.

(c)     **Payments**.  Interest hereunder shall be due and payable on the Maturity Date.

(d)     **Computation**.  All interest chargeable under the Loan Documents shall be computed on the basis of a three hundred sixty-five (365) day year for the actual number of days elapsed.

**2.4     Crediting Payments**.  Prior to the occurrence of an Event of Default, Lender shall credit a wire transfer of funds, check or other item of payment to the Obligations, first to unpaid Lender Expenses, then to any unpaid fees, then to accrued and unpaid interest, and lastly to the outstanding principal balance.  After the occurrence of an Event of Default, the receipt by Lender of any wire transfer of funds, check, or other item of payment shall be immediately applied to conditionally reduce Obligations, but shall not be considered a payment on account unless such payment is of immediately available federal funds or unless and until such check or other item of payment is honored when presented for payment.  Notwithstanding anything to the contrary contained herein, any wire transfer or payment received by Lender after 5:00 p.m. Central Time shall be deemed to have been received by Lender as of the opening of business on the immediately following Business Day.  Whenever any payment to Lender under the Loan Documents would otherwise be due (except by reason of acceleration) on a date that is not a Business Day, such payment shall instead be due on the next Business Day, and additional fees or interest, as the case may be, shall accrue and be payable for the period of such extension.

**2.5     Withholding**.

(a)     Payments received by Lender from Borrower under this Agreement will be made free and clear of and without deduction for any Taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of Borrower) requires Borrower to make any withholding or deduction of any Tax from any such payment, then Borrower shall be entitled to make such deduction or withholding and, if such Tax is an Indemnified Tax, then the sum payable by Borrower shall be increased to the extent necessary to ensure that, after the making of such required withholding or deduction, Lender receives a net sum equal to the sum which it would have received had no withholding or deduction been required.

(b)     Borrower shall pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with applicable law and Borrower will, upon request, furnish Lender with proof reasonably satisfactory to Lender indicating that Borrower has made such withholding payment.

(c)     Notwithstanding anything to the contrary in this Section 2.5, Borrower need not make any withholding payment if the amount or validity of such withholding payment is contested in good faith by appropriate and timely proceedings and as to which payment in full is

bonded or reserved against by Borrower.  The agreements and obligations of Borrower contained in this Section shall survive the termination of this Agreement.

(d)     Lender, if reasonably requested by Borrower, shall deliver such other documentation prescribed by applicable law or reasonably requested by Borrower as will enable Borrower to determine whether or not Lender is subject to backup withholding or information reporting requirements.

(e)     If Lender determines that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section (including by the payment of additional amounts pursuant to this Section), it shall pay to Borrower an amount equal to such refund (but only to the extent of indemnity payments made by Borrower under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that Borrower, upon the request of Lender, agrees to repay the amount paid over to Borrower (plus any penalties, interest or other charges imposed by the relevant taxing authority) to Lender in the event Lender is required to repay such refund to such taxing authority.

(f)     If any assignee of Lender's rights hereunder is not a "United States Person" as defined in IRC Section 7701(a)(30) (such assignee, (or, if such assignee is disregarded as an entity separate from its owner for U.S. federal income tax purposes, such owner, a "Foreign Lender"), such Foreign Lender shall, upon becoming party to this Agreement (and from time to time thereafter upon the reasonable request of the Borrower), to the extent that such Foreign Lender is entitled to a reduced rate of U.S. withholding tax or an exemption from U.S. withholding tax on interest, deliver to Borrower a complete and properly executed US Withholding Tax Form, certifying that such Foreign Lender is entitled to such reduced rate or exemption from U.S. withholding tax on interest and Lender, Borrower and such Foreign Lender shall cooperate in good faith to establish a register meeting the requirements of applicable law.  Notwithstanding anything to the contrary in this section 2.5, Borrower shall not be required to pay any additional amount to any Foreign Lender under Section 2.5 if such Foreign Lender fails or is unable to deliver the forms, certificates or other evidence described in the preceding sentence, unless such Foreign Lender's failure or inability to deliver such forms is the result of any change in any applicable law, treaty or governmental rule, or any change in the interpretation thereof after such Foreign Lender became a party to this Agreement; provided, further, that if a payment made to a Foreign Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Foreign Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in IRC sections 1471(b) or 1472(b), as applicable), such Foreign Lender shall deliver to the Borrower at the time or times prescribed by law and at such time or times reasonably requested by the Borrower such documentation prescribed by applicable law (including as prescribed by IRC section 1471(b)(3)(C)(i)) and such additional documentation reasonably requested by the Borrower as may be necessary for the Borrower to comply with its obligations under FATCA and to determine that such Foreign Lender has complied with such Foreign Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment.    Solely for purposes of this provision, "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

**2.6     Fees**.  Borrower shall pay to Lender the following:

(a)     **Origination Fee**. On the Closing Date, a fully earned, non-refundable origination fee of One Hundred Fifty Thousand Dollars ($150,000), payable at the Maturity Date.

(b)     **Exit Fee**.  On the Closing Date, a fully earned, non-refundable exit fee of Two Hundred Thousand Dollars ($200,000), payable at the Maturity Date.

(c)     **Success Fee.**  A fee equal to two percent (2%) of any amounts payable as a result of an award in the Arbitration or as settlement of the claims asserted in the Arbitration, payable at the Maturity Date.

(d)     **Lender Expenses**.  All Lender Expenses as and when they become due following the delivery of an invoice to Borrower, the U.S. Trustee, and the Committee and in accordance with paragraph 6 of the Final Order.

**2.7     Term**.  The term of this Agreement shall be from the Closing Date through the Maturity Date.  Notwithstanding the foregoing, Lender shall have the right to terminate its obligation to make Credit Extensions under this Agreement immediately after providing notice upon the occurrence and during the continuance of an Event of Default.  Notwithstanding termination, Lender's Lien on the Collateral shall remain in effect for so long as any Obligations are outstanding.

**2.8     Right to Credit Bid**.  Subject to the Orders, in connection with any sale or disposition of all or any portion of the Collateral, including in each case pursuant to Sections 9-610 or 9-620 of the UCC, at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code or as part of restructuring plan subject to confirmation under Section 1129 of the Bankruptcy Code, or at any sale or foreclosure conducted by Lender, by a chapter 7 trustee under Section 725 of the Bankruptcy Code, or otherwise, in each case in accordance with applicable law and, with respect to any credit bid, Section 363(k) of the Bankruptcy Code, Borrower hereby gives Lender the power and right, without assent by such Borrower, to "credit bid" the full amount of all Obligations in order to purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral.

## 3.     CONDITIONS OF LOANS.

**3.1     Conditions Precedent to Initial Credit Extension**.  The obligation of Lender to make the initial Credit Extension is subject to the satisfaction of the following conditions precedent:

(a)     Lender shall have received, in form and substance satisfactory to Lender, such documents, and completion of such matters, as Lender may reasonably deem necessary or appropriate;

(b)     the Borrower shall have delivered to Lender the initial Budget, which Budget shall be in form and substance satisfactory to Lender; and

(c)     the Interim Order Entry Date shall have occurred, and the Interim Order shall be in full force and effect, shall not have been vacated or reversed, shall not have been modified or amended other than as acceptable to the Lender and shall not be subject to a stay.

**3.2    Conditions Precedent to all Credit Extensions**.  The obligation of Lender to make each Credit Extension is further subject to the following conditions:

(a)    the representations and warranties contained in Section 5 shall be true and correct in all material respects on and as of the date of Borrower's request for a Credit Extension and on the effective date of each Credit Extension as though made at and as of each such date. The making of each Credit Extension shall be deemed to be a representation and warranty by Borrower on the date of such Credit Extension as to the accuracy of the facts referred to in this Section 3.2;

(b)    no Default or Event of Default shall be continuing or would exist after giving effect to such Credit Extension;

(c)    the Case shall have not been dismissed or converted to a case under Chapter 7 of the Bankruptcy Code; and

(d)    no trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in the Case.

## 4.    CREATION OF SECURITY INTEREST.

**4.1    Grant of Security Interest**.  To secure prompt repayment of any and all Obligations and prompt performance by Borrower of each of its covenants and duties under the Loan Documents, Borrower grants Lender a continuing security interest in all presently existing and hereafter acquired or arising Collateral (subject to Permitted Liens).

**4.2    Perfection and Priority of Security Interests**.  All Obligations shall at all times:

(a)    be entitled to a first priority, perfected security interest in and lien under Section 364(c)(2) of the Bankruptcy Code upon all Collateral of the Borrower that, on or as of the Petition Date, is not subject to a valid, perfected and non-avoidable lien; and

(b)    have a first priority, perfected priming security interest in and lien under Section 364(d)(1) of the Bankruptcy Code upon all Collateral, in all cases senior to all other liens and obligations secured by the Collateral.

**4.3    Delivery of Additional Documentation Required**.  Borrower shall from time to time execute and deliver to Lender, at the request of Lender, all financing statements and other documents that Lender may reasonably request, in form satisfactory to Lender, to perfect and continue the perfection of Lender's security interests in the Collateral and in order to fully consummate all of the transactions contemplated under the Loan Documents.

**4.4    Authorization to File Financing Statements**.  Borrower hereby authorizes Lender to file financing statements, without notice to Borrower, with all appropriate jurisdictions to perfect or protect Lender's interest or rights hereunder, including a notice that any disposition

of the Collateral, by either Borrower or any other Person, shall be deemed to violate the rights of Lender under the Code.

## 5. REPRESENTATIONS AND WARRANTIES.

The Borrower represents and warrants as follows:

**5.1 Due Organization and Qualification**. The Debtor is a limited liability company duly existing under the laws of Delaware and qualified and licensed to do business in any state in which the conduct of its business or its ownership of property requires that it be so qualified, except in each case (other than with respect to their states of incorporation) where the failure to do so could not reasonably be expected to cause a Material Adverse Effect.

**5.2 Due Authorization; No Conflict**. Subject to the entry of the Orders and the terms hereof, the execution, delivery, and performance of the Loan Documents are within Borrower's powers, have been duly authorized, and are not in conflict with nor constitute a breach of any provision contained in Borrower's Certificate of Organization or Bylaws, nor will they constitute an event of default under any material agreement to which Borrower is a party or by which Borrower is bound. Borrower is not in default under any agreement to which it is a party or by which it is bound, except to the extent such default would not reasonably be expected to cause a Material Adverse Effect.

**5.3 No Prior Encumbrances**. Borrower has good and marketable title to the Collateral, except for Permitted Liens.

**5.4 Name; Location of Chief Executive Office**. Borrower has not done business under any name other than that specified on the signature page hereof. The chief executive office of Borrower is located at 1920 McKinney Avenue, 7th Floor, Dallas, Texas 75205. Except as disclosed in writing to Lender, all of the Collateral is located only at the locations set forth on Exhibit A.

**5.5 Litigation**. Except as disclosed in writing to Lender or as set forth in the Schedules of Assets and Liabilities and Statements of Financial Affairs filed in the Case, there are no actions or proceedings (other than the Case) pending by or against Borrower before any court or administrative agency in which an adverse decision could reasonably be expected to have a Material Adverse Effect.

**5.6 No Material Adverse Change in Financial Statements**. All consolidated and consolidating financial statements related to Borrower that Lender has received from Borrower fairly present in all material respects Borrower's financial condition as of the date thereof and Borrower's consolidated and consolidating results of operations for the period then ended and have been prepared in accordance with GAAP. There has not been a material adverse change in the consolidated or the consolidating financial condition of Borrower since the date of the most recent of such financial statements submitted to Lender (other than as a result of the Case or the circumstances and events leading up thereto).

**5.7 Regulatory Compliance**. To the extent applicable, Borrower has met the minimum funding requirements of ERISA with respect to any employee benefit plans subject to

ERISA, and no event has occurred resulting from Borrower's failure to comply with ERISA that is reasonably likely to result in Borrower's incurring any liability that could reasonably be expected to have a Material Adverse Effect.  Borrower is not required to be registered as an "investment company" under the Investment Company Act of 1940.  Borrower is not engaged principally, or as one of the important activities, in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulations T and U of the Board of Governors of the Federal Reserve System).  Borrower has complied with all the provisions of the Federal Fair Labor Standards Act except in each case where the failure to do so could not reasonably be expected to cause a Material Adverse Effect.  Borrower has not violated any statutes, laws, ordinances or rules applicable to it, the violation of which could reasonably be expected to cause a Material Adverse Effect.

**5.8    Environmental Matters**.  Except as would not reasonably be expected to have a Material Adverse Effect, Borrower is in material compliance with all applicable laws relating to protection of the environment for health and safety. Borrower represents and warrants that there are no pending citations, notices of violation, administrative orders, complaints, judgments, consent orders or consent agreements issued to or entered into by Borrower relating to any such laws, which are applicable to the Collateral, except as disclosed on the Schedules of Assets and Liabilities and Statements of Financial Affairs filed in the Case.

**5.9    Taxes**.  Borrower has filed or caused to be filed all material tax returns required to be filed, and has paid, or has made adequate provision for the payment of, all taxes reflected therein, except (i) for taxes that are being contested in good faith by appropriate proceedings and are reserved against (to the extent required by GAAP) by Borrower, or (ii) to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

**5.10    Government Consents**.  Borrower has obtained all material consents, approvals and authorizations of, made all declarations or filings with, and given all notices to, all governmental authorities that are necessary for the continued operation of Borrower's business as currently conducted, except where the failure to do so would not reasonably be expected to cause a Material Adverse Effect.

**5.11    Full Disclosure**.  No representation, warranty or other statement made by Borrower in any certificate or written statement furnished to Lender taken together with all such certificates and written statements and supplements furnished to Lender contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained in such certificates or statements not misleading when made, it being recognized by Lender that the projections and forecasts provided by Borrower in good faith and based upon assumptions that were reasonable at the time such projections were delivered and are not to be viewed as facts and that actual results during the period or periods covered by any such projections and forecasts may differ from the projected or forecasted results.

**5.12    Use of Proceeds**. The Borrower shall use the proceeds of the DIP Loans in accordance with the Budget (subject to any Permitted Budget Variance) and the Orders entered in connection with the Case exclusively for one or more of the following purposes (subject to any additional restrictions on the use of such proceeds and any such cash collateral set forth in the Interim Order):

(a)  to pay certain costs, premiums, fees and expenses related to the Case; and

(b)  to fund working capital and other needs of the Debtor in accordance with the Budget (subject to any Permitted Budget Variance).

Proceeds of the DIP Loan Facility or cash collateral shall not be used (a) to permit the Debtor, or any other party-in-interest or their representatives to challenge or otherwise contest or institute any proceeding to determine the validity, perfection or priority of security interests in favor of Lender, or (b) to commence, prosecute or defend any claim, motion, proceeding or cause of action against Lender and its agents, attorneys, advisors or representatives including, without limitation, any lender liability claims or subordination claims.

**5.13  Financial Information**. (a) On and as of the Closing Date, the Budget, copies of which have heretofore been furnished to the Lender and (b) following the Closing Date, any updated Budget delivered pursuant to Section 6.13, in each case, are based on good faith estimates and assumptions made at such time by the persons who prepared it.

**5.14  Case**. The Case were commenced on the Petition Date in accordance with applicable law, and notice of the hearing for the approval of the Interim Order has been given as identified in the certificate of service filed with the Bankruptcy Court.

**5.15  Orders**. The Interim Order and the Final Order are in full force and effect, and have not, in whole or in material part, been reversed, modified, amended, stayed, vacated, appealed or subject to a stay pending appeal or otherwise challenged or subject to any pending or threatened challenge or proceeding in any jurisdiction, and the Borrower is in material compliance with each Order.

## 6.  AFFIRMATIVE COVENANTS.

Borrower shall do all of the following:

**6.1  Good Standing**. Borrower shall maintain its corporate existence and good standing in its jurisdiction of incorporation and maintain qualification in each other jurisdiction in which the failure to so qualify could reasonably be expected to have a Material Adverse Effect. Borrower shall maintain all licenses, approvals and agreements, the loss of which could have a Material Adverse Effect.

**6.2  Government Compliance**. Borrower shall meet the minimum funding requirements of ERISA with respect to any employee benefit plans subject to ERISA. Borrower shall comply with all statutes, laws, ordinances and government rules and regulations to which it is subject, noncompliance with which could have a Material Adverse Effect.

**6.3  Financial Statements, Reports, Certificates**. Borrower shall deliver the following to Lender:

(a)  no later than the 25th day of each month, a cash flow forecast in form and detail satisfactory to Lender, covering all of the weeks through the Maturity Date;

(b)      no later than the 25th day of each month, a Budget Variance Report certified by the Responsible Officer, and any updates to the Budget that are approved by Lender in Lender's sole discretion; and

(c)      promptly upon receipt of notice thereof, a report of (x) any other legal actions (other than the Case) pending or threatened in writing against Borrower that could reasonably be expected to result in liability to Borrower of One Hundred Thousand Dollars ($100,000) or more, or (y) any commercial tort claim acquired by Borrower;

(d)      within fourteen (14) days after the last day of each month, copies of bank statements for all bank accounts;

(e)      written notice within five (5) Business Days' of the resignation from or termination of employment of the Responsible Officer;

(f)      such other financial information as Lender may request from time to time in its Permitted Discretion.

To the extent any of the foregoing reports or financial information are due on a day that is not a Business Day, Borrower shall instead deliver such reports or financial information on the next Business Day.

6.4      **Right to Inspect**.  Lender (through any of its officers, employees, or agents) shall have the right, upon reasonable prior notice, from time to time during Borrower's usual business hours and at Borrower's sole cost and expense, to inspect Borrower's Books and to make copies thereof, to audit Borrower's accounts and to check, test, and appraise the Collateral in order to verify Borrower's financial condition or the amount, condition of, or any other matter relating to, the Collateral; provided that no notice is required if an Event of Default has occurred and is continuing.

6.5      **Taxes**.  Borrower shall make due and timely payment or deposit of all material Taxes required of it by law, provided that Borrower need not make any payment if (i) the amount or validity of such payment is contested in good faith by appropriate proceedings and is reserved against (to the extent required by GAAP) by Borrower and (ii) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect.

6.6      **Insurance.**

(a)      Borrower, at its expense, shall keep the Collateral insured against loss or damage in such amounts, as ordinarily insured against by other owners in similar businesses conducted by Borrower, if any.

(b)      All such policies of insurance shall be in such form, with such companies, and in such amounts as are reasonably satisfactory to Lender (it being hereby acknowledged by Lender that the insurance policies of Borrower in place on the Closing Date are satisfactory).

**6.7    Accounts**.  Except as required under the Bankruptcy Code, rules or policies of the U.S. Trustee, and/or a Bankruptcy Court order, Borrower shall not establish any deposit or securities account after the Closing Date without the approval of the Lender.

**6.8    Bankruptcy Filings.**  Not less than two (2) Business Days prior to filing any motion requesting approval for debtor-in-possession financing or use of cash collateral, Borrower shall send copies of such motions to Lender, and all such motions shall be satisfactory to Lender in Lender's Permitted Discretion.

**6.9    Further Assurances**.  At any time and from time to time Borrower shall execute and deliver such further instruments and take such further action as may reasonably be requested by Lender to effect the purposes of this Agreement.

**6.10    Prepetition Loan Documents**.  Borrower shall not amend, supplement, restate, otherwise modify the Prepetition Loan Documentation or enter into any new Prepetition Loan Documentation without the prior written consent of the Lender and as approved by the Bankruptcy Court.

**6.11    Debtor-in-Possession Obligations**.  Borrower shall comply in a timely manner with its obligations and responsibilities as a debtor-in-possession under the Bankruptcy Code, the rules of procedure of the Bankruptcy Court, and any order of the Bankruptcy Court.

**6.12    Budget Compliance and Variances.**

(a)    The Borrower will use the proceeds of the Loans solely to make disbursements for expenditures provided for in accordance with Section 5.13 and this Section 6.13. The Borrower shall not pay any expenses (other than de minimis amounts) or other disbursements (other than de minimis disbursements) other than the type of expenses and disbursements set forth in the Budget.

(b)    Beginning on the Closing Date, the Borrower shall not cause expenses to vary from the applicable Budget by more than ten percent (10%) on a cumulative basis for that portion of the Budget period then ended (collectively, the "**Permitted Budget Variances**").  In the event that actual amounts for total cash receipts and cash disbursements from operations line items are in excess of the Budget Variances, the parties hereto agree to negotiate in good faith to discuss any modification to the Budget and Permitted Budget Variances, it being understood and agreed that the Lender shall have no obligation to fund any amounts in excess of the Budget and Permitted Budget Variances.

(c)    If the Budget is updated, modified or supplemented by the Borrower, each such updated, modified or supplemented budget shall be approved in writing by, and shall be in form and substance satisfactory to, the Lender and no such updated, modified or supplemented budget shall be effective until so approved and once so approved shall be deemed to be a Budget. Each Budget delivered to Lender shall be accompanied by such supporting documentation as reasonably requested by the Lender.  Each Budget shall be prepared in good faith based upon assumptions which the Borrower believes to be reasonable.

**6.13** **Filing of Motions and Applications**. Without the prior written consent of the Lender, the Debtor shall not apply to the Bankruptcy Court for, or join in or support any motion or application seeking, authority to (a) take any action that is prohibited by the terms of any of the Loan Documents or the Orders, (b) refrain from taking any action that is required to be taken by the terms of any of the Loan Documents or the Orders, or (c) permit any Indebtedness or Claim to be pari passu with or senior to any of the DIP Loans, except as expressly stated in the Orders.

**7.** **NEGATIVE COVENANTS.**

Borrower shall not do any of the following:

**7.1** **Dispositions**. Convey, sell, lease, transfer or otherwise dispose of (collectively, a "**Transfer**"), all or any part of its business or property (including a Bankruptcy Sale), other than use of cash in the ordinary course of business unless prohibited under the terms of this Agreement or any other Loan Document.

**7.2** **Change in Business; Change in Executive Office**. Engage in any business, other than the businesses currently engaged in by Borrower and any business substantially similar or related thereto (or incidental thereto), or cease to conduct business in the manner conducted by Borrower as of the Closing Date.

**7.3** **Mergers or Acquisitions**. Merge, divide (pursuant to Delaware limited liability company law or any similar statute) or consolidate, with or into any other business organization, or acquire, all or substantially all of the capital stock or property of another Person.

**7.4** **Indebtedness**. Create, incur, guarantee, assume or be or remain liable with respect to any Indebtedness, other than Permitted Indebtedness.

**7.5** **Encumbrances**. Create, incur, assume or suffer to exist any Lien with respect to any of its property, or assign or otherwise convey any right to receive income, except for Permitted Liens, or enter into any agreement with any Person other than Lender not to grant a security interest in, or otherwise encumber, any of its property.

**7.6** **Distributions**. Pay any dividends or make any other distribution or payment on account of or in redemption, retirement or purchase of any equity interests.

**7.7** **Investments**. Directly or indirectly acquire or own, or make any Investment in or to any Person, or maintain or invest any of its property with a Person other than Lender unless such Person has entered into an account control agreement with Lender in form and substance satisfactory to Lender.

**7.8** **Transactions with Affiliates**. Directly or indirectly enter into or permit to exist any material transaction with any Affiliate of Borrower except for transactions that are in the ordinary course of Borrower's business, upon fair and reasonable terms that are no less favorable to Borrower than would be obtained in an arm's length transaction with a non-affiliated Person.

8. **EVENTS OF DEFAULT.**

Any one or more of the following events shall constitute an Event of Default by Borrower under this Agreement:

8.1 **Payment Default**. Except to the extent the holder thereof would be stayed from exercising remedies as a result of the Case, if Borrower fails to pay, when due, any of the Obligations;

8.2 **Covenant Default.**

(a) If Borrower fails to perform any obligation under Article 6 or violates any of the covenants contained in Article 7 of this Agreement; or

(b) If Borrower fails or neglects to perform or observe any other material term, provision, condition, covenant contained in this Agreement, in any of the Loan Documents, or in any other present or future agreement between Borrower and Lender and as to any default under such other term, provision, condition or covenant that can be cured, has failed to cure such default within ten days after Borrower receives notice thereof or any officer of Borrower becomes aware thereof; provided, however, that if the default cannot by its nature be cured within the ten day period or cannot after diligent attempts by Borrower be cured within such ten day period, and such default is likely to be cured within a reasonable time, then Borrower shall have an additional reasonable period (which shall not in any case exceed 30 days) to attempt to cure such default, and within such reasonable time period the failure to have cured such default shall not be deemed an Event of Default but no Credit Extensions will be made.

8.3 **Material Adverse Effect**. If there occurs any circumstance or circumstances that could reasonably be expected to have a Material Adverse Effect;

8.4 **Attachment**. Other than in connection with the Case in each case, if any material portion of Borrower's assets is attached, seized, subjected to a writ or distress warrant, or is levied upon, or comes into the possession of any trustee, receiver or person acting in a similar capacity and such attachment, seizure, writ or distress warrant or levy has not been removed, discharged or rescinded within ten (10) days, or if Borrower is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of its business affairs, or if a judgment or other claim becomes a lien or encumbrance upon any material portion of Borrower's assets, or if a notice of lien, levy, or assessment is filed of record with respect to any material portion of Borrower's assets by the United States Government, or any department, agency, or instrumentality thereof, or by any state, county, municipal, or governmental agency, and the same is not paid within ten (10) days after Borrower receives notice thereof, provided that none of the foregoing shall constitute an Event of Default where such action or event is stayed or an adequate bond has been posted pending a good faith contest by Borrower (provided that no Credit Extensions will be required to be made during such cure period);

8.5 **Assets.** (a) The Debtor moves (or fails to contest in good faith a motion brought by any other Person) to approve a sale or other disposition of substantially all of the Debtor's assets of the Collateral without the consent of the Lender, or (b) the allowance of any

claim or claims under Section 506(c) of the Bankruptcy Code against or with respect to any Collateral.

8.6 **Other Agreements**. Except to the extent the counterparty thereto would be stayed from exercising remedies as a result of the Case, if there is a default or other failure to perform in any agreement to which Borrower is a party or by which it is bound resulting in a right by a third party or parties, whether or not exercised, to accelerate the maturity of any Indebtedness in an amount in excess of One Hundred Thousand Dollars ($100,000) or which could have a Material Adverse Effect;

8.7 **Judgments**. If a judgment or judgments for the payment of money in an amount, individually or in the aggregate, of at least One Hundred Thousand Dollars ($100,000) (excluding amounts covered by insurance or third party indemnification) shall be rendered against Borrower and shall remain unsatisfied, unvacated or unstayed pending appeal for a period of ten (10) days (provided that no Credit Extensions will be made prior to the satisfaction or stay of such judgment);

8.8 **Misrepresentations**. If any material misrepresentation or material misstatement exists now or hereafter in any warranty or representation set forth herein or in any certificate delivered to Lender by the Responsible Officer pursuant to this Agreement or to induce Lender to enter into this Agreement or any other Loan Document;

8.9 **Case.** The Case of the Debtor shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code without the consent of the Lender;

8.10 **Trustee.** A motion or other pleading is filed in the Case for entry of an order appointing a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code and such motion is not otherwise overruled or dismissed by the Bankruptcy Court within twenty-one (21) calendar days;

8.11 **Relief from Stay.** The Bankruptcy Court shall enter an order or orders granting relief from any stay of proceeding (including, the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest) to (i) permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Debtor which have a value in excess of $100,000 in the aggregate or (ii) permit other actions that would have a Material Adverse Effect on the Debtor or its estate (taken as a whole);

8.12 **Orders.** The Interim Order (prior to Final Order Entry Date) or Final Order (on and after the Final Order Entry Date) shall cease to create a valid and perfected Lien on the Collateral or to be in full force and effect, shall have been in any material respect reversed, modified, amended, stayed, vacated, or subject to stay pending appeal, without prior written consent of Lender;

8.13 **Compliance with Orders.** Borrower shall fail to comply with the Interim Order (prior to Final Order Entry Date) or Final Order (on and after the Final Order Entry Date) in any material respect;

**8.14    Other Financing.** (a) Except as permitted in the Interim Order or Final Order, the entry of any order of the Bankruptcy Court granting to any third party a Lien pari passu with or senior to that granted to and/or for the benefit of the Lender hereunder, or (b) the Borrower shall make any payment of principal or interest or otherwise on account of any Indebtedness or payables other than the Obligations under the DIP Loan Facility, or other than in accordance with the Budget approved by the Lender; or

**8.15    Avoidance.** Any suit or action is commenced against the Lender by or on behalf of Borrower or any Committee, in each case that constitutes a challenge or that asserts a claim or seeks a legal or equitable remedy that would have the effect of subordinating the claim or Lien of the Lender and, if such suit or action shall not have been dismissed or stayed within fifteen (15) calendar days after service thereof on the Lender, and if stayed, such stay shall have been lifted.

**9.    LENDER'S RIGHTS AND REMEDIES.**

**9.1    Rights and Remedies**.  Upon the occurrence and during the continuance of an Event of Default, Lender may, at its election, do any one or more of the following, all of which are authorized by Borrower:

(a)    Subject to the Orders, Lender may, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court, suspend the DIP Loan Facility with respect to additional Advances, whereupon any additional Advances shall be made or incurred in Lender's sole discretion so long as such Default or Event of Default is continuing.  If any Event of Default has occurred and is continuing, Lender may, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court, except as otherwise expressly provided herein, increase the rate of interest applicable to the Loan to the Default Rate.

(b)    Subject to the Orders, Lender may (i) terminate the DIP Loan Facility with respect to further Advances; (ii) reduce the DIP Loan Commitments from time to time; (iii) declare all or any portion of the Obligations, including all or any portion of the Loan to be forthwith due and payable; or (iv) exercise any rights and remedies provided to Lender under the Loan Documents or at law or equity, including all remedies provided under the Bankruptcy Code; provided, however, Lender shall be permitted to exercise any remedy in the nature of a liquidation of, or foreclosure on, any interest of Borrower in the Collateral only after obtaining relief from automatic stay of Section 362 of the Bankruptcy Code.

**9.2    [Reserved.]**

**9.3    [Reserved.]**

**9.4    Lender Expenses**.  If Borrower fails to pay any amounts or furnish any required proof of payment due to third persons or entities, as required under the terms of this Agreement, then Lender may do any or all of the following after reasonable notice to Borrower: (a) make payment of the same or any part thereof; (b) set up such reserves as Lender deems necessary to protect Lender from the exposure created by such failure; or (c) obtain and maintain

insurance policies of the type discussed in Section 6.6 of this Agreement, and take any action with respect to such policies as Lender deems prudent. Any amounts so paid or deposited by Lender shall constitute Lender Expenses, shall be immediately due and payable, and shall bear interest at the then applicable rate hereinabove provided, and shall be secured by the Collateral. Any payments made by Lender shall not constitute an agreement by Lender to make similar payments in the future or a waiver by Lender of any Event of Default under this Agreement.

9.5 **Lender's Liability for Collateral**. So long as Lender complies with reasonable commercial lending practices, Lender shall not in any way or manner be liable or responsible for: (a) the safekeeping of the Collateral; (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause; or (c) any diminution in the value thereof. All risk of loss, damage or destruction of the Collateral shall be borne by Borrower.

9.6 **Remedies Cumulative**. Lender's rights and remedies under this Agreement, the Loan Documents, and all other agreements shall be cumulative. Lender shall have all other rights and remedies not inconsistent herewith as provided under the Code, by law, or in equity, subject to the requirements of the Bankruptcy Code. No exercise by Lender of one right or remedy shall be deemed an election, and no waiver by Lender of any Event of Default on Borrower's part shall be deemed a continuing waiver. No delay by Lender shall constitute a waiver, election, or acquiescence by it. No waiver by Lender shall be effective unless made in a written document signed on behalf of Lender and then shall be effective only in the instance and for the purpose for which it was given.

9.7 **Borrower Liability.** Any Borrower may, acting singly, request Credit Extensions hereunder. Each Borrower hereby appoints each other as agent for the other for all purposes hereunder, including with respect to requesting Credit Extensions hereunder. Each Borrower hereunder shall be jointly and severally obligated to repay all Credit Extensions made hereunder, regardless of which Borrower actually receives said Credit Extension, as if each Borrower hereunder directly received all Credit Extensions.

9.8 **Protective Payments**. If Borrower fails to obtain the insurance called for by Section 6.6 or fails to pay any premium thereon or fails to pay any other amount which Borrower is obligated to pay under this Agreement or any other Loan Document or which may be required to preserve the Collateral, Lender may obtain such insurance or make such payment, and all amounts so paid by Lender are Lender Expenses and immediately due and payable, bearing interest at the then highest rate applicable to the Obligations, and secured by the Collateral. Lender will make reasonable efforts to provide Borrower with notice of Lender obtaining such insurance at the time it is obtained or within a reasonable time thereafter. No payments by Lender are deemed an agreement to make similar payments in the future or Lender's waiver of any Event of Default.

9.9 **Savings Clause**. Notwithstanding any other provision herein, the aggregate interest rate charged with respect to any of the Obligations, including all charges or fees in connection therewith deemed in the nature of interest under applicable law shall not exceed the Highest Lawful Rate. If the rate of interest (determined without regard to the preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the outstanding amount of the Advances made hereunder shall bear interest at the Highest Lawful Rate until the total amount of interest due hereunder equals the amount of interest which would have been due hereunder if the

stated rates of interest set forth in this Agreement had at all times been in effect. In addition, if when the Advances made hereunder are repaid in full the total interest due hereunder (taking into account the increase provided for above) is less than the total amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect, then to the extent permitted by law, Borrower shall pay to Lender an amount equal to the difference between the amount of interest paid and the amount of interest which would have been paid if the Highest Lawful Rate had at all times been in effect. Notwithstanding the foregoing, it is the intention of Lender and Borrower to conform strictly to any applicable usury laws. Accordingly, if Lender contracts for, charges, or receives any consideration which constitutes interest in excess of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if previously paid, shall at Lender's option be applied to the outstanding amount of the Advances made hereunder or be refunded to Borrower.

**10.     NOTICES.**

All notices, consents, requests, approvals, demands, or other communication by any party to this Agreement or any other Loan Document must be in writing and shall be deemed to have been validly served, given, or delivered: (a) upon the earlier of actual receipt and three (3) Business Days after deposit in the U.S. mail, first class, registered or certified mail return receipt requested, with proper postage prepaid; (b) upon transmission, when sent by electronic mail or facsimile transmission; (c) one (1) Business Day after deposit with a reputable overnight courier with all charges prepaid; or (d) when delivered, if hand-delivered by messenger, all of which shall be addressed to the party to be notified and sent to the address, facsimile number, or email address indicated below.   Lender or Borrower may change its mailing or electronic mail address or facsimile number by giving the other party written notice thereof in accordance with the terms of this Section 10:

|  |  |
|---|---|
| If to Borrower: | Eventide Credit Acquisition, LLC<br>1920 McKinney Avenue, 7th Floor<br>Dallas, TX 75201<br>Attn:  Drew McManigle<br>email:  drew@macco.group |
|  | With a copy to (which does not constitute notice): |
|  | Bernard R. Given II<br>Loeb & Loeb LLP<br>10100 Santa Monica Blvd., Suite 2200<br>Los Angeles, CA 90067<br>Email:  bgiven@loeb.com |
| If to Lender: | Guardian Trust Corporation, as trustee for<br>Bluetech Irrevocable Trust<br>Attn:   Ms. Tine Ponia<br>Bermuda House, Tutakimoa Road<br>P.O. Box 822<br>Rarotonga, Cook Islands |

email: tine.ponia@asiacititrust.com

With a copy to (which does not constitute notice):

Lauren Fitte
Giordani Baker Grossman & Ripp, LLP
100 Congress Ave., Ste. 1440
Austin, Texas 78701
Email: lfitte@gbgrlaw.com

The parties hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other.

**11.     CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER; JUDICIAL REFERENCE.**

Except as otherwise expressly provided in any of the Loan Documents, Delaware law governs the Loan Documents without regard to principles of conflicts of law. Borrower submits to the exclusive jurisdiction of the Bankruptcy Court; provided, however, that nothing in this Agreement shall be deemed to operate to preclude Lender from bringing suit or taking other legal action in any jurisdiction to realize on the Collateral or any other security for the Obligations, or to enforce a judgment or other court order in favor of Lender. Borrower expressly submits and consents in advance to such jurisdiction in any action or suit commenced in any such court, and Borrower hereby waives any objection that it may have based upon lack of personal jurisdiction, improper venue, or forum non conveniens and hereby consents to the granting of such legal or equitable relief as is deemed appropriate by such court. Borrower and Lender agree and acknowledge that any language found in the Prior Agreement indicating that Lender submits to the jurisdiction of the Bankruptcy Court was included in that agreement inadvertently. Lender does not now, nor has it at any time, submitted to the jurisdiction of the Bankruptcy Court or any other U.S. court. The parties agree that any contrary language found in the Prior Agreement was included unintentionally and is void.

**TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, BORROWER AND LENDER EACH WAIVE THEIR RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE LOAN DOCUMENTS OR ANY CONTEMPLATED TRANSACTION, INCLUDING CONTRACT, TORT, BREACH OF DUTY AND ALL OTHER CLAIMS. THIS WAIVER IS A MATERIAL INDUCEMENT FOR BOTH PARTIES TO ENTER INTO THIS AGREEMENT. EACH PARTY HAS REVIEWED THIS WAIVER WITH ITS COUNSEL.**

This Section 11 shall survive the termination of this Agreement.

**12.     GENERAL PROVISIONS.**

**12.1     Successors and Assigns**. This Agreement shall bind and inure to the benefit of the respective successors and permitted assigns of each of the parties; provided,

however, that neither this Agreement nor any rights hereunder may be assigned by Borrower or Lender, without the other's prior written consent, which consent may be granted or withheld in such party's sole discretion.

      **12.2**    **Indemnification**. Borrower shall defend, indemnify and hold harmless Lender and its officers, employees, and agents (each an "**Indemnified Party**") against: (a) all obligations, demands, claims, and liabilities claimed or asserted by any other party in connection with the transactions contemplated by this Agreement; and (b) all losses or Lender Expenses in any way suffered, incurred, or paid by Lender as a result of or in any way arising out of, following, or consequential to transactions between Lender and Borrower whether under this Agreement, the DIP Facility, the Case, or otherwise (including without limitation reasonable attorneys' fees and expenses), except for losses caused by an Indemnified Party's gross negligence or willful misconduct. This Section 12.2 shall not apply to Taxes.

      **12.3**    **Time of Essence**. Time is of the essence for the performance of all obligations set forth in this Agreement.

      **12.4**    **Severability of Provisions**. Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

      **12.5**    **Amendments in Writing, Integration**. All amendments to or terminations of this Agreement or the Loan Documents must be in writing signed by the parties. All prior agreements, understandings, representations, warranties, and negotiations between the parties hereto with respect to the subject matter of this Agreement and the Loan Documents, if any, are merged into this Agreement and the Loan Documents. The Prior Agreement never became effective because it was never approved by the Court. That fact notwithstanding, the Prior Agreement is terminated and is of no force or effect.

      **12.6**    **Counterparts**. This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.

      **12.7**    **Electronic Execution of Documents.** The words "execution," "signed," "signature" and words of like import in any Loan Document shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity and enforceability as a manually executed signature or the use of a paper-based recordkeeping systems, as the case may be, to the extent and as provided for in any applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act.

      **12.8**    **Survival**. All covenants, representations and warranties made in this Agreement shall continue in full force and effect so long as any Obligations remain outstanding or Lender has any obligation to make Credit Extensions to Borrower. The obligations of Borrower to indemnify Lender with respect to the expenses, damages, losses, costs and liabilities described in Section 12.2 shall survive until all applicable statute of limitations periods with respect to actions that may be brought against Lender have run.

**12.9    Confidentiality; Disclosure**.    In handling any confidential information Lender and all employees and agents of Lender, including but not limited to accountants, shall exercise the same degree of care that it exercises with respect to its own proprietary information of the same types to maintain the confidentiality of any non-public information thereby received or received pursuant to this Agreement except that disclosure of such information may be made (i) to the subsidiaries or affiliates of Lender in connection with their present or prospective business relations with Borrower, (ii) to prospective transferees or purchasers of any interest in the loans, provided that they are similarly bound by confidentiality obligations, (iii) as required by law, regulations, rule or order, subpoena, judicial order or similar order (including in connection with the Case), (iv) as may be required in connection with the examination, audit or similar investigation of Lender and (v) as Lender may determine in connection with the enforcement of any remedies hereunder.    Confidential information hereunder shall not include information that either:  (a) is in the public domain or in the knowledge or possession of Lender when disclosed to Lender, or becomes part of the public domain after disclosure to Lender through no fault of Lender; or (b) is disclosed to Lender by a third party, provided Lender does not have actual knowledge that such third party is prohibited from disclosing such information.    Borrower authorizes Lender to disclose its relationship with Borrower, including use of Borrower's logo in Lender's promotional materials.

**12.10    Patriot Act Notice**.    Lender notifies Borrower that, pursuant to the requirements of the USA Patriot Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "**Patriot Act**"), it is required to obtain, verify and record information that identifies Borrower, which information includes names and addresses and other information that will allow Lender to identify Borrower in accordance with the Patriot Act.

[signature page follows]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

**Borrower:**

**EVENTIDE CREDIT ACQUISITIONS, LLC**

By: _____*/s* M. Drew McManigle_____
      Name:  M. Drew McManigle
      Title:   Manager

**Lender:**

GUARDIAN TRUST CORPORATION, as trustee of the BLUETECH IRREVOCABLE TRUST

By: _____
      Name:
      Title:

By: _____
      Name:
      Title:

[Signature Page 27 to Debtor-in-Possession Loan and Security Agreement]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

**Borrower:**

**EVENTIDE CREDIT ACQUISITIONS, LLC**

By: _____

      Name: M. Drew McManigle
      Title: Manager

**Lender:**

GUARDIAN TRUST CORPORATION, as trustee of the BLUETECH IRREVOCABLE TRUST

ATP DIRECTORS LIMITED
BY ITS DULY AUTHORISED OFFICER

By: its Director _____

      Name:
      Title: Angela Pope      Kaylene Parris

By: _____

      Name:
      Title:

[Signature Page 27 to Debtor-in-Possession Loan and Security Agreement]

19065044.1
233953-10002

**Exhibit A**

**COLLATERAL DESCRIPTION**

Pursuant to Bankruptcy Code section 364(c)(2), (i) a valid, perfected security interest in and lien upon all of Borrower's assets and all proceeds and products of the foregoing, and (ii) a valid, perfected security interest in and lien upon proceeds of any and all claims, causes of action, and rights of Borrower, except those arising under Bankruptcy Code sections 542-553.

# Exhibit 2

## (Redline)

## AMENDED AND RESTATED DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT

This **DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT** is entered into as of May ~~15~~26, 2020 (this "**Agreement**"), by and between GUARDIAN TRUST CORPORATION AS TRUSTEE OF THE BLUETECH IRREVOCABLE TRUST ("**Lender**") and EVENTIDE CREDIT ACQUISITIONS, LLC, a Delaware limited liability company ("**Borrower**" or "**Debtor**"), debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code.

### Recitals

WHEREAS, on January 28, 2020 (the "**Petition Date**"), the Debtor filed a voluntary petition with the Bankruptcy Court initiating a case pending under Chapter 11 of the Bankruptcy Code (the "**Case**") and has continued in the possession of its assets and in the management of its businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, Borrower has requested that the Lender make available to the Borrower a debtor-in-possession term loan in an aggregate principal amount of two million dollars ($2,000,000);~~and~~

**WHEREAS, Borrower and Lender entered into a prior loan agreement, dated as of May 15, 2020 (the "Prior Agreement"), which the parties have agreed to terminate and supersede with this Agreement; and**

WHEREAS, Lender is willing to make the Loan described herein on the terms and conditions set forth in this Agreement.

NOW THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, Lender and Borrower agree as follows:

## 1.    DEFINITIONS AND CONSTRUCTION.

**1.1    Definitions**.  As used in this Agreement, the following terms shall have the following definitions:

"Advance" or "Advances" means a cash advance or cash advances under the DIP Loan Facility.

"Advance Request" has the meaning assigned in Section 2.1(c).

"Affiliate" means, with respect to any Person, any Person that owns or controls directly or indirectly such Person, any Person that controls or is controlled by or is under common control with such Person, and each of such Person's senior executive officers, directors, and partners.

"Arbitration" means that certain arbitration commenced by the Borrower on December 18, 2019 before the American Arbitration Association against Tribal Economic

Development Holdings, LLC, Big Picture Loans, LLC, Ascension Technologies, LLC, and The Lac Vieux Desert Band of Lake Superior Chippewa Indians.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"Bankruptcy Court" means the United States Bankruptcy Court for Northern District of Texas or any court having jurisdiction over the Case from time to time.

"Bankruptcy Sale" means a sale pursuant to Section 363 of the Bankruptcy Code of all or a portion of the assets of Borrower.

"Borrower's Books" means all of Borrower's books and records including: ledgers; records concerning Borrower's assets, liabilities business operations or financial condition; and all computer programs, or tape files, and the equipment, containing such information.

"Budget" means a 13-week cash flow projection and debtor-in-possession budget in form and substance acceptable to the Lender; provided that, with the consent of the Lender, the budget may be updated in accordance with Section 6.13.

"Budget Variance Report" means a weekly report provided by the Borrower to the Lender showing by line item and in the aggregate the actual cash disbursements of the Borrower for the applicable trailing two (2)-week period set forth in Section 6.13(b), comparing the actual cash receipts and disbursements (on a line item by line item basis) with the weekly and cumulative budgeted amounts for each such line item set forth in the Budget for such period, noting therein all variances on a line-item and cumulative basis from the amounts set forth for such period in the Budget, together with explanations for all material variances, and certified as being true and correct by the Borrower's controller.

"Business Day" means any day that is not a Saturday, Sunday, or other day on which banks in the State of Delaware are authorized or required to close.

"Case" has the meaning set forth in the recitals.

"Closing Date" means the date on which the conditions specified in Section 3.1 are satisfied.

"Code" means the Delaware Uniform Commercial Code.

"Collateral" means the property described on **Exhibit A** attached hereto.

"Committee" means the official committee of unsecured creditors appointed in the Case by the U.S. Trustee on February 7, 2020 as set forth at Docket No. 14.

"Contingent Obligation" means, as applied to any Person, any direct or indirect liability, contingent or otherwise, of that Person with respect to (i) any indebtedness, lease, dividend, letter of credit or other obligation of another; (ii) any obligations with respect to undrawn letters of credit, corporate credit cards, or merchant services issued or provided for the account of

that Person; and (iii) all obligations arising under any agreement or arrangement designed to protect such Person against fluctuation in interest rates, currency exchange rates or commodity prices; provided, however, that the term "Contingent Obligation" shall not include endorsements for collection or deposit in the ordinary course of business. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determined amount of the primary obligation in respect of which such Contingent Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by Lender in good faith; provided, however, that such amount shall not in any event exceed the maximum amount of the obligations under the guarantee or other support arrangement.

"Credit Extension" means each Advance or any other extension of credit by Lender for the benefit of Borrower hereunder.

"Daily Balance" means the amount of the Obligations owed at the end of a given day.

"Debtor" has the meaning set forth in the recitals.

"Default" means any circumstance that, with the passage of time or giving of notice, would constitute an Event of Default.

"DIP Loan" has the meaning given to such term in Section 2.1(a) hereof.

"DIP Loan Commitments" means an aggregate amount not to exceed Two Million Dollars ($2,000,000).

"DIP Loan Facility" means the facility under which Borrower may request Lender to issue Advances, as specified in Section 2.1 hereof.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations thereunder.

"Event of Default" has the meaning assigned in Section 8.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to Lender or required to be withheld or deducted from a payment to Lender, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case (i) imposed as a result of Lender being organized under the laws of, or having its principal office or its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) any U.S. federal withholding Taxes imposed on amounts payable to or for the account of Lender with respect to any obligations under this Agreement pursuant to a law in effect on the date Lender acquired its interest in such obligations or on the date that Lender changes its lending office, except, in each case, to the extent that amounts with respect to such Taxes were payable to Lender immediately before the date it acquired such interest or changed its lending office, (c) Taxes that are attributable to Lender's failure to comply with Section 2.5, and (d) any U.S. federal withholding Taxes imposed under FATCA. For purposes of this definition, any reference to Lender shall be deemed to include a Foreign Lender.

"FATCA" means Sections 1471 through 1474 of the IRC, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the IRC, any intergovernmental agreement entered into in connection with the implementation of such sections of the IRC and any fiscal or regulatory legislation, rules or practices adopted pursuant to, or official interpretations implementing such, intergovernmental agreements.

"Final Order" means a final order of the Bankruptcy Court in substantially the form of the Interim Order (or such other form acceptable to the Lender) authorizing the Loans.

"Final Order Entry Date" means the date on which the Final Order is entered by the Bankruptcy Court.

"GAAP" means generally accepted accounting principles as in effect from time to time.

"Governmental Authority" is any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization.

"Guarantee" means, as to any Person, any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly.

"Highest Lawful Rate" means the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the laws applicable to Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum non-usurious interest rate than applicable laws now allow.

"Indebtedness" means (a) all indebtedness for borrowed money or the deferred purchase price of property or services, including without limitation reimbursement and other obligations with respect to surety bonds and letters of credit, (b) all obligations evidenced by notes, bonds, debentures or similar instruments, (c) all capital lease obligations and (d) all Contingent Obligations.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Lender under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Interim Order" means an interim order of the Bankruptcy Court (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms thereof) in the form and substance satisfactory to the Lender, approving the Loan Documents and authorizing the initial DIP Loans in accordance with the Budget.

"Interim Order Entry Date" means the date on which the Interim Order is entered by the Bankruptcy Court.

"Investment" means any beneficial ownership of (including stock, partnership interest or other securities) any Person, or any loan, advance or capital contribution to any Person.

"IRC" means the Internal Revenue Code of 1986, as amended.

"IRS" means the United States Internal Revenue Service.

"Lender Expenses" means all reasonable and documented out-of-pocket costs and expenses (including reasonable and documented fees and expenses of one external counsel) of counsel to Lender incurred in connection the preparation, negotiation, administration, and enforcement of the Loan Documents; reasonable Collateral audit fees; and Lender's reasonable and documented fees and expenses of external counsel incurred in amending, enforcing or defending the Loan Documents (including fees and expenses of appeal).

"Lien" means any mortgage, lien, deed of trust, charge, pledge, security interest or other encumbrance.

"Loan" means the DIP Loans.

"Loan Documents" means, collectively, this Agreement, any note or notes executed by Borrower, the Orders and any other agreement entered into in connection with this Agreement, all as amended or extended from time to time.

"Material Adverse Effect[1]" means a material adverse effect on (i) the business, operations, condition (financial or otherwise), or prospects of Borrower taken as a whole or (ii) the ability of Borrower to repay the Obligations or otherwise perform its obligations under the Loan Documents or (iii) the value of the Collateral taken as a whole or priority of Lender's security interests in the Collateral; provided that the term "Material Adverse Effect" will not be deemed to exist as a result of the Case.

"Maturity Date" means the earlier of (i) the date which is one-hundred eighty (180) days from the date of the first Advance, (ii) the consummation of a sale of all of the assets or a portion of the assets of the Borrower pursuant to Section 363 of the Bankruptcy Code or otherwise (including a Bankruptcy Sale); (iii) the effective date of a plan of reorganization or liquidation in the Case; (iv) entry of a final order by the Bankruptcy Court dismissing the Case; or (v) the date of termination of the DIP Loan Commitments and the acceleration of any outstanding extensions of credit under the Loans in accordance with the terms of this Agreement.

"Obligations" means all debt, principal, interest, Lender Expenses and other amounts owed to Lender by Borrower pursuant to this Agreement or any other agreement, whether absolute or contingent, due or to become due, now existing or hereafter arising.

"Orders" means collectively, the Interim Order and the Final Order.

---

[1] To discuss if should be modified to address pandemic.

"Other Connection Taxes" means, with respect to Lender, Taxes imposed as a result of a present or former connection between Lender and the jurisdiction imposing such Tax (other than connections arising from Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any loan hereunder or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"Permitted Budget Variance" has the meaning given to it in <u>Section 6.13</u>.

"Permitted Discretion" means a determination made in good faith in the exercise of its commercially reasonable (from the perspective of a first priority perfected secured asset based lender) business judgment based on how an asset based lender with similar rights providing a credit facility of the type provided under this Agreement would act in similar circumstances at the time with the information then available to it.

"Permitted Indebtedness" means:

(a)    Indebtedness of Borrower in favor of Lender arising under this Agreement or any other Loan Document;

(b)    Indebtedness to trade creditors incurred in the ordinary course of business;

(c)    Indebtedness existing on the Closing Date;

(d)    Indebtedness incurred as a result of endorsing negotiable instruments received in the ordinary course of business; and

(e)    Guarantees of Borrower in respect of Indebtedness otherwise permitted hereunder.

"Permitted Liens" means the following:

(a)    Any Liens existing on the Closing Date;

(b)    Any Liens arising under this Agreement or the other Loan Documents;

(c)    Liens for taxes, fees, assessments or other governmental charges or levies, either not delinquent or being contested in good faith by appropriate proceedings, provided the same have no priority over any of Lender's security interests;

(d)    carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business which are not overdue for a period of

more than 30 days or which are being contested in good faith and by appropriate proceedings if adequate reserves with respect thereto are maintained on the books of the applicable Person;

(e) Liens arising from judgments, decrees or attachments in circumstances not constituting an Event of Default under Sections 8.4 (attachment) or 8.7 (judgments/settlements);

(f) Subject to Section 6.7, Liens in favor of other financial institutions arising in connection with Borrower's deposit accounts held at such institutions to secure standard fees for deposit services charged by, but not financing made available by such institutions, provided that Lender has a perfected security interest in the amounts held in such deposit accounts; and

(g) Liens incurred in connection with the extension, renewal or refinancing of the indebtedness secured by Liens of the type described in clauses (a) through (g) above, provided that any extension, renewal or replacement Lien shall be limited to the property encumbered by the existing Lien and the principal amount of the indebtedness being extended, renewed or refinanced does not increase.

"Person" means any individual, sole proprietorship, partnership, limited liability company, joint venture, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, entity or governmental agency.

"Petition Date" has the meaning set forth in the recitals.

"Responsible Officer" means Drew McManigle, the Chief Restructuring Officer of the Borrower.

"Tax" or "Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"U.S. Trustee" means the United States Trustee for the Northern District of Texas.

"US Withholding Tax Form" means whichever of the following that is relevant (including, in each case, any successor form):

(a) IRS Form W-8BEN or W-8BEN-E,

(b) IRS Form W-8IMY (with appropriate attachments),

(c) IRS Form W-8ECI,

(d) IRS Form W-8EXP,

(e) In the case of a Foreign Lender relying on the "portfolio interest exemption," IRS Form W-8BEN or W-8BEN-E and a certificate to the effect that such Foreign Lender is not (1) a "bank" within the meaning of IRC section 881(c)(3)(A), (2) a "10-percent

shareholder" of Borrower within the meaning of IRC section 881(c)(3)(B), or (3) a "controlled foreign corporation" described in IRC section 881(c)(3)(C), or

(f)     any other IRS form by which a person may claim complete exemption from, or reduction in the rate of, withholding (including backup withholding) of US federal income tax on interest and other payments to that person.

**1.2     Accounting Terms**.  All accounting terms not specifically defined herein shall be construed in accordance with GAAP and all calculations made hereunder shall be made in accordance with GAAP.  When used herein, the terms "financial statements" shall include the notes and schedules thereto.

**2.     LOAN AND TERMS OF PAYMENT**.

**2.1     Credit Extensions.**  Borrower promises to pay to the order of Lender, in lawful money of the United States of America, the aggregate unpaid principal amount of all Credit Extensions made by Lender to Borrower hereunder.  Borrower shall also pay interest on the unpaid principal amount of such Credit Extensions at rates in accordance with the terms hereof.

(a)     **Term Loan**.  Subject to and upon the terms and conditions of this Agreement (including the satisfaction (or waiver) of the conditions precedent set forth in Sections 3.1 and 3.2), Lender agrees that it will make from time-to-time Advances in an amount not to exceed its DIP Loan Commitment (each, a "**DIP Loan**").  Amounts borrowed under this Section 2.1(a) may not be reborrowed once repaid.

(b)     Whenever Borrower desires an Advance of a DIP Loan, Borrower will notify Lender by e-mail transmission or telephone no later than 12:00 p.m. Central time (each an "**Advance Request**"), two (2) Business Days prior to the date the Advance may be made.  Lender is authorized to make Advances under this Agreement, based upon instructions received from the Responsible Officer or a designee of the Responsible Officer, or without instructions if in Lender's discretion such Advances are necessary to meet Obligations which have become due and remain unpaid.  Lender shall be entitled to rely on any telephonic notice given by a person who Lender reasonably believes to be the Responsible Officer or a designee thereof, and Borrower shall indemnify and hold Lender harmless for any damages or loss suffered by Lender as a result of such reliance.  Lender will wire Advances in immediately available federal funds to a deposit account identified by the Borrower in writing from time to time.

(c)     All Advances under this Section 2.1 and all accrued and unpaid interest thereon shall be repaid in full by Borrower on the Maturity Date.

**2.2     [Reserved.]**

**2.3     Interest Rates, Payments, and Calculations**.

(a)     **Interest Rate.**  Except as set forth in Section 2.3(b), the Advances shall bear interest, on the outstanding Daily Balance thereof, at a rate equal to twelve percent (12%) per annum.

(b)    **Default Rate**.  All Obligations shall bear interest, from and after the occurrence and during the continuance of an Event of Default, automatically and without notice to Borrower, at a rate equal to five percent (5%) above the interest rate applicable immediately prior to the occurrence of an Event of Default.

(c)    **Payments**.  Interest hereunder shall be due and payable on the Maturity Date.

(d)    **Computation**.  All interest chargeable under the Loan Documents shall be computed on the basis of a three hundred sixty-five (365) day year for the actual number of days elapsed.

**2.4    Crediting Payments**.  Prior to the occurrence of an Event of Default, Lender shall credit a wire transfer of funds, check or other item of payment to the Obligations, first to unpaid Lender Expenses, then to any unpaid fees, then to accrued and unpaid interest, and lastly to the outstanding principal balance.  After the occurrence of an Event of Default, the receipt by Lender of any wire transfer of funds, check, or other item of payment shall be immediately applied to conditionally reduce Obligations, but shall not be considered a payment on account unless such payment is of immediately available federal funds or unless and until such check or other item of payment is honored when presented for payment.  Notwithstanding anything to the contrary contained herein, any wire transfer or payment received by Lender after 5:00 p.m. Central Time shall be deemed to have been received by Lender as of the opening of business on the immediately following Business Day.  Whenever any payment to Lender under the Loan Documents would otherwise be due (except by reason of acceleration) on a date that is not a Business Day, such payment shall instead be due on the next Business Day, and additional fees or interest, as the case may be, shall accrue and be payable for the period of such extension.

**2.5    Withholding**.

(a)    Payments received by Lender from Borrower under this Agreement will be made free and clear of and without deduction for any Taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of Borrower) requires Borrower to make any withholding or deduction of any Tax from any such payment, then Borrower shall be entitled to make such deduction or withholding and, if such Tax is an Indemnified Tax, then the sum payable by Borrower shall be increased to the extent necessary to ensure that, after the making of such required withholding or deduction, Lender receives a net sum equal to the sum which it would have received had no withholding or deduction been required.

(b)    Borrower shall pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with applicable law and Borrower will, upon request, furnish Lender with proof reasonably satisfactory to Lender indicating that Borrower has made such withholding payment.

(c)    Notwithstanding anything to the contrary in this Section 2.5, Borrower need not make any withholding payment if the amount or validity of such withholding payment is contested in good faith by appropriate and timely proceedings and as to which payment in full is

bonded or reserved against by Borrower. The agreements and obligations of Borrower contained in this Section shall survive the termination of this Agreement.

(d) Lender, if reasonably requested by Borrower, shall deliver such other documentation prescribed by applicable law or reasonably requested by Borrower as will enable Borrower to determine whether or not Lender is subject to backup withholding or information reporting requirements.

(e) If Lender determines that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section (including by the payment of additional amounts pursuant to this Section), it shall pay to Borrower an amount equal to such refund (but only to the extent of indemnity payments made by Borrower under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that Borrower, upon the request of Lender, agrees to repay the amount paid over to Borrower (plus any penalties, interest or other charges imposed by the relevant taxing authority) to Lender in the event Lender is required to repay such refund to such taxing authority.

(f) If any assignee of Lender's rights hereunder is not a "United States Person" as defined in IRC Section 7701(a)(30) (such assignee, (or, if such assignee is disregarded as an entity separate from its owner for U.S. federal income tax purposes, such owner, a "Foreign Lender"), such Foreign Lender shall, upon becoming party to this Agreement (and from time to time thereafter upon the reasonable request of the Borrower), to the extent that such Foreign Lender is entitled to a reduced rate of U.S. withholding tax or an exemption from U.S. withholding tax on interest, deliver to Borrower a complete and properly executed US Withholding Tax Form, certifying that such Foreign Lender is entitled to such reduced rate or exemption from U.S. withholding tax on interest and Lender, Borrower and such Foreign Lender shall cooperate in good faith to establish a register meeting the requirements of applicable law. Notwithstanding anything to the contrary in this section 2.5, Borrower shall not be required to pay any additional amount to any Foreign Lender under Section 2.5 if such Foreign Lender fails or is unable to deliver the forms, certificates or other evidence described in the preceding sentence, unless such Foreign Lender's failure or inability to deliver such forms is the result of any change in any applicable law, treaty or governmental rule, or any change in the interpretation thereof after such Foreign Lender became a party to this Agreement; provided, further, that if a payment made to a Foreign Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Foreign Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in IRC sections 1471(b) or 1472(b), as applicable), such Foreign Lender shall deliver to the Borrower at the time or times prescribed by law and at such time or times reasonably requested by the Borrower such documentation prescribed by applicable law (including as prescribed by IRC section 1471(b)(3)(C)(i)) and such additional documentation reasonably requested by the Borrower as may be necessary for the Borrower to comply with its obligations under FATCA and to determine that such Foreign Lender has complied with such Foreign Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this provision, "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

**2.6    Fees**. Borrower shall pay to Lender the following:

(a)      **Origination Fee**. On the Closing Date, a fully earned, non-refundable origination fee of ~~Two~~ **One** Hundred **Fifty** Thousand Dollars ($~~200,000~~**150,000**), payable at the Maturity Date.

(b)      **Exit Fee**. On the Closing Date, a fully earned, non-refundable exit fee of Two Hundred Thousand Dollars ($200,000), payable at the Maturity Date.

(c)      **Success Fee.** A fee equal to two percent (2%) of any amounts payable as a result of an award in the Arbitration or as settlement of the claims asserted in the Arbitration, payable at the Maturity Date.

(d)      **Lender Expenses**. All Lender Expenses as and when they become due following the delivery of an invoice to Borrower, the U.S. Trustee, and the Committee and in accordance with paragraph 6 of the Final Order.

2.7      **Term**. The term of this Agreement shall be from the Closing Date through the Maturity Date. Notwithstanding the foregoing, Lender shall have the right to terminate its obligation to make Credit Extensions under this Agreement immediately after providing notice upon the occurrence and during the continuance of an Event of Default. Notwithstanding termination, Lender's Lien on the Collateral shall remain in effect for so long as any Obligations are outstanding.

2.8      **Right to Credit Bid**. Subject to the Orders, in connection with any sale or disposition of all or any portion of the Collateral, including in each case pursuant to Sections 9-610 or 9-620 of the UCC, at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code or as part of restructuring plan subject to confirmation under Section 1129 of the Bankruptcy Code, or at any sale or foreclosure conducted by Lender, by a chapter 7 trustee under Section 725 of the Bankruptcy Code, or otherwise, in each case in accordance with applicable law and, with respect to any credit bid, Section 363(k) of the Bankruptcy Code, Borrower hereby gives Lender the power and right, without assent by such Borrower, to "credit bid" the full amount of all Obligations in order to purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral.

3.      **CONDITIONS OF LOANS.**

3.1      **Conditions Precedent to Initial Credit Extension**. The obligation of Lender to make the initial Credit Extension is subject to the satisfaction of the following conditions precedent:

(a)      Lender shall have received, in form and substance satisfactory to Lender, such documents, and completion of such matters, as Lender may reasonably deem necessary or appropriate;

(b)      the Borrower shall have delivered to Lender the initial Budget, which Budget shall be in form and substance satisfactory to Lender; and

(c) the Interim Order Entry Date shall have occurred, and the Interim Order shall be in full force and effect, shall not have been vacated or reversed, shall not have been modified or amended other than as acceptable to the Lender and shall not be subject to a stay.

**3.2 Conditions Precedent to all Credit Extensions**. The obligation of Lender to make each Credit Extension is further subject to the following conditions:

(a) the representations and warranties contained in Section 5 shall be true and correct in all material respects on and as of the date of Borrower's request for a Credit Extension and on the effective date of each Credit Extension as though made at and as of each such date. The making of each Credit Extension shall be deemed to be a representation and warranty by Borrower on the date of such Credit Extension as to the accuracy of the facts referred to in this Section 3.2;

(b) no Default or Event of Default shall be continuing or would exist after giving effect to such Credit Extension;

(c) the Case shall have not been dismissed or converted to a case under Chapter 7 of the Bankruptcy Code; and

(d) no trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in the Case.

**4. CREATION OF SECURITY INTEREST**.

**4.1 Grant of Security Interest**. To secure prompt repayment of any and all Obligations and prompt performance by Borrower of each of its covenants and duties under the Loan Documents, Borrower grants Lender a continuing security interest in all presently existing and hereafter acquired or arising Collateral (subject to Permitted Liens).

**4.2 Perfection and Priority of Security Interests**. All Obligations shall at all times:

(a) be entitled to a first priority, perfected security interest in and lien under Section 364(c)(2) of the Bankruptcy Code upon all Collateral of the Borrower that, on or as of the Petition Date, is not subject to a valid, perfected and non-avoidable lien; and

(b) have a first priority, perfected priming security interest in and lien under Section 364(d)(1) of the Bankruptcy Code upon all Collateral, in all cases senior to all other liens and obligations secured by the Collateral.

**4.3 Delivery of Additional Documentation Required**. Borrower shall from time to time execute and deliver to Lender, at the request of Lender, all financing statements and other documents that Lender may reasonably request, in form satisfactory to Lender, to perfect and continue the perfection of Lender's security interests in the Collateral and in order to fully consummate all of the transactions contemplated under the Loan Documents.

**4.4    Authorization to File Financing Statements**.  Borrower hereby authorizes Lender to file financing statements, without notice to Borrower, with all appropriate jurisdictions to perfect or protect Lender's interest or rights hereunder, including a notice that any disposition of the Collateral, by either Borrower or any other Person, shall be deemed to violate the rights of Lender under the Code.

**5.    REPRESENTATIONS AND WARRANTIES.**

The Borrower represents and warrants as follows:

**5.1    Due Organization and Qualification**.  The Debtor is a limited liability company duly existing under the laws of Delaware and qualified and licensed to do business in any state in which the conduct of its business or its ownership of property requires that it be so qualified, except in each case (other than with respect to their states of incorporation) where the failure to do so could not reasonably be expected to cause a Material Adverse Effect.

**5.2    Due Authorization; No Conflict**.  Subject to the entry of the Orders and the terms hereof, the execution, delivery, and performance of the Loan Documents are within Borrower's powers, have been duly authorized, and are not in conflict with nor constitute a breach of any provision contained in Borrower's Certificate of Organization or Bylaws, nor will they constitute an event of default under any material agreement to which Borrower is a party or by which Borrower is bound.  Borrower is not in default under any agreement to which it is a party or by which it is bound, except to the extent such default would not reasonably be expected to cause a Material Adverse Effect.

**5.3    No Prior Encumbrances**.  Borrower has good and marketable title to the Collateral, except for Permitted Liens.

**5.4    Name; Location of Chief Executive Office**.  Borrower has not done business under any name other than that specified on the signature page hereof.  The chief executive office of Borrower is located at 1920 McKinney Avenue, 7th Floor, Dallas, Texas 75205.  Except as disclosed in writing to Lender, all of the Collateral is located only at the locations set forth on Exhibit A.

**5.5    Litigation**.  Except as disclosed in writing to Lender or as set forth in the Schedules of Assets and Liabilities and Statements of Financial Affairs filed in the Case, there are no actions or proceedings (other than the Case) pending by or against Borrower before any court or administrative agency in which an adverse decision could reasonably be expected to have a Material Adverse Effect.

**5.6    No Material Adverse Change in Financial Statements**.  All consolidated and consolidating financial statements related to Borrower that Lender has received from Borrower fairly present in all material respects Borrower's financial condition as of the date thereof and Borrower's consolidated and consolidating results of operations for the period then ended and have been prepared in accordance with GAAP.  There has not been a material adverse change in the consolidated or the consolidating financial condition of Borrower since the date of the most recent of such financial statements submitted to Lender (other than as a result of the Case or the circumstances and events leading up thereto).

5.7 **Regulatory Compliance**. To the extent applicable, Borrower has met the minimum funding requirements of ERISA with respect to any employee benefit plans subject to ERISA, and no event has occurred resulting from Borrower's failure to comply with ERISA that is reasonably likely to result in Borrower's incurring any liability that could reasonably be expected to have a Material Adverse Effect. Borrower is not required to be registered as an "investment company" under the Investment Company Act of 1940. Borrower is not engaged principally, or as one of the important activities, in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulations T and U of the Board of Governors of the Federal Reserve System). Borrower has complied with all the provisions of the Federal Fair Labor Standards Act except in each case where the failure to do so could not reasonably be expected to cause a Material Adverse Effect. Borrower has not violated any statutes, laws, ordinances or rules applicable to it, the violation of which could reasonably be expected to cause a Material Adverse Effect.

5.8 **Environmental Matters**. Except as would not reasonably be expected to have a Material Adverse Effect, Borrower is in material compliance with all applicable laws relating to protection of the environment for health and safety. Borrower represents and warrants that there are no pending citations, notices of violation, administrative orders, complaints, judgments, consent orders or consent agreements issued to or entered into by Borrower relating to any such laws, which are applicable to the Collateral, except as disclosed on the Schedules of Assets and Liabilities and Statements of Financial Affairs filed in the Case.

5.9 **Taxes**. Borrower has filed or caused to be filed all material tax returns required to be filed, and has paid, or has made adequate provision for the payment of, all taxes reflected therein, except (i) for taxes that are being contested in good faith by appropriate proceedings and are reserved against (to the extent required by GAAP) by Borrower, or (ii) to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

5.10 **Government Consents**. Borrower has obtained all material consents, approvals and authorizations of, made all declarations or filings with, and given all notices to, all governmental authorities that are necessary for the continued operation of Borrower's business as currently conducted, except where the failure to do so would not reasonably be expected to cause a Material Adverse Effect.

5.11 **Full Disclosure**. No representation, warranty or other statement made by Borrower in any certificate or written statement furnished to Lender taken together with all such certificates and written statements and supplements furnished to Lender contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained in such certificates or statements not misleading when made, it being recognized by Lender that the projections and forecasts provided by Borrower in good faith and based upon assumptions that were reasonable at the time such projections were delivered and are not to be viewed as facts and that actual results during the period or periods covered by any such projections and forecasts may differ from the projected or forecasted results.

5.12 **Use of Proceeds**. The Borrower shall use the proceeds of the DIP Loans in accordance with the Budget (subject to any Permitted Budget Variance) and the Orders entered in connection with the Case exclusively for one or more of the following purposes (subject to any

additional restrictions on the use of such proceeds and any such cash collateral set forth in the Interim Order):

       (a)     to pay certain costs, premiums, fees and expenses related to the Case; and

       (b)     to fund working capital and other needs of the Debtor in accordance with the Budget (subject to any Permitted Budget Variance).

Proceeds of the DIP Loan Facility or cash collateral shall not be used (a) to permit the Debtor, or any other party-in-interest or their representatives to challenge or otherwise contest or institute any proceeding to determine the validity, perfection or priority of security interests in favor of Lender, or (b) to commence, prosecute or defend any claim, motion, proceeding or cause of action against Lender and its agents, attorneys, advisors or representatives including, without limitation, any lender liability claims or subordination claims.

       **5.13**    **Financial Information**. (a) On and as of the Closing Date, the Budget, copies of which have heretofore been furnished to the Lender and (b) following the Closing Date, any updated Budget delivered pursuant to Section 6.13, in each case, are based on good faith estimates and assumptions made at such time by the persons who prepared it.

       **5.14**    **Case**. The Case were commenced on the Petition Date in accordance with applicable law, and notice of the hearing for the approval of the Interim Order has been given as identified in the certificate of service filed with the Bankruptcy Court.

       **5.15**    **Orders**. The Interim Order and the Final Order are in full force and effect, and have not, in whole or in material part, been reversed, modified, amended, stayed, vacated, appealed or subject to a stay pending appeal or otherwise challenged or subject to any pending or threatened challenge or proceeding in any jurisdiction, and the Borrower is in material compliance with each Order.

## 6.    AFFIRMATIVE COVENANTS.

Borrower shall do all of the following:

       **6.1**    **Good Standing**. Borrower shall maintain its corporate existence and good standing in its jurisdiction of incorporation and maintain qualification in each other jurisdiction in which the failure to so qualify could reasonably be expected to have a Material Adverse Effect. Borrower shall maintain all licenses, approvals and agreements, the loss of which could have a Material Adverse Effect.

       **6.2**    **Government Compliance**. Borrower shall meet the minimum funding requirements of ERISA with respect to any employee benefit plans subject to ERISA. Borrower shall comply with all statutes, laws, ordinances and government rules and regulations to which it is subject, noncompliance with which could have a Material Adverse Effect.

       **6.3**    **Financial Statements, Reports, Certificates**. Borrower shall deliver the following to Lender:

(a)    no later than the 25th day of each month, a cash flow forecast in form and detail satisfactory to Lender, covering all of the weeks through the Maturity Date;

(b)    no later than the 25th day of each month, a Budget Variance Report certified by the Responsible Officer, and any updates to the Budget that are approved by Lender in Lender's sole discretion; and

(c)    promptly upon receipt of notice thereof, a report of (x) any other legal actions (other than the Case) pending or threatened in writing against Borrower that could reasonably be expected to result in liability to Borrower of One Hundred Thousand Dollars ($100,000) or more, or (y) any commercial tort claim acquired by Borrower;

(d)    within fourteen (14) days after the last day of each month, copies of bank statements for all bank accounts;

(e)    written notice within five (5) Business Days' of the resignation from or termination of employment of the Responsible Officer;

(f)    such other financial information as Lender may request from time to time in its Permitted Discretion.

To the extent any of the foregoing reports or financial information are due on a day that is not a Business Day, Borrower shall instead deliver such reports or financial information on the next Business Day.

**6.4    Right to Inspect**.  Lender (through any of its officers, employees, or agents) shall have the right, upon reasonable prior notice, from time to time during Borrower's usual business hours and at Borrower's sole cost and expense, to inspect Borrower's Books and to make copies thereof, to audit Borrower's accounts and to check, test, and appraise the Collateral in order to verify Borrower's financial condition or the amount, condition of, or any other matter relating to, the Collateral; provided that no notice is required if an Event of Default has occurred and is continuing.

**6.5    Taxes**.  Borrower shall make due and timely payment or deposit of all material Taxes required of it by law, provided that Borrower need not make any payment if (i) the amount or validity of such payment is contested in good faith by appropriate proceedings and is reserved against (to the extent required by GAAP) by Borrower and (ii) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect.

**6.6    Insurance.**

(a)    Borrower, at its expense, shall keep the Collateral insured against loss or damage in such amounts, as ordinarily insured against by other owners in similar businesses conducted by Borrower, if any.

(b)    All such policies of insurance shall be in such form, with such companies, and in such amounts as are reasonably satisfactory to Lender (it being hereby acknowledged by Lender that the insurance policies of Borrower in place on the Closing Date are satisfactory).

**6.7    Accounts**.  Except as required under the Bankruptcy Code, rules or policies of the U.S. Trustee, and/or a Bankruptcy Court order, Borrower shall not establish any deposit or securities account after the Closing Date without the approval of the Lender.

**6.8    Bankruptcy Filings.**  Not less than two (2) Business Days prior to filing any motion requesting approval for debtor-in-possession financing or use of cash collateral, Borrower shall send copies of such motions to Lender, and all such motions shall be satisfactory to Lender in Lender's Permitted Discretion.

**6.9    Further Assurances**.  At any time and from time to time Borrower shall execute and deliver such further instruments and take such further action as may reasonably be requested by Lender to effect the purposes of this Agreement.

**6.10    Prepetition Loan Documents**.  Borrower shall not amend, supplement, restate, otherwise modify the Prepetition Loan Documentation or enter into any new Prepetition Loan Documentation without the prior written consent of the Lender and as approved by the Bankruptcy Court.

**6.11    Debtor-in-Possession Obligations**.  Borrower shall comply in a timely manner with its obligations and responsibilities as a debtor-in-possession under the Bankruptcy Code, the rules of procedure of the Bankruptcy Court, and any order of the Bankruptcy Court.

**6.12    Budget Compliance and Variances.**

(a)    The Borrower will use the proceeds of the Loans solely to make disbursements for expenditures provided for in accordance with Section 5.13 and this Section 6.13. The Borrower shall not pay any expenses (other than de minimis amounts) or other disbursements (other than de minimis disbursements) other than the type of expenses and disbursements set forth in the Budget.

(b)    Beginning on the Closing Date, the Borrower shall not cause expenses to vary from the applicable Budget by more than ten percent (10%) on a cumulative basis for that portion of the Budget period then ended (collectively, the "**Permitted Budget Variances**").  In the event that actual amounts for total cash receipts and cash disbursements from operations line items are in excess of the Budget Variances, the parties hereto agree to negotiate in good faith to discuss any modification to the Budget and Permitted Budget Variances, it being understood and agreed that the Lender shall have no obligation to fund any amounts in excess of the Budget and Permitted Budget Variances.

(c)    If the Budget is updated, modified or supplemented by the Borrower, each such updated, modified or supplemented budget shall be approved in writing by, and shall be in form and substance satisfactory to, the Lender and no such updated, modified or supplemented budget shall be effective until so approved and once so approved shall be deemed to be a Budget. Each Budget delivered to Lender shall be accompanied by such supporting documentation as

reasonably requested by the Lender.  Each Budget shall be prepared in good faith based upon assumptions which the Borrower believes to be reasonable.

**6.13   Filing of Motions and Applications**.  Without the prior written consent of the Lender, the Debtor shall not apply to the Bankruptcy Court for, or join in or support any motion or application seeking, authority to (a) take any action that is prohibited by the terms of any of the Loan Documents or the Orders, (b) refrain from taking any action that is required to be taken by the terms of any of the Loan Documents or the Orders, or (c) permit any Indebtedness or Claim to be pari passu with or senior to any of the DIP Loans, except as expressly stated in the Orders.

## 7.   NEGATIVE COVENANTS.

Borrower shall not do any of the following:

**7.1   Dispositions**.  Convey, sell, lease, transfer or otherwise dispose of (collectively, a "**Transfer**"), all or any part of its business or property (including a Bankruptcy Sale), other than use of cash in the ordinary course of business unless prohibited under the terms of this Agreement or any other Loan Document.

**7.2   Change in Business; Change in Executive Office**.  Engage in any business, other than the businesses currently engaged in by Borrower and any business substantially similar or related thereto (or incidental thereto), or cease to conduct business in the manner conducted by Borrower as of the Closing Date.

**7.3   Mergers or Acquisitions**.  Merge, divide (pursuant to Delaware limited liability company law or any similar statute) or consolidate, with or into any other business organization, or acquire, all or substantially all of the capital stock or property of another Person.

**7.4   Indebtedness**.  Create, incur, guarantee, assume or be or remain liable with respect to any Indebtedness, other than Permitted Indebtedness.

**7.5   Encumbrances**.  Create, incur, assume or suffer to exist any Lien with respect to any of its property, or assign or otherwise convey any right to receive income, except for Permitted Liens, or enter into any agreement with any Person other than Lender not to grant a security interest in, or otherwise encumber, any of its property.

**7.6   Distributions**.  Pay any dividends or make any other distribution or payment on account of or in redemption, retirement or purchase of any equity interests.

**7.7   Investments**.  Directly or indirectly acquire or own, or make any Investment in or to any Person, or maintain or invest any of its property with a Person other than Lender unless such Person has entered into an account control agreement with Lender in form and substance satisfactory to Lender.

**7.8   Transactions with Affiliates**.  Directly or indirectly enter into or permit to exist any material transaction with any Affiliate of Borrower except for transactions that are in the ordinary course of Borrower's business, upon fair and reasonable terms that are no less favorable to Borrower than would be obtained in an arm's length transaction with a non-affiliated Person.

8.      **EVENTS OF DEFAULT.**

Any one or more of the following events shall constitute an Event of Default by Borrower under this Agreement:

8.1      **Payment Default**.  Except to the extent the holder thereof would be stayed from exercising remedies as a result of the Case, if Borrower fails to pay, when due, any of the Obligations;

8.2      **Covenant Default.**

(a)      If Borrower fails to perform any obligation under Article 6 or violates any of the covenants contained in Article 7 of this Agreement; or

(b)      If Borrower fails or neglects to perform or observe any other material term, provision, condition, covenant contained in this Agreement, in any of the Loan Documents, or in any other present or future agreement between Borrower and Lender and as to any default under such other term, provision, condition or covenant that can be cured, has failed to cure such default within ten days after Borrower receives notice thereof or any officer of Borrower becomes aware thereof; provided, however, that if the default cannot by its nature be cured within the ten day period or cannot after diligent attempts by Borrower be cured within such ten day period, and such default is likely to be cured within a reasonable time, then Borrower shall have an additional reasonable period (which shall not in any case exceed 30 days) to attempt to cure such default, and within such reasonable time period the failure to have cured such default shall not be deemed an Event of Default but no Credit Extensions will be made.

8.3      **Material Adverse Effect**.   If there occurs any circumstance or circumstances that could reasonably be expected to have a Material Adverse Effect;

8.4      **Attachment**.  Other than in connection with the Case in each case, if any material portion of Borrower's assets is attached, seized, subjected to a writ or distress warrant, or is levied upon, or comes into the possession of any trustee, receiver or person acting in a similar capacity and such attachment, seizure, writ or distress warrant or levy has not been removed, discharged or rescinded within ten (10) days, or if Borrower is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of its business affairs, or if a judgment or other claim becomes a lien or encumbrance upon any material portion of Borrower's assets, or if a notice of lien, levy, or assessment is filed of record with respect to any material portion of Borrower's assets by the United States Government, or any department, agency, or instrumentality thereof, or by any state, county, municipal, or governmental agency, and the same is not paid within ten (10) days after Borrower receives notice thereof, provided that none of the foregoing shall constitute an Event of Default where such action or event is stayed or an adequate bond has been posted pending a good faith contest by Borrower (provided that no Credit Extensions will be required to be made during such cure period);

8.5      **Assets.**  (a) The Debtor moves (or fails to contest in good faith a motion brought by any other Person) to approve a sale or other disposition of substantially all of the Debtor's assets of the Collateral without the consent of the Lender, or (b) the allowance of any

claim or claims under Section 506(c) of the Bankruptcy Code against or with respect to any Collateral.

**8.6** **Other Agreements**. Except to the extent the counterparty thereto would be stayed from exercising remedies as a result of the Case, if there is a default or other failure to perform in any agreement to which Borrower is a party or by which it is bound resulting in a right by a third party or parties, whether or not exercised, to accelerate the maturity of any Indebtedness in an amount in excess of One Hundred Thousand Dollars ($100,000) or which could have a Material Adverse Effect;

**8.7** **Judgments**. If a judgment or judgments for the payment of money in an amount, individually or in the aggregate, of at least One Hundred Thousand Dollars ($100,000) (excluding amounts covered by insurance or third party indemnification) shall be rendered against Borrower and shall remain unsatisfied, unvacated or unstayed pending appeal for a period of ten (10) days (provided that no Credit Extensions will be made prior to the satisfaction or stay of such judgment);

**8.8** **Misrepresentations**. If any material misrepresentation or material misstatement exists now or hereafter in any warranty or representation set forth herein or in any certificate delivered to Lender by the Responsible Officer pursuant to this Agreement or to induce Lender to enter into this Agreement or any other Loan Document;

**8.9** **Case.** The Case of the Debtor shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code without the consent of the Lender;

**8.10** **Trustee.** A motion or other pleading is filed in the Case for entry of an order appointing a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code and such motion is not otherwise overruled or dismissed by the Bankruptcy Court within twenty-one (21) calendar days;

**8.11** **Relief from Stay.** The Bankruptcy Court shall enter an order or orders granting relief from any stay of proceeding (including, the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest) to (i) permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Debtor which have a value in excess of $100,000 in the aggregate or (ii) permit other actions that would have a Material Adverse Effect on the Debtor or its estate (taken as a whole);

**8.12** **Orders.** The Interim Order (prior to Final Order Entry Date) or Final Order (on and after the Final Order Entry Date) shall cease to create a valid and perfected Lien on the Collateral or to be in full force and effect, shall have been in any material respect reversed, modified, amended, stayed, vacated, or subject to stay pending appeal, without prior written consent of Lender;

**8.13** **Compliance with Orders.** Borrower shall fail to comply with the Interim Order (prior to Final Order Entry Date) or Final Order (on and after the Final Order Entry Date) in any material respect;

**8.14** **Other Financing.** (a) Except as permitted in the Interim Order or Final Order, the entry of any order of the Bankruptcy Court granting to any third party a Lien pari passu with or senior to that granted to and/or for the benefit of the Lender hereunder, or (b) the Borrower shall make any payment of principal or interest or otherwise on account of any Indebtedness or payables other than the Obligations under the DIP Loan Facility, or other than in accordance with the Budget approved by the Lender; or

**8.15** **Avoidance.** Any suit or action is commenced against the Lender by or on behalf of Borrower or any Committee, in each case that constitutes a challenge or that asserts a claim or seeks a legal or equitable remedy that would have the effect of subordinating the claim or Lien of the Lender and, if such suit or action shall not have been dismissed or stayed within fifteen (15) calendar days after service thereof on the Lender, and if stayed, such stay shall have been lifted.

## 9. LENDER'S RIGHTS AND REMEDIES.

**9.1** **Rights and Remedies**. Upon the occurrence and during the continuance of an Event of Default, Lender may, at its election, do any one or more of the following, all of which are authorized by Borrower:

(a) Subject to the Orders, Lender may, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court, suspend the DIP Loan Facility with respect to additional Advances, whereupon any additional Advances shall be made or incurred in Lender's sole discretion so long as such Default or Event of Default is continuing. If any Event of Default has occurred and is continuing, Lender may, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court, except as otherwise expressly provided herein, increase the rate of interest applicable to the Loan to the Default Rate.

(b) Subject to the Orders, Lender may (i) terminate the DIP Loan Facility with respect to further Advances; (ii) reduce the DIP Loan Commitments from time to time; (iii) declare all or any portion of the Obligations, including all or any portion of the Loan to be forthwith due and payable; or (iv) exercise any rights and remedies provided to Lender under the Loan Documents or at law or equity, including all remedies provided under the Bankruptcy Code; provided, however, Lender shall be permitted to exercise any remedy in the nature of a liquidation of, or foreclosure on, any interest of Borrower in the Collateral only after obtaining relief from automatic stay of Section 362 of the Bankruptcy Code.

**9.2** **[Reserved.]**

**9.3** **[Reserved.]**

**9.4** **Lender Expenses**. If Borrower fails to pay any amounts or furnish any required proof of payment due to third persons or entities, as required under the terms of this Agreement, then Lender may do any or all of the following after reasonable notice to Borrower: (a) make payment of the same or any part thereof; (b) set up such reserves as Lender deems necessary to protect Lender from the exposure created by such failure; or (c) obtain and maintain

insurance policies of the type discussed in Section 6.6 of this Agreement, and take any action with respect to such policies as Lender deems prudent. Any amounts so paid or deposited by Lender shall constitute Lender Expenses, shall be immediately due and payable, and shall bear interest at the then applicable rate hereinabove provided, and shall be secured by the Collateral. Any payments made by Lender shall not constitute an agreement by Lender to make similar payments in the future or a waiver by Lender of any Event of Default under this Agreement.

**9.5     Lender's Liability for Collateral**.  So long as Lender complies with reasonable commercial lending practices, Lender shall not in any way or manner be liable or responsible for: (a) the safekeeping of the Collateral; (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause; or (c) any diminution in the value thereof. All risk of loss, damage or destruction of the Collateral shall be borne by Borrower.

**9.6     Remedies Cumulative**.   Lender's rights and remedies under this Agreement, the Loan Documents, and all other agreements shall be cumulative. Lender shall have all other rights and remedies not inconsistent herewith as provided under the Code, by law, or in equity, subject to the requirements of the Bankruptcy Code.  No exercise by Lender of one right or remedy shall be deemed an election, and no waiver by Lender of any Event of Default on Borrower's part shall be deemed a continuing waiver.  No delay by Lender shall constitute a waiver, election, or acquiescence by it.  No waiver by Lender shall be effective unless made in a written document signed on behalf of Lender and then shall be effective only in the instance and for the purpose for which it was given.

**9.7     Borrower Liability.**  Any Borrower may, acting singly, request Credit Extensions hereunder.  Each Borrower hereby appoints each other as agent for the other for all purposes hereunder, including with respect to requesting Credit Extensions hereunder.  Each Borrower hereunder shall be jointly and severally obligated to repay all Credit Extensions made hereunder, regardless of which Borrower actually receives said Credit Extension, as if each Borrower hereunder directly received all Credit Extensions.

**9.8     Protective Payments**. If Borrower fails to obtain the insurance called for by Section 6.6 or fails to pay any premium thereon or fails to pay any other amount which Borrower is obligated to pay under this Agreement or any other Loan Document or which may be required to preserve the Collateral, Lender may obtain such insurance or make such payment, and all amounts so paid by Lender are Lender Expenses and immediately due and payable, bearing interest at the then highest rate applicable to the Obligations, and secured by the Collateral. Lender will make reasonable efforts to provide Borrower with notice of Lender obtaining such insurance at the time it is obtained or within a reasonable time thereafter.  No payments by Lender are deemed an agreement to make similar payments in the future or Lender's waiver of any Event of Default.

**9.9     Savings Clause**. Notwithstanding any other provision herein, the aggregate interest rate charged with respect to any of the Obligations, including all charges or fees in connection therewith deemed in the nature of interest under applicable law shall not exceed the Highest Lawful Rate. If the rate of interest (determined without regard to the preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the outstanding amount of the Advances made hereunder shall bear interest at the Highest Lawful Rate until the total amount of interest due hereunder equals the amount of interest which would have been due hereunder if the

stated rates of interest set forth in this Agreement had at all times been in effect. In addition, if when the Advances made hereunder are repaid in full the total interest due hereunder (taking into account the increase provided for above) is less than the total amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect, then to the extent permitted by law, Borrower shall pay to Lender an amount equal to the difference between the amount of interest paid and the amount of interest which would have been paid if the Highest Lawful Rate had at all times been in effect. Notwithstanding the foregoing, it is the intention of Lender and Borrower to conform strictly to any applicable usury laws. Accordingly, if Lender contracts for, charges, or receives any consideration which constitutes interest in excess of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if previously paid, shall at Lender's option be applied to the outstanding amount of the Advances made hereunder or be refunded to Borrower.

10.    **NOTICES.**

All notices, consents, requests, approvals, demands, or other communication by any party to this Agreement or any other Loan Document must be in writing and shall be deemed to have been validly served, given, or delivered: (a) upon the earlier of actual receipt and three (3) Business Days after deposit in the U.S. mail, first class, registered or certified mail return receipt requested, with proper postage prepaid; (b) upon transmission, when sent by electronic mail or facsimile transmission; (c) one (1) Business Day after deposit with a reputable overnight courier with all charges prepaid; or (d) when delivered, if hand-delivered by messenger, all of which shall be addressed to the party to be notified and sent to the address, facsimile number, or email address indicated below.  Lender or Borrower may change its mailing or electronic mail address or facsimile number by giving the other party written notice thereof in accordance with the terms of this Section 10:

|                    |                                          |
|--------------------|------------------------------------------|
| If to Borrower:    | Eventide Credit Acquisition, LLC         |
|                    | 1920 McKinney Avenue, 7th Floor          |
|                    | Dallas, TX 75201                         |
|                    | Attn:  Drew McManigle                    |
|                    | email:  drew@macco.group                 |

With a copy to (which does not constitute notice):

Bernard R. Given II
Loeb & Loeb LLP
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA 90067
Email:  bgiven@loeb.com

|                 |                                          |
|-----------------|------------------------------------------|
| If to Lender:   | Guardian Trust Corporation, as trustee for |
|                 | Bluetech Irrevocable Trust               |
|                 | Attn:  Ms. Tine Ponia                    |
|                 | Bermuda House, Tutakimoa Road            |
|                 | P.O. Box 822                             |
|                 | Rarotonga, Cook Islands                  |

email: tine.ponia@asiacititrust.com

With a copy to (which does not constitute notice):

Lauren Fitte
Giordani Baker Grossman & Ripp, LLP
100 Congress Ave., Ste. 1440
Austin, Texas 78701
Email: lfitte@gbgrlaw.com

The parties hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other.

**11.     CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER; JUDICIAL REFERENCE.**

Except as otherwise expressly provided in any of the Loan Documents, Delaware law governs the Loan Documents without regard to principles of conflicts of law.  Borrower ~~and Lender each submit~~ **submits** to the exclusive jurisdiction of the Bankruptcy Court; provided, however, that nothing in this Agreement shall be deemed to operate to preclude Lender from bringing suit or taking other legal action in any ~~other~~ jurisdiction to realize on the Collateral or any other security for the Obligations, or to enforce a judgment or other court order in favor of Lender. Borrower expressly submits and consents in advance to such jurisdiction in any action or suit commenced in any such court, and Borrower hereby waives any objection that it may have based upon lack of personal jurisdiction, improper venue, or forum non conveniens and hereby consents to the granting of such legal or equitable relief as is deemed appropriate by such court.  **Borrower and Lender agree and acknowledge that any language found in the Prior Agreement indicating that Lender submits to the jurisdiction of the Bankruptcy Court was included in that agreement inadvertently.  Lender does not now, nor has it at any time, submitted to the jurisdiction of the Bankruptcy Court or any other U.S. court.  The parties agree that any contrary language found in the Prior Agreement was included unintentionally and is void.**

**TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, BORROWER AND LENDER EACH WAIVE THEIR RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE LOAN DOCUMENTS OR ANY CONTEMPLATED TRANSACTION, INCLUDING CONTRACT, TORT, BREACH OF DUTY AND ALL OTHER CLAIMS. THIS WAIVER IS A MATERIAL INDUCEMENT FOR BOTH PARTIES TO ENTER INTO THIS AGREEMENT.  EACH PARTY HAS REVIEWED THIS WAIVER WITH ITS COUNSEL.**

This Section 11 shall survive the termination of this Agreement.

**12.     GENERAL PROVISIONS.**

**12.1     Successors and Assigns**.  This Agreement shall bind and inure to the benefit of the respective successors and permitted assigns of each of the parties; provided,

however, that neither this Agreement nor any rights hereunder may be assigned by Borrower or Lender, without the other's prior written consent, which consent may be granted or withheld in such party's sole discretion.

        **12.2**    **Indemnification**. Borrower shall defend, indemnify and hold harmless Lender and its officers, employees, and agents (each an "**Indemnified Party**") against: (a) all obligations, demands, claims, and liabilities claimed or asserted by any other party in connection with the transactions contemplated by this Agreement; and (b) all losses or Lender Expenses in any way suffered, incurred, or paid by Lender as a result of or in any way arising out of, following, or consequential to transactions between Lender and Borrower whether under this Agreement, the DIP Facility, the Case, or otherwise (including without limitation reasonable attorneys' fees and expenses), except for losses caused by an Indemnified Party's gross negligence or willful misconduct. This Section 12.2 shall not apply to Taxes.

        **12.3**    **Time of Essence**. Time is of the essence for the performance of all obligations set forth in this Agreement.

        **12.4**    **Severability of Provisions**. Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

        **12.5**    **Amendments in Writing, Integration**. All amendments to or terminations of this Agreement or the Loan Documents must be in writing signed by the parties. All prior agreements, understandings, representations, warranties, and negotiations between the parties hereto with respect to the subject matter of this Agreement and the Loan Documents, if any, are merged into this Agreement and the Loan Documents. **The Prior Agreement never became effective because it was never approved by the Court. That fact notwithstanding, the Prior Agreement is terminated and is of no force or effect.**

        **12.6**    **Counterparts**. This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.

        **12.7**    **Electronic Execution of Documents.** The words "execution," "signed," "signature" and words of like import in any Loan Document shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity and enforceability as a manually executed signature or the use of a paper-based recordkeeping systems, as the case may be, to the extent and as provided for in any applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act.

        **12.8**    **Survival**. All covenants, representations and warranties made in this Agreement shall continue in full force and effect so long as any Obligations remain outstanding or Lender has any obligation to make Credit Extensions to Borrower. The obligations of Borrower to indemnify Lender with respect to the expenses, damages, losses, costs and liabilities described in Section 12.2 shall survive until all applicable statute of limitations periods with respect to actions that may be brought against Lender have run.

**12.9  Confidentiality; Disclosure**.  In handling any confidential information Lender and all employees and agents of Lender, including but not limited to accountants, shall exercise the same degree of care that it exercises with respect to its own proprietary information of the same types to maintain the confidentiality of any non-public information thereby received or received pursuant to this Agreement except that disclosure of such information may be made (i) to the subsidiaries or affiliates of Lender in connection with their present or prospective business relations with Borrower, (ii) to prospective transferees or purchasers of any interest in the loans, provided that they are similarly bound by confidentiality obligations, (iii) as required by law, regulations, rule or order, subpoena, judicial order or similar order (including in connection with the Case), (iv) as may be required in connection with the examination, audit or similar investigation of Lender and (v) as Lender may determine in connection with the enforcement of any remedies hereunder.  Confidential information hereunder shall not include information that either:  (a) is in the public domain or in the knowledge or possession of Lender when disclosed to Lender, or becomes part of the public domain after disclosure to Lender through no fault of Lender; or (b) is disclosed to Lender by a third party, provided Lender does not have actual knowledge that such third party is prohibited from disclosing such information.  Borrower authorizes Lender to disclose its relationship with Borrower, including use of Borrower's logo in Lender's promotional materials.

**12.10  Patriot Act Notice**.  Lender notifies Borrower that, pursuant to the requirements of the USA Patriot Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "**Patriot Act**"), it is required to obtain, verify and record information that identifies Borrower, which information includes names and addresses and other information that will allow Lender to identify Borrower in accordance with the Patriot Act.

[signature page follows]

        IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

<div style="margin-left:40%">

**Borrower:**

**EVENTIDE CREDIT ACQUISITIONS, LLC**

By: _____
     Name: M. Drew McManigle
     Title:   Manager

**Lender:**

GUARDIAN TRUST CORPORATION, as trustee
of the BLUETECH IRREVOCABLE TRUST

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

</div>

[Signature Page 27 to Debtor-in-Possession Loan and Security Agreement]

19065044.119094912.1
233953-10002

**Exhibit A**

**COLLATERAL DESCRIPTION**

Pursuant to Bankruptcy Code section 364(c)(2), (i) a valid, perfected security interest in and lien upon all of Borrower's assets and all proceeds and products of the foregoing, and (ii) a valid, perfected security interest in and lien upon proceeds of any and all claims, causes of action, and rights of Borrower, ~~including~~ **except** those arising under Bankruptcy Code sections 542-553 ~~(other than section 549)~~**.**

| Summary Report | |
|---|---|
| Title | **pdfDocs compareDocs Comparison Results** |
| Date & Time | 5/26/2020 1:55:27 PM |
| Comparison Time | 0.75 seconds |
| compareDocs version | v4.3.600.4 |

| Sources | |
|---|---|
| Original Document | [#19065044] [v1] Eventide - FINAL DIP Loan and Security Agreement.docx |
| Modified Document | [#19094912] [v1] v2 Eventide - REVISED DIP Loan and Security Agreement.docx |

| Comparison Statistics | |
|---|---|
| Insertions | 6 |
| Deletions | 4 |
| Changes | 9 |
| Moves | 0 |
| Font Changes | 0 |
| Paragraph Style Changes | 0 |
| Character Style Changes | 0 |
| TOTAL CHANGES | 19 |
| | |
| | |
| | |
| | |
| | |

| Word Rendering Set Markup Options | |
|---|---|
| Name | Windows 10 - Standard (Redline or Track Changes) |
| Insertions | |
| Deletions | |
| Moves / Moves | |
| Font Changes | |
| Paragraph Style Changes | |
| Character Style Changes | |
| Inserted cells | |
| Deleted cells | |
| Merged cells | |
| Changed lines | Mark left border. |
| Comments color | By Author. |
| Balloons | False |

| compareDocs Settings Used | Category | Option Selected |
|---|---|---|
| Open Comparison Report after saving | General | Always |
| Report Type | Word | Formatting |
| Character Level | Word | False |
| Include Headers / Footers | Word | True |
| Include Footnotes / Endnotes | Word | True |
| Include List Numbers | Word | True |
| Include Tables | Word | True |
| Include Field Codes | Word | True |
| Include Moves | Word | True |
| Flatten Field Codes | Word | True |
| Show Track Changes Toolbar | Word | True |
| Show Reviewing Pane | Word | True |
| Update Automatic Links at Open | Word | [Yes / No] |
| Summary Report | Word | End |
| Detail Report | Word | Separate (View Only) |
| Document View | Word | Print |
| Remove Personal Information | Word | False |