**LOEB & LOEB LLP**
Bernard R. Given II
State Bar No. 07990180
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA 90067-4120
Tel: 310-282-2000
Fax: 310-282-2200
Email: bgiven@loeb.com

*Counsel to the Debtor*
*and Debtor-in-Possession*

**FORSHEY & PROSTOK, LLP**
Jeff P. Prostok
State Bar No. 16352500
Lynda Lankford
State Bar No. 11935020
777 Main Street, Suite 1290
Fort Worth, TX 76012
Tel: 817-877-8855
Fax: 817-877-4151
Email: jprostok@forsheyprostok.com
          llankford@forsheyprostok.com

*Counsel to the Debtor*
*and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| EVENTIDE CREDIT ACQUISITIONS, LLC, | § | Case No. 20-40349-elm11 |
| Debtor. | § | |
| | § | |
| | § | |
| | § | |
| | § | |

## DEBTOR'S OBJECTION TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION FOR SANCTIONS FOR BAD FAITH FILING PURSUANT TO 11 U.S.C. §§ 105 AND 329, AND BANKRUPTCY RULES 2016 AND 9011

<u>**TABLE OF CONTENTS**</u>

<u>Page</u>

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ....................................................................................................3

    I.     The Debtor's Formation and Involvement in Pre-Bankruptcy Litigation. ..............3

    II.    The Bankruptcy Case is Filed. ................................................................7

OBJECTION.......................................................................................................19

    I.     THE COURT LACKS JURISDICTION OVER THE MOTION. ........................19

    II.    THE MOTION SHOULD BE DENIED BECAUSE THE
           COMMITTEE DID NOT COMPLY WITH BANKRUPTCY RULE
           9011 BEFORE FILING THE MOTION. ...............................................20

    III.   THE MOTION SHOULD BE DENIED BECAUSE THE EVIDENCE
           IN SUPPORT OF SANCTIONS IS NOT CLEAR AND
           CONVINCING. .............................................................................21

         A.    The Debtor's Decision to File For Chapter 11 Was Based on the
               Debtor's Good Faith Belief that It Needed the Breathing Spell
               of Bankruptcy to Deal with the Substantial Litigation It Faced. ..............22

         B.    Counsel's Suggestion That the Consumer Borrowers' Claims
               Could Be Separately Classified Is Supported by Fifth Circuit
               Law and Is Not an Indicator of Bad Faith...................................24

         C.    The Debtor's Actions Were Taken With the Knowledge and
               Consent of the CRO and the DIP Motion Was Proposed for a
               Proper Purpose. ............................................................28

         D.    The Fees Charged By the Debtor's Professionals, Many of
               Which Remain Unpaid, Were Incurred to Advance Claims the
               Debtor Believed Were Valid.................................................31

CONCLUSION....................................................................................................32

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bank of N.Y. Trust Co. NA v. Pac. Lumber Co. (In re Scopac)*,
    624 F.3d 274 (5th Cir. 2010) ............................................................................................19, 20

*Cadle Co. v. Pratt (In re Pratt)*,
    524 F.3d 580 (5th Cir. 2008) .......................................................................................................20

*In re Couture Hotel Corp.*,
    536 B.R. 712 (Bankr. N.D. Tex. 2015).........................................................................................26

*In re Dow Corning Co.*,
    244 B.R. 634 (Bankr. E.D. Mich. 1999) .......................................................................11, 24, 27

*Duggan et al. v. Martorello et al.*,
    No. 1:18-cv-12277-JGD (D. Mass.) ..............................................................................................5

*Elliott v. Tilton*,
    64 F.3d 213 (5th Cir. 1995) ..........................................................................................................21

*FDIC v. Fadili*,
    165 B.R. 58 (D. Mass. 1994) ........................................................................................................21

*Galloway et al. v. Big Picture Loans, LLC et al.*,
    No. 3:18-cv-406 (E.D. Va.) .....................................................................................................5, 16

*Galloway et al. v. Martorello et al.*,
    No. 3:19-cv-00314-REP (E.D. Va.).....................................................................................5, 12, 16

*Galloway et al. v. Williams et al.*,
    No. 3:19-cv-470 (E.D. Va.) ...........................................................................................5, 6, 8, 16

*In re General Homes Corp.*,
    134 B.R. 853 (Bankr. S.D. Tex. 1991) ........................................................................................26

*In re General Teamsters, Warehousemen & Helpers Union Local 890*,
    225 B.R. 719 (Bankr. N.D. Cal. 1998) ........................................................................................27

*In re Greektown Holdings, LLC*,
    917 F.3d 451 (6th Cir. 2019) ........................................................................................................32

*In re HBA East, Inc.*,
    101 B.R. 411 (Bankr. E.D.N.Y. 1989).........................................................................................21

*Heartland Fed. Sav. & Loan v. Briscoe Enters. (In re Briscoe Enters.)*,
994 F.2d 1160 (5th Cir. 1993) ................................................27

*In re Intercorp Int'l, Ltd.*,
309 B.R. 686 (Bankr. S.D.N.Y. 2004) ..................................21

*Krystal Energy Co. v. Navajo Nation*,
357 F.3d 1055 (9th Cir. 2004) ..............................................32

*In re McCommas LFG Processing Partners*,
Case No. 07-32219-HDH-11 ................................................26

*In re Parsley*,
384 B.R. 138 (Bankr. S.D. Tex. 2008) ..................................21

*Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*,
995 F.2d 1274 (5th Cir. 1991) ..........................................26, 27

*Reed v. Iowa Marine and Repair Corp.*,
16 F.3d 82 (5th Cir. 1994) ....................................................21

*In re Rochem, Ltd.*,
58 B.R. 641 (Bankr. D.N.J. 1985) ........................................27

*Save Our Springs (SOS) Alliance v. WSI (II)-COS, L.L.C. (In re Save Our Springs (SOS) Alliance)*,
632 F.3d 168 (5th Cir. 2011) ................................................27

*In re Simon*,
No. 07-31414-KR, 2008 Bankr. LEXIS 2787 (Bankr. E.D. Va. July 29, 2008) ....................27

*Smith et al. v. Martorello et al.*,
No. 3:18-cv-01651-AC ..........................................................5

*In re Southern Cal. Sound Sys., Inc.*,
69 B.R. 893 (Bankr. S.D. Cal. 1987) ....................................22

*In re St. Stephen's 350 E. 116th St.*,
313 B.R. 161 (Bankr. S.D.N.Y. 2004) ..................................21

*In re Thru, Inc.*,
No. 17-31034, 2017 Bankr. LEXIS 1902 (Bankr. N.D. Tex. Jul. 10, 2017), *appeal dism'd in part as moot*, No. 3:17-CV-1958-G, 2018 U.S. Dist. LEXIS 179769 (N.D. Tex. Oct. 19, 2018), *aff'd*, 782 F. App'x 339 (5th Cir. 2019) ..................26

*Tompkins v. Cyr*,
202 F.3d 770 (5th Cir. 2000) ................................................20

*In re Transtexas Gas Corp. v. TransTexas Gas*,
    303 F.3d 571 (5th Cir. 2002) ................................................................19

*In re United States Mineral Prods. Co.*,
    No. 01-2471(JKF), 2005 Bankr. LEXIS 3259 (Bankr. D. Del. Nov. 29, 2005) .....................27

*Whispering Pines Estates, Inc. v. Flash Island, Inc. (In re Whispering Pines
Estates, Inc.)*,
    369 B.R. 752 (1st Cir. BAP 2007) ........................................................19

*Williams et al. v. Big Picture Loans, LLC et al.*,
    No. 3:17-cv-461 (E.D. Va.) ..................................................................5

*Williams et al. v. Microbilt et al.*,
    No. 3:19-cv-85 (E.D. Va.) ....................................................................5

*In re Woodbrook Assocs.*,
    19 F.3d 312 (7th Cir. 1994) .................................................................21

**Statutes**

11 U.S.C. § 106 ............................................................................13, 14, 31

11 U.S.C. § 362 ..................................................................................8, 9

11 U.S.C. § 542 .....................................................................................10

11 U.S.C. § 1122(a) ............................................................................26, 27

11 U.S.C. § 1129 ...................................................................................23

11 U.S.C. § 1129(a)(10), (b) .....................................................................25

**Other Authorities**

Fed. R. Bankr. P. 2004 ..................................................................... *passim*

Fed. R. Bankr. P. 9011 ....................................................................1, 20, 21

Fed. R. Bankr. P. 9011(c)(1)(A) .................................................................20

Eventide Credit Acquisitions, LLC, the debtor in the above-captioned case (the "**Debtor**"), by and through undersigned counsel, hereby files this objection (the "**Objection**") to *The Official Committee of Unsecured Creditors' Motion for Sanctions for Bad Faith Filing Pursuant to 11 U.S.C. §§ 105 and 329, and Bankruptcy Rules 2016 and 9011* [Docket No. 285] (the "**Motion**"), filed by the Official Committee of Unsecured Creditors (the "**Committee**").  In support of this Objection, the Debtor states as follows:

<u>**PRELIMINARY STATEMENT**</u>

1.      On June 26, 2020, the Debtor filed an appeal, *see* Docket No. 290 (the "**Appeal**"), of the Court's *Order Dismissing Bankruptcy Case*, Docket No. 288 (the "**Dismissal Order**"). Accordingly, because the relief sought in the Motion is substantially connected to the Court's basis for the Dismissal Order and the Dismissal Order is the subject of the Appeal, Eventide respectfully submits that the Court does not have jurisdiction to determine the Motion while the Appeal is pending.

2.      However, to the extent the Court finds that it does have jurisdiction, the Committee's Motion should nevertheless be denied.  The Committee purports to seek sanctions pursuant to Bankruptcy Rule 9011, but did not comply with the safe harbor provisions of that rule before filing the Motion.  For this reason alone, the Motion should be denied.

3.      To the extent the Court is nevertheless inclined to hear and determine the Committee's request for sanctions, there is insufficient evidence to warrant the relief the Committee seeks.

4.      First, the Committee asserts that sanctions are warranted because the Court found that the Debtor's bankruptcy filing was a litigation strategy designed to assist Matt Martorello ("**Martorello**") and affiliated entities.  *See* Motion at 2.  However, the evidence showed that the

Debtor filed for bankruptcy with the intent to accomplish a resolution of the claims against it, and to provide a means for paying those claims held to be valid. It is true that members of the Debtor would have also benefited from this resolution process, but that is true of all bankruptcies filed to resolve extensive litigation in numerous jurisdictions and dwindling resources to address it.

5. Second, the Committee asserts that sanctions are warranted based on the Court's displeasure with actions taken by Martorello and with Debtor's counsel's suggestion that a plan might be confirmed over the Consumer Borrower's objection if the Consumer Borrower's claims were separately classified. *See* Motion at 5. However, as evidenced by the Motion itself, the Court found that Martorello—not the Debtor or its counsel—had resorted to name-calling. Moreover, counsel's suggestion regarding classification is supported by Fifth Circuit law, was raised only as a possible scenario in the event a consensual plan could not be negotiated, and was asserted, in specific rebuttal to the Consumer Borrowers' assertion of bad faith, only to demonstrate that the Debtor was capable of confirming a plan over the objection of the Consumer Borrowers.

6. Third, the Committee requests sanctions based on the Court's finding that the Debtor's actions were being taken at the direction of the 100% voting member of the Debtor, Breakwater Holdings, LLC ("**Breakwater**"), rather than at the direction of Drew McManigle, the Debtor's manager and chief restructuring officer (the "**CRO**"), and, in particular, that the CRO was not involved in the negotiation of the Debtor's proposed debtor-in-possession loan from Bluetech Irrevocable Trust ("**Bluetech**"), the 100% owner of Breakwater. The Debtor respectfully submits that this finding significantly downplays the role fulfilled by the CRO, his knowledge and consent to the filing of each substantive pleading by the Debtor in the Chapter 11 Case and the related adversary proceedings, and his involvement in seeking and obtaining a debtor-in-possession loan for the Debtor. The Debtor was not required to obtain a CRO or independent

manager, but did so to obtain the input of an industry veteran. That said, it would have been cost prohibitive and an inefficient use of time and resources for the CRO to review and analyze each of the hundreds of substantive pleadings and documents relating to, and produced in, the myriad of Pending Actions. Accordingly, the CRO relied on the advice and recommendation of counsel, including with the respect to the Debtor's entry into the proposed debtor-in-possession loan, as he was entitled to do. This division of labor is not uncommon in cases where the Debtor has limited employees and resources and is certainly not sanctionable.

7.　　Finally, the Committee argues that sanctions are warranted because the adversary proceedings filed by the Debtor did not ultimately net an economic benefit to the estate. But that is not the standard for imposition of an award of attorneys' fees, let alone an award of sanctions. Each of the adversary proceedings were filed with both a legal and factual predicate. Although the Debtor was not able to achieve the result sought through the adversary proceedings, the filings themselves were not frivolous. Moreover, the suggestion that the fees incurred, the substantial portion of which remain unpaid in any event, were predominantly in connection with the adversary proceedings is not supported by a review of the invoices submitted by the Debtor's professionals. The Motion should be denied.

## **BACKGROUND**

### I.　　**The Debtor's Formation and Involvement in Pre-Bankruptcy Litigation.**

8.　　The Debtor was formed in 2015 to facilitate the seller-financed sale of Bellicose Capital, LLC ("**Bellicose**") to Tribal Economic Development Holdings, LLC ("**TED**"), an arm of the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("**LVD**" or "**Tribe**"). Since 2011, the Tribe had operated a consumer lending business, providing small dollar short-term loans at high APRs from its reservation, to consumers in need of short-term emergency financial solutions,

all pursuant exclusively to LVD's consumer lending laws and federal laws. Prior to the sale, Bellicose provided services to entities owned and used by LVD in its lending business.

9. The transaction between TED and the Debtor is evidenced by (1) a secured promissory note to the Debtor (the "**Promissory Note**"), (2) a Loan and Security Agreement (the "**LSA**"), (3) a Parental Guarantee and Sovereign Immunity Waiver executed by LVD ("**Guarantee**"), and (4) an Agreement and Plan of Merger (the "**Merger Agreement**" and together with the Note, LSA and Guarantee, the "**Transaction Documents**"). As part of the transaction, LVD formed Big Picture Loans, LLC ("**Big Picture**") and Ascension Technologies, LLC ("**Ascension**" and, together with TED and Big Picture, the "**Tribal Entities**"), as wholly-owned subsidiaries of TED, to continue to carry on LVD's consumer lending business.

10. The LSA provides that as part of the seller-financed transaction, Eventide effectively loaned TED up to $300,000,000, plus interest in the amount of 1.8% per annum, for TED's purchase of Bellicose. The loan is to be repaid by proceeds from LVD's online consumer lending business conducted through the Tribal Entities and is secured by substantially all of the assets of the Tribal Entities. Specifically, the LSA and Promissory Note call for variable loan payments to be made to the Debtor pursuant to a contractual waterfall set forth in Section 1.2 of the Promissory Note (the "**Waterfall**"), exclusively from the profits earned by the Tribal Entities' online consumer lending. The term of the loan is seven years, after which point the remaining balance of the Promissory Note sunsets on January 26, 2023.

11. Beginning in 2017, certain borrowers from LVD's lending entities commenced purported class action lawsuits against Big Picture, Ascension, and Matt Martorello (the founder of Bellicose), asserting claims for violation of state usury laws and RICO. Today, pending

litigations stemming from LVD's lending business include the following (the "**Pending Actions**" and the named plaintiffs therein, the "**Consumer Borrowers**"):

    a.    *Williams et al. v. Big Picture Loans, LLC et al.*, No. 3:17-cv-461 (E.D. Va.) ("***Williams I***");

    b.    *Galloway et al. v. Big Picture Loans, LLC et al.*, No. 3:18-cv-406 (E.D. Va.) ("***Galloway I***");

    c.    *Smith et al. v. Martorello et al.*, No. 3:18-cv-01651-AC (D. Oreg.) ("***Smith***");

    d.    *Duggan et al. v. Martorello et al.*, No. 1:18-cv-12277-JGD (D. Mass.) ("***Duggan***");

    e.    *Williams et al. v. Microbilt et al.*, No. 3:19-cv-85 (E.D. Va.) ("***Williams II***");

    f.    *Galloway et al. v. Martorello et al.*, No. 3:19-cv-00314-REP (E.D. Va.) ("***Galloway II***"); and

    g.    *Galloway et al. v. Williams et al.*, No. 3:19-cv-470 (E.D. Va.) ("***Galloway III***").

12.    The Debtor is a direct party to *Duggan*, *Smith* and *Galloway II*. In addition, under the Debtor's Operating Agreement, the Debtor is required to indemnify its members and manger, and individuals working for its manager, for any claims or causes of action asserted against them as result of their role with the Debtor. *See* Debtor's Operating Agreement § V(L) and § VII(B)(i). Accordingly, prior to the Debtor's bankruptcy filing, it paid the legal expenses of (1) Matt Martorello, the founder of Bellicose, the Debtor's president, and the manager of Liont, LLC ("**Liont**") (2) Rebecca Martorello, the wife of Matt Martorello and a former employee of Liont, (3) Liont, the Debtor's former manager, (4) Justin Martorello, a member of the Debtor, (5) Gallant Capital, LLC ("**Gallant**"), a member of the Debtor, (6) Kairos Holding, LLC ("**Kairos**"), a former member of the Debtor, (7) Breakwater Holdings, LLC ("**Breakwater**"), a member of the Debtor, and (8) Bluetech Irrevocable Trust ("**Bluetech**"), the 100% owner of Breakwater (collectively, the "**Indemnified Defendants**"). In addition, three other members of the Debtor, Brian McFadden,

Simon Liang, and James Dowd, were sued in certain of the Pending Actions, but had not sought ongoing indemnification from the Debtor relating to the Pending Actions. Big Picture and Ascension were also defendants in certain of the Pending Actions.

13.     On May 6, 2019, TED and Eventide entered into that certain letter agreement for $5,000,000 in advance payments on the Promissory Note (the "**Side Letter**"). Pursuant to the Side Letter, the Tribal Entities agreed to make certain payments to Eventide beginning in May 2019 with the final payment being made on July 31, 2019. Thereafter, TED and Eventide agreed that TED could offset amounts it would otherwise be required to pay under the Promissory Note until all amounts advanced to Eventide under the Side Letter had been offset.

14.     Later, on November 26, 2019, the Tribal Entities sought to resolve the Pending Actions, as against them, by way of a settlement with the Consumer Borrowers, and the putative consumer classes that they purport to represent (the "**Settlement Agreement**"), which was filed in *Galloway III*. The Debtor is not a party to *Galloway III*.

15.     The Debtor asserted that the Tribal Entities' commitments under the Settlement Agreement constituted breaches of the Transaction Documents and would negatively impact payments under the Waterfall by as much as $22 million with no corresponding benefit to the Debtor. Accordingly, the Debtor sought to intervene in *Galloway III* to challenge the Settlement Agreement. While the Debtor's motion for intervention has been fully briefed for five months, the District Court for the Eastern District of Virginia (the "**Virginia Court**") has not yet ruled on the motion.

16.     Because of the Tribal Entities' breaches of the Transaction Documents, including entry into the Settlement Agreement and incurrence of additional debt thereunder without Eventide's consent as required under the LSA, Eventide commenced an arbitration before the

American Arbitration Association in December 2019 (the "**Arbitration**"). Eventide's arbitration demand, as amended, sets forth each of Tribal Entities' breaches of the Transaction Documents.

17. The Settlement Agreement was preliminarily approved by the Virginia Court on December 20, 2019.

18. In the year prior to the Debtor's bankruptcy filing, the Debtor expended over $7.5 million in legal fees, in its own defense and in defense of the Indemnified Defendants in the Pending Actions. In addition, at the time of the bankruptcy filing, the Debtor had not received a payment on the Promissory Note, its primary and most valuable asset, from the Tribal Entities in over a year. Moreover, the Debtor had limited funds in its bank accounts, even after obtaining loans totaling $1.25 million from Bluetech, the 100% owner of Breakwater, which owns 59.6% of the Debtor.

**II.     The Bankruptcy Case is Filed.**

19. On January 28, 2020 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code commencing this case (the "**Chapter 11 Case**"). The CRO approved the Debtor's bankruptcy filing and executed the necessary documents in connection with the filing. *See, e.g*, Docket No. 1; Docket No. 124 (the "**CRO Feb./Mar. Fee Statement**") at 6.

20. On January 29, 2020, the Debtor filed its *Complaint for Declaratory and Injunctive Relief* (the "**Stay Extension Complaint**")*,* commencing Adversary Proceeding No. 20-04008 ("**A.P. 4008**") against Big Picture, Ascension, and the Consumer Borrowers. That same day, the Debtor also filed its *Motion for Preliminary Declaratory/Injunctive Relief*. *See* A.P. 4008 Docket No. 2 (the "**Stay Extension Motion**"). The CRO was consulted regarding the filing of the Stay Extension Complaint and the Stay Extension Motion and approved of the filings. *See, e.g.*, CRO Feb./Mar. Fee Statement at 6. The Stay Extension Complaint and Stay Extension Motion, citing

extensive case law in the Fifth Circuit and elsewhere, sought an order from the Court extending the automatic stay of section 362 of the Bankruptcy to the claims asserted against the Indemnified Defendants in the Pending Actions as well as to final approval of the Settlement Agreement in *Galloway III* on the grounds that the continued prosecution of the Pending Actions would result in additional indemnification obligations for the Debtor and hinder the Debtor's ability to obtain full relief in the Arbitration. The Debtor later consented to the Committee's intervention in A.P. 4008. *See* A.P. 4008 Docket No. 9 at 3.

21. On February 7, 2020, the Office of the United States Trustee (the "**U.S. Trustee**") appointed the Committee. *See* Docket No. 14.

22. The U.S. Trustee initially set the Debtor's 341 meeting for March 27, 2020 and the deadline to file proofs of claims as June 25, 2020. *See* Docket No. 8.

23. On February 11, 2020, the Debtor filed the *Debtor's Application for Order Authorizing the Employment and Retention of Forshey & Prostok, LLP as Attorneys for the Debtor as of the Petition Date*. *See* Docket No. 17 (the "**FP Application**"). The CRO reviewed and approved the FP Application before it was filed. *See* CRO Feb./Mar. Fee Statement at p. 7. The FP Application was granted on March 24, 2020. *See* Docket No. 91.

24. On February 13, 2020, the Debtor filed the *Application for Order Authorizing the Retention of Loeb & Loeb LLP as Counsel to the Debtor, as of the Petition Date. See* Docket No. 21 (the "**Loeb Application**"). The CRO reviewed and approved the Loeb Application before it was filed. *See* CRO Feb./Mar. Fee Statement at p. 7. The Loeb Application was granted on April 3, 2020. *See* Docket No. 119.

25. Also on February 13, 2020, the Committee filed the *Application for Approval of Employment of Cole Schotz P.C. as Counsel to the Official Committee of Unsecured Creditors,*

*Effective as of February 7, 2020*. *See* Docket No. 25 (the "**Cole Schotz Application**"). The Cole Schotz Application was granted on March 10, 2020. *See* Docket No. 56.

26.     On February 14, 2020, the Tribal Entities were required to make a payment to the Debtor under the Waterfall. Instead, the Tribal Entities withheld the payment and purportedly applied it to reduce amounts allegedly still owed by the Debtor on the Side Letter. The Debtor sent a letter to the Tribal Entities on February 20, 2020 demanding that they make payments on the Waterfall. On February 25, 2020, Big Picture and Ascension responded and denied any liability for payments under the Waterfall and also asserted that, as a result of their sovereign immunity, the automatic stay of section 362 of the Bankruptcy Code did not apply to their actions.

27.     On February 26, 2020, the Debtor filed the *Debtor's Emergency Motion for Order Shortening Time Within Which Proofs of Claim or Interest May be Filed*. *See* Docket No. 33 (the "**Motion to Shorten**"). The Debtor sought an expedited hearing on the Motion to Shorten on the grounds that it wanted to expedite the claims analysis process. *See* Docket No. 35 at ¶ 8. Counsel for the Debtor consulted with the CRO regarding the Motion to Shorten in advance of its filing and obtained his consent that it should be filed. *See, e.g.*, CRO Feb./Mar. Fee Statement at p. 7. The Court granted the Debtor's request and an expedited hearing was scheduled for March 5, 2020. *See* Docket No. 36.

28.     On February 26, 2020, the Debtor also filed the *Debtor's Application for Entry of an Order Authorizing Employment and Retention of Drew McManigle of MACCO Restructuring Group, LLC as Chief Restructuring Officer for the Debtor Nunc Pro Tunc to the Petition Date*, seeking the approval of Drew McManigle as the CRO. *See* Docket No. 34 (the "**CRO Application**"). The CRO Application was granted on March 27, 2020. *See* Docket No. 97.

29.     On March 3, 2020, the Committee filed its opposition to the Motion to Shorten arguing, among other things, that a class claim on behalf of the Consumer Borrowers was likely and that publication notice was unlikely to be sufficient for many of the potential claims to be asserted against the Debtor since the Debtor had the right under the Loan Agreement to obtain a list of Big Picture's borrowers.  *See* Docket No. 40 at ¶¶ 6, 10.  The Consumer Borrowers similarly argued that actual notice to all consumer borrowers was required.  *See* Docket No. 43 at ¶¶ 12-14.

30.     On March 4, 2020, the Debtor filed the *Debtor's Motion for Entry of Order Establishing Procedures for Interim Compensation and Reimbursement of Professionals* [Docket No. 46] (the "**Compensation Procedures Motion**").   The Court granted the Compensation Procedures Motion on March 30, 2020 and permitted the Debtor to pay 80% of the fees of estate professionals on a monthly basis, provided that the estate professional notified all other estate professionals and the U.S. Trustee of the fees requested and that those notice parties did not object within 10 days of receiving such notice.  *See* Docket No. 104.  Pursuant to the Compensation Procedures Order, Loeb & Loeb, Forshey & Prostok, MACCO, and Cole Schotz provided notice of their monthly fee statements to those parties entitled to notice.  None of the notice parties asserted any objection to the monthly fee requests of any of the professionals.

31.     On March 5, 2020, the Debtor filed its *Complaint for Turnover, Temporary Restraining Order and Injunctive Relief, and Foreclosure* (the "**Turnover Complaint**"), commencing Adversary Proceeding No. 20-04014 ("**A.P. 4014**") against the Tribal Entities, seeking turnover, pursuant to section 542 of the Bankruptcy Code, of post-petition payments owed by the Tribal Entities to the Debtor under the Waterfall as well as turnover of the documents and information the Debtor was entitled to receive pursuant to section 4.3 of the LSA.  *See* A.P. 4014 Docket No. 1.  Contemporaneously therewith, the Debtor also filed the *Debtor's Motion for a*

*Temporary Restraining Order and Preliminary Injunction*. *See* A.P. 4014 Docket No. 5 (the "**TRO Motion**"). The CRO was consulted regarding the filing of the Turnover Complaint and the TRO Motion and approved of their filing. *See, e.g.*, CRO Feb./Mar. Fee Statement at 13, 15. The Court set a hearing on the TRO Motion for March 12, 2020. *See* A.P. 4014 Docket No. 12.

32.     Also on March 5, 2020, the Court held a hearing on the Motion to Shorten. At the hearing, the Debtor withdrew its request to proceed by publication notice in recognition of the concerns raised by the Committee and the Consumer Borrowers. At the same time, the Debtor advised the Court that it did not have a list of Big Picture's borrowers, despite attempts to obtain the list, and that the Debtor was seeking turnover of that information as part of the relief sought by the Turnover Complaint. In its ruling, the Court, drawing on experience from *Dow Corning*, acknowledged that the *Dow Corning* "case dealt with the fact that there was a lot of litigation and whether or not there was the possibility of mainstreaming a process to more efficiently address the claims. . . in *Dow Corning*, obviously, it was a material factor, because you had competing interests on both sides." 3/5/20 Hr'g Tr. 72:23 – 73:4. The Court further stated that "the filing of the case to address a lot of litigation is not terribly surprising to the Court." *Id.* at 7:18-20. The Court granted the Motion to Shorten, in part, and set the bar date for filing proofs of claims by known non-governmental persons and entities as May 8, 2020. *See* Docket No. 68 at ¶ 2. The Court denied the Debtor's request to use publication notice and reserved the right of parties in interest, including the Committee and the Consumer Borrowers, to file a motion seeking to reset the bar date for any party that did not receive actual notice from the Debtor. *See id.* at ¶¶ 5-6.

33.     On March 11, 2020, the Tribal Entities filed motions to dismiss A.P. 4008 and A.P. 4014, asserting that the Court lacked subject matter jurisdiction over them as sovereign entities. *See* A.P. 4008 Docket No. 17; A.P. No. 4014 Docket No. 15. That same day, the Tribal Entities

filed an opposition to the TRO Motion, *see* A.P. 4014 Docket No. 20, and sought to continue the hearing on the motion until after the hearing on their motion to dismiss A.P. 4014, *see* A.P. 4014 Docket No. 16. The Court granted the Tribal Entities' motion for a continuance and set a hearing on their motion to dismiss for April 1, 2020. *See* A.P. 4014 Docket No. 30.

34. On March 20, 2020, the Debtor filed its Schedules of Assets and Liabilities, *see* Docket No. 75 ("**Schedules**"), and Statement of Financial Affairs, *see* Docket No. 76 ("**SOFA**"). Beginning shortly after the Petition Date, the CRO and members of his team took the lead in drafting the Schedules and SOFAs. The CRO and his team worked collaboratively with the Debtor's counsel, Martorello, and the Debtor's accountant to compile information and accurately complete the Schedules and SOFAs. *See, e.g.*, CRO Feb./Mar. Fee Statement at p. 9-11, 16-19.

35. Also on March 20, 2020, the Committee moved for Bankruptcy Rule 2004 productions and examinations from the Debtor, Martorello, and Bluetech. *See* Docket Nos. 62-64 (the "**Rule 2004 Motions**"). The Debtor objected to the Rule 2004 examination, and proposed that, to save time and expense, and since the Committee is comprised solely of Consumer Borrowers, the Debtor produce and facilitate the cross-use of information already available in the Pending Actions to the Committee. *See* Docket No. 83 at ¶¶ 3-4. Martorello, through his counsel, also objected to the Rule 2004 examination on the grounds set forth in his objection. *See* Docket No. 84. Bluetech moved to quash the Committee's Rule 2004 Motion on the basis of lack of personal jurisdiction. Bluetech further argued that, because it is a named defendant in *Galloway II*, the members of the Committee appeared to be seeking discovery from Bluetech that they would be unable to obtain in the action itself. *See generally* Docket No. 85.

36. On March 23, 2020, the Committee withdrew its Rule 2004 Motion as to Bluetech. *See* Docket No. 90. The Committee did not renew is Rule 2004 Motion as to Bluetech.

37.     On March 26, 2020, the Debtor filed its omnibus opposition to the Tribal Entities' motions to dismiss, arguing that the Tribal Entities waived immunity from the suits in entering into the Transaction Documents and because section 106 of the Bankruptcy Code abrogates the sovereign immunity of Native American tribes. *See* A.P. 4014 Docket No. 41.

38.     On March 30, 2020, the Court entered orders granting, in part, and denying, in part, the Rule 2004 Motions relating to the Debtor and Martorello.  *See* Docket Nos. 102 & 103 (the "**Rule 2004 Orders**"). The Rule 2004 Orders directed the Debtor and Martorello to produce responsive documents outlined in the Rule 2004 Orders by April 29, 2020 and to appear for respective examinations by June 28, 2020.

39.     On April 1, 2020, the Court held a scheduling conference on the Debtor's Stay Extension Motion in A.P. 4008 and a hearing on the Tribal Defendants' motions to dismiss A.P. 4008 and A.P. 4014.  The hearing on the Tribal Defendants' motions to dismiss was lengthy and largely focused on whether section 106 of the Bankruptcy Code abrogates the sovereign immunity of Native American Tribes.  Ultimately, the Court continued the hearing to April 6, 2020 for additional arguments from counsel.

40.     On April 3, 2020, the Debtor filed the *Debtor's Application Pursuant to 11 U.S.C. § 327(e) for Order Authorizing Retention and Employment of Special Counsel, Armstrong Teasdale LLP, Nunc Pro Tunc to Petition Date* [Docket No. 120] (the "**AT Application**"), seeking to retain Armstrong Teasdale LLP ("**Armstrong**") for the limited purpose of assisting the Debtor in complying with the Rule 2004 Order and in the Pending Actions and Arbitration.  *See* Docket No. 120 at ¶ 10.  In seeking the retention of Armstrong, the Debtor sought to minimize duplication of effort by Loeb & Loeb and to capitalize on Armstrong's historical knowledge of the Pending Actions, including the procedural posture of each of the Pending Actions, as well as documents

produced, depositions taken, discovery agreements reached, arguments made, and hearings held. *See id.* The CRO was consulted regarding the Debtor's retention of Armstrong and determined to approve the retention of Armstrong as special counsel as well as the filing of the AT Application. *See, e.g.* Loeb Fee App. at p. 29; CRO Feb./Mar. Fee Statement at p. 9. The Committee objected to the AT Application, arguing that Martorello was controlling the Debtor post-petition and that, if Armstrong were to represent the Debtor, it could not also represent any of the Debtor's co-defendants. *See* Docket No. 122.

41. On April 6, 2020, the Court held a continued hearing on the Tribal Entities' motions to dismiss. While the Court ultimately held that section 106 of the Bankruptcy Code does not abrogate the sovereign immunity of Native American tribes, it acknowledged that it was a "very difficult decision". 4/6/20 Hr'g Tr. 36:2. The Court granted the Tribal Entities' motion to dismiss A.P. 4008 since it was predicated entirely on claims under the Bankruptcy Code. However, the Court requested additional briefing on issues relating to *res judicata* and the Tribal Entities' contractual waiver of immunity before ruling on the Tribal Entities' motion to dismiss A.P. 4014.

42. The Debtor filed the additional briefing requested by the Court on April 9, 2020. *See* A.P. 4014 Docket No. 76.

43. On April 9, 2020, the Consumer Borrowers filed the *Consumer Borrowers' Motion for an Order Dismissing the Debtor's Chapter 11 Case or, in the Alternative, for Abstention. See* Docket No. 123 (the "**Case Dismissal Motion**").

44. On April 13, 2020, the Court held a continued hearing on the Tribal Entities' motion to dismiss A.P. 4014 and granted the motion. While the Court granted that motion to dismiss, it provided an outline of its view on the contractual waiver and declined to find that it could not be a court of competent jurisdiction under the Transaction Documents to issue the Debtor the relief it

sought. *See* 4/13/20 Hr'g Tr. 41:8-44:23. Instead, the Court held that because the claims in the Turnover Complaint were drafted as claims under the Bankruptcy Code, as opposed to for breach of contract, the motion would be granted. *See id.* at 45:3-22.

45. Once the Court granted the Tribal Entities' motions to dismiss A.P. 4008 and A.P. 4014, and with the Debtor unable to obtain expedited relief requiring the Tribal Entities to make payments on the Promissory Note, the Debtor, with the agreement and assistance of the CRO, began seeking financing. Initial indications of interest from third-party lenders approached by the CRO and counsel for Debtor were lukewarm, largely because the collateral that the Debtor could offer to secure the loan was limited to the proceeds of an award in the Arbitration and because of reluctance to lend to an entity that conducted business with a Native American tribe. *See, e.g.*, Docket No. 153-1. In addition, the Debtor initially sought financing of $1 million but, after the hearing on the Arbitration was delayed a month as a result of complications arising from the COVID-19 pandemic, the CRO reviewed the budget that he and his team had drafted and agreed that the amount of financing that should be sought needed to be increased. The need to seek additional financing beyond what was originally anticipated, in turn, required the Debtor to enter into further negotiations with potential lenders. *See, e.g.*, Docket No. 150 ("**CRO Apr. Fee Statement**") at p. 6-7; Docket No. 274 ("**CRO May Fee Statement**") at p. 6-7.

46. On April 24, 2020, the Debtor filed its *Complaint for Breach of Contract and Declaratory Relief* against the Tribal Entities, commencing Adversary Proceeding No. 20-04030 ("**A.P. 4030**"), *see* A.P. 4030 Docket No. 1, and its *Motion for Preliminary Injunction*, *see* A.P. 4030 Docket No. 2 (the "**Injunction Motion**"). Via the claims in A.P. 4030 and the Injunction Motion, the Debtor, utilizing the outline for claims within the scope of the Tribal Entities' sovereign immunity waiver previously found by the Court, requested that the Court require the

Tribal Entities to maintain the status quo during the pendency of the Arbitration and not seek final approval of the Settlement Agreement.  A.P. 4030 was filed with the knowledge and approval of the CRO.  *See, e.g.*, CRO Apr. Fee Statement at p. 6.

47.     On April 29, 2020, the Debtor served its responses to the requests set forth in the Rule 2004 Order and produced hundreds of responsive documents.  In advance of the Debtor's production pursuant to the Rule 2004 Order, the CRO was provided a draft of the Debtor's responses and objections and a detailed summary of the documents that would be produced.  In addition, after the production was made, the CRO was provided access to copies of the documents that were produced via Relativity.  *See* CRO May Fee Statement at p. 7; Loeb Interim Fee App. at p. 60.

48.     On May 1, 2020, the Court held a hearing on the Debtor's request to expedite the hearing on the Injunction Motion.  While the Court denied the motion for an expedited hearing, and set a briefing schedule on the Tribal Entities' forthcoming motion to dismiss, it did acknowledge that if the Settlement Agreement were finally approved, "that's a bell that can't be unrung."  5/1/20 Hr'g Tr. at 26:18.

49.     On May 8, 2020, many of the Consumer Borrowers filed proofs of claims against the Debtor.  *See* Claim Nos. 8-17, 19-44.  However, certain of the Consumer Borrowers did not file any proof of claim against the Debtor, including Renee Galloway, a named plaintiff in *Galloway I*, *Galloway II*, and *Galloway III* and a member of the Committee.  As expected, each of the claims filed by the Consumer Borrowers was predicated on the claims they had asserted in the Pending Actions and purported to be filed on behalf of a class of claimants.  Certain of the Indemnified Defendants also filed claims against the Debtor asserting their right to indemnification.  *See* Claim Nos. 2-6.

50.     On May 10, 2020, the Debtor filed the *Debtor's Response in Opposition to Motion of Consumer Borrowers for Order Dismissing Chapter 11 Case or, in the Alternative, for Abstention*. *See* Docket No. 148 (the "**Case Dismissal Opposition**"). The CRO reviewed and approved of the filing of the Case Dismissal Opposition. *See* CRO May Fee Statement at p. 7.

51.     On May 14, 2020, the Committee joined in the Consumer Borrower's request for abstention relating to this Chapter 11 Case. *See* Docket No. 151 (the "**Committee Abstention Joinder**"). Notably, the Committee did not join in the Consumer Borrowers' request for dismissal of the Chapter 11 Case.

52.     On May 15, 2020, the Debtor filed *Debtor's Motion Pursuant to 11 U.S.C. § 1121(d)(1) for an Order Extending the Exclusive Periods in which to Propose a Chapter 11 Plan and to Solicit Acceptances Thereof* [Docket No. 152] (the "**Exclusivity Extension Motion**"), seeking an extension of the exclusive period during which to file and solicit votes on a proposed plan until after a decision was reached in the Arbitration. That same day, the Debtor also filed its motion [Docket No. 153] (the "**DIP Motion**") for approval of a Debtor-in-Possession Loan and Security Agreement (the "**DIP Loan Agreement**") with Bluetech in the amount of $2 million. The CRO, having been advised of, and participating in, substantial negotiations relating to the Debtor's request for financing, albeit not directly with Bluetech itself, approved the filing of the DIP Motion. *See* CRO May Fee Statement at p. 6. The Debtor sought an interim hearing on the DIP Motion for May 28, 2020, to occur currently with the hearing on the Case Dismissal Motion. *See* Docket No. 154. The Court set an interim hearing on the DIP Motion for May 29, 2020. *See* Docket No. 156.

53.     On May 20, 2020, the Committee and the Consumer Borrowers conducted the Rule 2004 examination of the CRO and on May 21, 2020, the Committee and the Consumer Borrowers conducted the Rule 2004 examination of Martorello.

54.     On May 26, 2020, the Committee filed its objection to the DIP Motion, arguing that the approval of the DIP Agreement would compromise the estate's ability to pursue avoidance actions against insiders and that the terms were not fair and reasonable. *See* Docket No. 168. The Consumer Borrowers likewise objected to the DIP Motion on May 27, 2020 on similar grounds. *See* Docket No. 207.

55.     The Debtor filed a revised proposed DIP Loan Agreement on May 27, 2020, evidencing Bluetech's agreement to reduce its origination fee and to forego a lien on the avoidance actions, but also disclosing that it would not submit to jurisdiction of the Court in entering into the DIP Loan Agreement. *See* Docket No. 181. The CRO was advised of, and approved, the filing of the revised proposed DIP Loan Agreement.

56.     On May 27, 2020, the Debtor filed its initial objections to each of the proofs of claims filed by the Consumer Borrowers. *See* Docket Nos. 183-185, 187-194, 198, 200, 202, 204-205, 208, 210, 212, 214-222, 224, 226-227, 229-230, 232, 234 ("**Debtor's Claim Objections**"). Martorello also objected to each of the proofs of claims filed by the Consumer Borrowers. *See* Docket Nos. 180, 195-197, 199, 201, 203, 206, 209, 211, 213, 223, 225, 228, 231, 233, 235-255 ("**Martorello's Claim Objections**"). By the Debtor's Claim Objections, the Debtor sought to progress the Chapter 11 Case forward

57.     The Court held a hearing on the Case Dismissal Motion on May 28, 2020 and an interim hearing on the DIP Motion on May 29, 2020.

58.      The Court held a hearing on the Tribal Entities motion to dismiss A.P. 4030 on June 6, 2020.

59.      The Court issued an oral ruling granting the Case Dismissal Motion on June 9, 2020.  The Court entered the Case Dismissal Order on June 18, 2020.

## OBJECTION

### I.      THE COURT LACKS JURISDICTION OVER THE MOTION.

60.      The Debtor respectfully submits that the Court currently lacks jurisdiction to hear and determine the Motion as a result of the Appeal.   It is well established that "[t]he filing of a notice of appeal is an event of jurisdictional significance – it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."  *Bank of N.Y. Trust Co. NA v. Pac. Lumber Co. (In re Scopac)*, 624 F.3d 274, 280 (5th Cir. 2010) (quoting *Griggs v. Provident Consumer Discount Co.*, 103 S. Ct. 400, 402 (1982)). This divestiture rule applies to the appeal of a bankruptcy court order.  *In re Transtexas Gas Corp. v. TransTexas Gas*, 303 F.3d 571, 579 (5th Cir. 2002).  The Fifth Circuit has adopted a "functional test" to determine whether a bankruptcy court has been divested of jurisdiction over a particular matter: "once an appeal is pending, it is imperative that a lower court not exercise jurisdiction over those issues which, although not themselves expressly on appeal, nevertheless so impact the appeal so as to interfere with or effectively circumvent the appeal process."  *In re Scopac*, 624 F.3d at 280 (quoting *Whispering Pines Estates, Inc. v. Flash Island, Inc. (In re Whispering Pines Estates, Inc.)*, 369 B.R. 752, 759 (1st Cir. BAP 2007)).  The purpose of this doctrine is to "avoid the confusion of placing the same matter before two courts at the same time and preserve the integrity of the appeal process."  *In re Whispering Pines Estates, Inc.*, 369 B.R. at 757.

61.      The Committee's Motion places the same issues that are currently on appeal squarely before this Court for further consideration.  Indeed, the Motion itself extensively cites to

and relies on the specific findings made by this Court in issuing the Case Dismissal Order. Here, unlike the issues in *Scopac,* there are virtually no "independent factual inquiries" for the Court to consider apart from the issues on appeal. *See In re Scopac,* 624 F.3d at 280. Likewise, the Motion relies on the legal conclusions giving rise to the Case Dismissal Order to support the request for relief. The merits of the Motion are essentially duplicative of the factual and legal issues on appeal and involve the same "aspects of the case." As such, the Court is divested of jurisdiction over the Motion during the pendency of the appeal of the Case Dismissal Order.

## II. THE MOTION SHOULD BE DENIED BECAUSE THE COMMITTEE DID NOT COMPLY WITH BANKRUPTCY RULE 9011 BEFORE FILING THE MOTION.

62.     The Motion should be denied because counsel for the Committee did not serve its Motion twenty-one days in advance of filing it with the Court. Strict compliance with Rule 11 is mandatory before sanctions can be imposed. *See Cadle Co. v. Pratt (In re Pratt)*, 524 F.3d 580, 588 (5th Cir. 2008). Rule 9011(c)(1)(A) of the Federal Rules of Bankruptcy Procedure states that a "motion for sanctions may not be filed with or presented to the court unless, within 21 days *after service of the motion*. . . the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected." Fed. R. Bankr. P. 9011(c)(1)(A) (emphasis added).

63.     "Compliance with the service requirement is a mandatory prerequisite to an award of sanctions under Rule 11." *In re Pratt*, 524 F.3d at 586 (citing *Elliott v. Tilton*, 64 F.3d 213, 216 (5th Cir. 1995) (affirming the district court's denial of sanctions when movant failed to serve respondent with a copy of the motion prior to filing it with the court); *Tompkins v. Cyr*, 202 F.3d 770, 788 (5th Cir. 2000) (affirming denial of sanctions because (1) the defendant failed to serve a copy of the motion on the respondents twenty-one days prior to filing with the court, and (2) the defendant did not file motion until after the trial had concluded). Informal notice does not suffice; the motion itself must first be served. *See id.* at 588.

64. Here, while certainly the Chapter 11 Case was hotly contested, the Committee did not advise the Debtor or its counsel of its intention to seek sanctions relating to the filing of the Chapter 11 Case until June 16, 2020 and, even then, did not serve the Debtor or its counsel with a copy of the Motion. The Debtor and its counsel did not receive a copy of the Motion until it was filed with the Court. For this this reason alone, the Motion should be denied.

## III. THE MOTION SHOULD BE DENIED BECAUSE THE EVIDENCE IN SUPPORT OF SANCTIONS IS NOT CLEAR AND CONVINCING.

65. Should the Court determine to nevertheless hear and decide the Motion under its inherent powers to impose sanctions, the Motion should still be denied. The "threshold for use of inherent sanctions power is high." *Elliot*, 64 F.3d at 217. "Indeed, the Supreme Court has cautioned that 'because of their very potency, inherent powers must be exercised with restraint and discretion." *Id.* (*Reed v. Iowa Marine and Repair Corp.*, 16 F.3d 82 (5th Cir. 1994) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991))). To sanction an attorney, the Court must find that the attorney himself acted in bad faith. *See id.* (citing *Reed*, 16 F.3d 82; *R.T.C. v. Bright*, 6 F.3d 336, 340 (5th Cir. 1993); *In re Thalheim*, 853 F.2d 383, 389 (5th Cir. 1988)).

66. In addition, courts have held that a higher standard of proof is required to impose sanctions under Rule 9011 than for dismissal of a case under section 1112(b) for bad faith filing. For dismissal, the movant must show "cause" by a preponderance of the evidence. *In re Woodbrook Assocs.*, 19 F.3d 312, 317 (7th Cir. 1994). For Rule 9011 sanctions, the standard of proof is "clear" or "substantial" evidence. *In re St. Stephen's 350 E. 116th St.*, 313 B.R. 161, 170 (Bankr. S.D.N.Y. 2004); *In re Intercorp Int'l, Ltd.*, 309 B.R. 686, 693 (Bankr. S.D.N.Y. 2004); *see also In re Parsley,* 384 B.R. 138, 179 (Bankr. S.D. Tex. 2008) (where Rule 9011 did not apply, court's inherent power to sanction attorney conduct required "clear and convincing evidence" that sanctions were warranted). Accordingly, there is no per se rule that sanctions should be imposed

in every case dismissed for bad faith filing. *FDIC v. Fadili*, 165 B.R. 58, 60 (D. Mass. 1994); *In re HBA East, Inc.*, 101 B.R. 411, 418 (Bankr. E.D.N.Y. 1989); *In re Southern Cal. Sound Sys., Inc.*, 69 B.R. 893, 901 (Bankr. S.D. Cal. 1987).

67.     Without a doubt, the issues faced by the Debtor are dominated by the arguments the Consumer Borrowers have made regarding the legality of the Debtor's business and further complicated by the sovereign immunity issues present because of the Debtor's dealings with the Tribal Entities.  But that does not mean that the Debtor or its counsel approached the Chapter 11 filing in bad faith.  Instead, the Debtor commenced the Chapter 11 Case with the belief that the breathing spell of bankruptcy could decrease the fees incurred by the Debtor in its own defense and in defense of the Indemnified Defendants.  The Debtor affirmatively believed that it would be able to use the tools provided under the Bankruptcy Code to pursue certain claims against the Tribal Entities and to propose and file a plan that would result in payments to creditors, including the Consumer Borrowers, if their claims were found to be valid.  The Chapter 11 Case did not proceed as the Debtor anticipated and, accordingly, the Court denied the Debtor the further protections of the Bankruptcy Code, for the reasons the Court stated on the record, by entering the Case Dismissal Order.  This is sanction enough.  The Motion should be denied.

A.     **The Debtor's Decision to File For Chapter 11 Was Based on the Debtor's Good Faith Belief that It Needed the Breathing Spell of Bankruptcy to Deal with the Substantial Litigation It Faced.**

68.     This Chapter 11 Case was filed for the express purpose of resolving the Consumer Borrowers' claims, limiting costs and preventing further delay.  The Consumer Borrowers and the Committee were faced with a choice when the Debtor filed for Chapter 11 in this Court.  They sought dismissal and chose to return to the District Court for the Eastern District of Virginia, *and* to the District of Oregon *and* to the District of Massachusetts, along with potentially other district courts if additional copycat litigation is filed, so that they can pursue the Debtor until nothing is

left to satisfy any judgment they may obtain against it. But they could have pursued their claims against the Debtor while it was subject to the close scrutiny of the Court, saved millions in legal bills by streamlining the claims for resolution, and obtained a timely resolution of their claims by the Court. Moreover, had the Court determined that the Consumer Borrowers' claims were valid, creditors, the vast majority of which would be the Consumer Borrowers, could have received distributions from the Debtor's estate pursuant to the strict requirements of section 1129 of the Bankruptcy Code and pursued claims for alleged improper transfers to the Debtor's members using chapter 5 causes of action in addition to state law causes of action, all at the expense of the Debtor's estate rather than at their own cost. This very procedural scenario demonstrates that the Debtor's intentions, and its filing of the Chapter 11 Case, were not in bad faith and were not solely an exercise in forum shopping.

69. It is true that the Indemnified Defendants, who are also the subject of the Consumer Borrower's claims, would have benefited from a streamlined process of deciding the Consumer Borrower's claims in this Court. However, that is always the case where a Debtor files for bankruptcy to address substantial litigation expenses against itself and those it is required to indemnify. Indeed, there is an ample body of case law cited in the Debtor's Stay Extension Motion, acknowledging that, in certain circumstances, and to reduce claims for indemnification, the cases should be stayed or transferred to the bankruptcy court for resolution. *See* A.P. 4008 Docket No. 2-1. That this relief was considered and pursued does not render the entire Chapter 11 Case a farce or filed in bad faith. Substantial benefits could have redounded to the Consumer Borrowers, and all creditors, had the relief been granted.

2. Moreover, there was recent precedent in this very Court for utilizing the tools of Chapter 11 to address substantial litigation faced by a special purpose entity. Debtor's counsel

had recently completed the successful resolution of disputes in the Total Diagnostix Labs, LLC matter. *See In re Total Diagnostix Labs, LLC*, No. 18-40938-elm11 (Bankr. N.D. Tex.). In that case, the debtors' only asset was a note receivable from an affiliate based on the sale of its assets to the affiliate six months earlier. Like Eventide, but to a lesser degree, three pending lawsuits were depleting time and resources. The debtor had no operations or employees. The bankruptcy allowed the successful resolution of the disputed lawsuits and then dismissal of that case. This Court allowed the case to be dismissed rather than converted. Based on this recent precedent, and the precedent from cases like *Dow Corning*, which the Court acknowledged was also filed to address substantial litigation, there was no reason to think Eventide would not be a proper candidate for bankruptcy in this Court, and certainly not a filing that would give rise to sanctions. In short, the Debtor's decision to file for bankruptcy, and counsel's recommendation that it did so, was not based on frivolous legal arguments with no basis under the law, but, rather, on precedent in this very Court and many others. The Motion should be denied.

      **B.**    **Counsel's Suggestion That the Consumer Borrowers' Claims Could Be Separately Classified Is Supported by Fifth Circuit Law and Is Not an Indicator of Bad Faith.**

      70.    The Committee argues that sanctions are appropriate because of counsel's suggestion that the Debtor could confirm a plan by separately classifying the Consumer Borrowers. *See* Motion at 2. The Consumer Borrowers had argued that the Debtor could not reorganize, particularly if the Consumer Borrowers voted *en bloc* to reject any plan of reorganization that the Debtor might propose. At the hearing on the Case Dismissal Motion, counsel for the Debtor refuted this argument by presenting a scenario in which a plan might be confirmed over the Consumer Borrowers' opposition. Counsel suggested that the Debtor could propose a plan that classified the Consumer Borrowers' claims separately from other unsecured claims, and that a

class of such other unsecured claims could vote to accept the plan. 5/28/20 Hr'g Tr. 30:7-14.[1] In counsel's hypothetical, of course, such an affirmative vote would provide the necessary impaired accepting class, opening the possibility of seeking "cramdown" confirmation. *See* 11 U.S.C. § 1129(a)(10), (b).

71.     Counsel was presenting one practical possibility by which the Debtor could reorganize without any cooperation by the Consumer Borrowers.  Counsel meant only to remind the Court that the implacable opposition of the Consumer Borrowers was not an absolute barrier to confirmation of a plan, and that a legitimate way forward existed by which the Debtor could successfully reorganize and leave chapter 11.  Counsel did not intend his suggestion as any sort of threat to propose a plan that would inflict unfair or improper treatment on the Consumer Borrowers.  In fact, counsel pointedly remarked that he was not giving up hope that the parties could still arrive at a consensual plan.  5/28/20 Hr'g Tr. 30:7-14.30:11-12 ("We're hopeful that the Consumer Borrowers will accept the treatment").  Moreover, such a threat would be pointless in any event: even if an impaired accepting class could be obtained for such a hypothetical plan, the Debtor would still bear the burden of proving that the plan satisfied the other confirmation prerequisites that protect creditors' rights, including the "best interests of creditors" test, *id*. § 1129(a)(7), and the requirement that the plan "does not discriminate unfairly, and is fair and equitable" with respect to each impaired rejecting class, 11 U.S.C. § 1129(b)(1).

---

[1] Counsel for the Committee had also previously acknowledged that separate classification of the Consumer Borrowers under a proposed plan could be appropriate.  *See* 3/5/20 Hr'g Tr. 60:8-16 ("[B]ut you also don't have to wait to file a plan. You could very easily separately classify the consumer borrower class action claims and otherwise they could take the position the case is solvent.  But for those claims, we have a solvent debtor.  So they put together a plan that says we've got 300,000 dollars of assets, we're going to pay it to Class 4, the general unsecured creditors, the trade; Class 5 is the consumer borrowers, and that gets decided post-confirmation, and it gets litigated.  It doesn't slow down their case whatsoever.").

72.     Nevertheless, in the Court's ruling dismissing this case, the Court characterized counsel's suggestion as "previewing the Debtor's intent to gerrymander a vote on a plan . . . ." 6/9/20 Hr'g Tr. 55:8-9.

73.     Counsel's suggestion that the Consumer Borrowers' claims could be separately classified from other general unsecured claims is fully consistent with precedent in the Fifth Circuit and elsewhere and is not indicative of bad faith either in the commencement of this Chapter 11 Case or in hypothetically proposing such a plan.  "[A] plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a) (emphasis added).  However, the Bankruptcy Code does not require that all "substantially similar" claims must be included in the same class.  *See Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture),* 995 F.2d 1274, 1279 (5th Cir. 1991); *In re Thru, Inc*., No. 17-31034, 2017 Bankr. LEXIS 1902, at *8 (Bankr. N.D. Tex. Jul. 10, 2017), *appeal dism'd in part as moot*, No. 3:17-CV-1958-G, 2018 U.S. Dist. LEXIS 179769 (N.D. Tex. Oct. 19, 2018), *aff'd*, 782 F. App'x 339 (5th Cir. 2019); *In re Couture Hotel Corp.,* 536 B.R. 712, 733 (Bankr. N.D. Tex. 2015). On the contrary, courts recognize that a plan proponent has and should have a large degree of flexibility in classifying claims and equity interests.  *See Couture Hotel,* 536 B.R. at 733; *In re McCommas LFG Processing Partners,* Case No. 07-32219-HDH-11), 2007 Bankr. LEXIS 4053 (Bankr. N.D. Tex. Nov. 29, 2007); *In re General Homes Corp.,* 134 B.R. 853, 863 (Bankr. S.D. Tex. 1991).

74.     Such flexibility in classifying claims, though broad, is not without limits. In the Fifth Circuit, separate classification of "substantially similar" claims will be upheld if the plan proponent shows that the classification was based on a reasonable justification and not to

gerrymander an impaired accepting class.[2] *Save Our Springs (SOS) Alliance v. WSI (II)-COS, L.L.C. (In re Save Our Springs (SOS) Alliance)*, 632 F.3d 168, 174 (5th Cir. 2011); *Heartland Fed. Sav. & Loan v. Briscoe Enters. (In re Briscoe Enters.)*, 994 F.2d 1160, 1167 (5th Cir. 1993); *Greystone*, 995 F.2d at 1279.

75.     It was fully consistent with these precedents for Debtor's counsel to suggest that a hypothetical plan could classify the Consumer Borrowers' claims separately from other non-priority unsecured claims.  The Consumer Borrowers' claims are unliquidated and disputed, and most if not all of the other non-priority unsecured claims are not.  Any plan would need to provide special handling of unliquidated and disputed claims, such as by establishing an alternative dispute resolution procedure for liquidating the claims and/or creating a reserve from which to make distributions on account of claims that are liquidated at different times.  This need to provide different treatment is a reasonable justification for separately classifying the claims. Several courts have specifically upheld a chapter 11 plan's separate classification of unliquidated litigation claims from other unsecured claims.  *See In re Simon*, No. 07-31414-KR, 2008 Bankr. LEXIS 2787, at *24 (Bankr. E.D. Va. July 29, 2008); *In re United States Mineral Prods. Co.*, No. 01-2471(JKF)*, 2005 Bankr. LEXIS 3259, at *61 (Bankr. D. Del. Nov. 29, 2005); *In re Dow Corning Co.*, 244 B.R. 634, 647 (Bankr. E.D. Mich. 1999); *In re General Teamsters, Warehousemen & Helpers Union Local 890*, 225 B.R. 719, 735 (Bankr. N.D. Cal. 1998); *In re Rochem, Ltd.*, 58 B.R. 641, 643 (Bankr. D.N.J. 1985).

76.     In summary, counsel's mention of one possible plan scenario was well within established law on classification of claims in a chapter 11 plan.  Of course, the plan discussion was

---

[2] Claims are "substantially similar" when they "share common priority and rights against the debtor's estate." *Greystone*, 995 F.2d at 1278 (unsecured deficiency claim under § 1111(b) "substantially similar" to unsecured trade claims).  Solely for the purpose of this discussion, the Debtor assumes that the Consumer Borrowers' claims are "substantially similar" to other non-priority unsecured claims against the Debtor as that term is used in § 1122(a).

brief, hypothetical, and concerned classification only. It was not counsel's purpose to present a full outline of plan terms: counsel sought only to rebut the contention that, without the Consumer Borrowers' consent, the Debtor had absolutely no chance of reorganizing. Counsel did not suggest that confirmation of such a plan would be easy or automatic—only that it was possible. In view of the governing Fifth Circuit authorities and instructive case law from other jurisdictions, counsel's scenario is more than amply supported and cannot reasonably be seen as indicative of bad faith. The Motion should be denied.

**C.    The Debtor's Actions Were Taken With the Knowledge and Consent of the CRO and the DIP Motion Was Proposed for a Proper Purpose.**

77.    The Committee further seeks sanctions based on the Court's finding that the Debtor was acting at the direction of Breakwater rather than at the direction of the CRO, based, it appears, on the Debtor's request for approval of the DIP Loan Agreement. *See* Motion at 2.

78.    Granting the Committee's request for sanctions on this basis would be an oversimplification of the dynamics of this Chapter 11 Case. The CRO's monthly fee statements demonstrate the CRO's extensive involvement in the case. Among other things, the CRO (1) approved the filing of the Chapter 11 case, (2) prepared the Debtor's Schedules and SOFAs and monthly operating reports, (3) reviewed and approved the retention applications of the Debtor's professionals, (4) opened and maintained the Debtor's bank account, (5) reviewed and approved the fee requests of estate professionals, (6) approved of the Debtor's filing the Motion to Shorten, (7) reviewed and approved of the filing of A.P. 4008, A.P. 4014, and A.P. 4030 and the related motions for relief therein after conferring with counsel for the Debtor on the strategy associated with those filings, and (8) attended and testified, where appropriate, in hearings in the Chapter 11 Case. *See* CRO Feb./Mar. Fee Statement; CRO Apr. Fee Statement; CRO May Fee Statement. The CRO was also advised of the Debtor's proposed responses to the Rule 2004 requests and the

substance of the production and was granted access to review the production on Relativity, along with all other books and records of the Debtor that were collected by counsel. *See* CRO May Fee Statement at p. 7; Loeb Interim Fee App. at p. 60.

79.     With respect to the DIP Motion itself, the CRO (1) agreed in the recommendation of counsel that the Debtor needed to seek financing, (2) drafted and revised the budget for the financing, (3) executed non-disclosure agreements with potential lenders, (3) engaged in negotiations with certain potential third-party lenders, (4) conferred with counsel regarding the terms being offered by Bluetech, (5) reviewed and approved of the DIP Motion and the DIP Loan Agreement, and (6) reviewed and approved of the Amended DIP Loan Agreement. *See* CRO Apr. Fee Statement; CRO May Fee Statement.

80.     For these services by the CRO, and other services not fully listed here, the Debtor incurred fees of over $125,000.00.  Accordingly, while it is true that the CRO granted counsel for the Debtor wide latitude to propose and pursue legal strategies and that counsel did so also in consultation with the Debtor's President, Matt Martorello, a blanket finding that the Debtor's actions were taken without the consultation and final approval of the CRO is inaccurate.  In fact, had the CRO micromanaged the processes, the Debtor would have likely had to contend with arguments regarding duplication of effort and excessive fees.  Counsel for the Debtor and CRO sought a balance that is reflected in the CRO's monthly fee statements and in counsel's interim fee applications and which was the proper exercise of the CRO's business judgment.

81.     Separately, with respect to the DIP Motion itself, the Debtor submits that its request for approval of the DIP Motion was for a proper purpose, even if the terms proposed were admittedly onerous.  The Debtor was unable to obtain relief against the Tribal Entities in A.P. 4014 and, accordingly, did not receive anticipated payments under the Waterfall after the Petition Date.

As a result, the Committee had asserted that the Debtor was administratively insolvent on a cash basis, notwithstanding the substantial value attributable to the Debtor's entitlement to payments on the Promissory Note. Accordingly, to allay these concerns, the Debtor, with the approval and active assistance of the CRO, sought post-petition financing. Both counsel for the Debtor and CRO reached out to their contacts in an attempt to obtain the necessary financing. When the only potential lender that expressed an interest in providing a loan to the Debtor included a success fee of 30% of any award obtained in the Arbitration in its initial term sheet, the CRO agreed that the Debtor should approach Bluetech regarding a potential loan. Negotiations with the potential third-party lender continued alongside negotiations with Bluetech on a potential loan. Ultimately, Bluetech proposed terms that were substantially better than those proposed by the third-party lender, and so the Debtor, through the CRO, exercised its judgment to seek approval of financing from Bluetech.

82. In granting the Case Dismissal Motion, the Court expressed dismay that the CRO did not negotiate directly with Bluetech regarding the terms of the proposed DIP Loan Agreement. However, negotiations of the terms occurred between counsel for the Debtor and counsel for Bluetech. This division of labor is not uncommon and is not impermissible.

83. The Court was also troubled by Bluetech's refusal in the DIP Loan Agreement to submit to the jurisdiction of the Court. Counsel for the Debtor agrees that such a term is unconventional, but believed, in good faith, that the risk relating to the term in the DIP Loan Agreement was minimal. First, the only likely claim of the Debtor against Bluetech under the DIP Loan Agreement would have been for a failure to fund. Since the financing was expected to be provided in two tranches, the first after the interim hearing on the DIP Motion and the second after the final hearing on the DIP Motion, counsel viewed the risk of failing to fund to be low. Second,

to the extent the Debtor defaulted in repayment of the financing and Bluetech proceeded to exercise its rights of default, Bluetech would have necessarily needed to seek relief from a court in the United States and thereby submit itself to the jurisdiction of that United States court. Given this practical procedural posture, Bluetech's refusal to provide the funding absent the provision, and the lack of other sources of funding for the Debtor on less onerous terms, counsel recommended that the CRO approve the Debtor's entry into DIP Loan Agreement. It became apparent at the CRO's Rule 2004 examination and the hearing on the DIP Motion that the CRO did not fully appreciate the potential jurisdictional risks associated with accepting financing from Bluetech, but that does not necessarily lead to the conclusion that the DIP Motion was not filed in good faith, let alone that it was filed in bad faith. Accordingly, because the CRO did take an appropriate role in the Chapter 11 Case, including with respect to the Debtor's DIP Motion, the Motion should be denied.

> **D.    The Fees Charged By the Debtor's Professionals, Many of Which Remain Unpaid, Were Incurred to Advance Claims the Debtor Believed Were Valid.**

84.     The Committee further seeks sanctions on the grounds that the fees charged by the Debtor's professionals were nearly $800,000, were incurred in adversary proceedings that the Court viewed as duplicative of the arbitration, and as netting zero beneficial results for the estate. *See* Motion at ¶ 3. This finding is also not a basis for imposing sanctions on the Debtor or its counsel.

85.     While it is true that the Debtor incurred fees in connection with A.P. 4008 and A.P. 4014 against the Tribal Entities, those adversary proceedings advanced legal theories and causes of action under the Bankruptcy Code that are unavailable in the Arbitration. While the Court ultimately held that section 106 of the Bankruptcy Code does not abrogate the sovereign immunity of Native American tribes, it acknowledged that it was a "very difficult decision". 4/6/20 Hr'g Tr.

36:2. Indeed, there is a circuit split on the very issue with no guiding case law from the Fifth Circuit and, at the time the adversary proceedings were filed, a petition for certiorari to the United States Supreme Court was pending. *Compare Krystal Energy Co. v. Navajo Nation*, 357 F.3d 1055 (9th Cir. 2004), *with In re Greektown Holdings, LLC*, 917 F.3d 451 (6th Cir. 2019). Accordingly, while the Debtor was not ultimately successful in A.P. 4008 and A.P. 4014, the legal theories it advanced were not frivolous or sanctionable. Instead, those adversary proceedings were filed in a good faith attempt to require the Tribal Entities to make post-Petition Date payments under the Waterfall and to maintain the status quo while the Arbitration was pending. Awarding sanctions, and requiring the payment of attorneys' fees as the Committee seeks in the Motion, every time the relief requested by a party is denied would distort the American Rule and discourage zealous advocacy by attorneys on behalf of their clients for fear of reprimand.

86. In addition, under the Interim Compensation Order, the Committee received and had the opportunity to review the invoices of the Debtor's professionals on a monthly basis. It did not, at any point, assert that the nature and amount of the fees charged by counsel for the Debtor was inappropriate. While the Interim Compensation Order certainly preserved the Committee's right to later object to counsel's fees, it is an entirely different matter for the Committee to seek disgorgement of the fees that counsel was paid in advocating for the Debtor based on unsettled areas of the law. For this reason, and for all of the foregoing reasons, the Motion should be denied.

## CONCLUSION

WHEREFORE, the Debtor requests that, to the extent the Court determines that it has jurisdiction over the Motion, the Court sustain this Objection, deny the Motion and grant such other and further relief as is just and appropriate.

Dated: July 6, 2020

**LOEB & LOEB LLP**

*/s/ Bernard R. Given II*
Bernard R. Given II
State Bar No. 07990180
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA 90067-4120
Tel.: 310-282-2000
Fax: 310-282-2200
Email: bgiven@loeb.com

-and-

**FORSHEY & PROSTOK, LLP**
Jeff P. Prostok
State Bar No. 16352500
Lynda Lankford
State Bar No. 11935020
777 Main Street, Suite 1290
Fort Worth, TX 76012
Tel: 817-877-8855
Fax: 817-877-4151
Email: jprostok@forsheyprostok.com
        llankford@forsheyprostok.com

*Counsel to the Debtor and Debtor in Possession*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was served upon all parties receiving electronic notice via the Court's CM/ECF system on July 6, 2020.  I hereby further certify that a true and correct copy of the foregoing document was served via U.S. mail to the parties listed below on July 6, 2020.

**U.S. TRUSTEE:**

**Erin Marie Schmidt**
United States Trustee
1100 Commerce St., Room 976
Dallas, TX 75242-1496
(214) 767-1075
Fax : (214) 767-8971
Email: ustpregion06.da.ecf@usdoj.gov

**Elizabeth Ziegler Young**
U.S. Trustee Office
1100 Commerce Street, Room 976
Dallas, TX 75242
(214) 767-8967
Fax : (214) 767-8971
Email: elizabeth.a.young@usdoj.gov

**COMMITTEE**:

**Gary H. Leibowitz**
Cole Schotz P.C.
300 E. Lomard Street, Suite 1450
Baltimore, MD 21202
(410) 528-2971
Fax : (410) 528-9401
Email: gleibowitz@coleschotz.com

**Irving E. Walker**
Cole Schotz P.C.
300 East Lombard St., Ste. 1450
Baltimore, MD 21202
410-230-0660
Fax : 410-230-0667
Email: iwalker@coleschotz.com

**Michael D. Warner**
Cole Schotz P.C.
1700 City Center Tower II

301 Commerce St.
Fort Worth, TX 76102
(817)810-5250
Fax : (817)810-5255
Email: mwarner@coleschotz.com

**REQUEST FOR SPECIAL NOTICE**:

**Robin Phelan**
PhelanLaw
4214 Woodfin Dr.
Dallas, TX 75220
Email: robin@phelanlaw.org

**Kristi C. Kelly**
Kelly Guzzo, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Fax: (703) 591-0167
Email: kkelly@kellyguzzo.com

**Steve A. Pierce**
Norton Rose Fullbright US LLP
111 West Houston Street, Suite 1800
San Antonio, TX 78205
Fax: (210) 270-7205
Email: steve.pierce@nortonrosefullbright.com

**Toby L. Gerber**
Norton Rose Fullbright US LLP
2200 Ross Avenue, Suite 3600
Dallas, TX 75201
Fax: (214) 855-8000
Email: toby.gerber@nortonrosefullbright.com

**Justin Gray**
**Anna M. Bruty**
Rosette, LLP
44 Grandville Ave. SW
Grand Rapids, MI 49503
Email: jgray@rosettelaw.com
        abruty@rosettelaw.com

**Marcus Alan Helt, Esq**.
FOLEY & LARDNER LLP
2021 McKinney Avenue
Suite 1600 Dallas, TX 75201
Fax: 214-999-4667
Email: mhelt@foley.com

**Michael A. Caddell**
**Amy E. Tabor**
Caddell & Chapman
628 East 9th Street
Houston TX 77007-1722
Fax: 713-751-0906
Email: mac@caddellchapman.com
        aet@caddellchapman.com

**J. Brian Vanderwoude**
Dorsey & Whitney LLP
300 Crescent Court, Suite 400
Dallas, Texas 75201
Fax: (214) 981-9901
Email: vanderwoude.brian@dorsey.com

By:  /s/ Bernard R. Given
     Bernard R. Given II